

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
McALLEN DIVISION

United States District Court
Southern District of Texas
FILED

MLC   JUN 1 6 2004

Michael N. Milby, Clerk

| | | |
|---|---|---|
| ARTURO DIAZ, | § | |
| | § | |
| Petitioner, | § | |
| | § | |
| v. | § | No. M-03-MC-055 |
| | § | |
| DOUG DRETKE, Director, | § | **M-04-225** |
| Texas Department of Criminal Justice, | § | |
| Correctional Institutions Division, | § | |
| | § | |
| Respondent. | § | |

## PETITION FOR WRIT OF HABEAS CORPUS

Petitioner Arturo Diaz was convicted of capital murder, for murder committed during

the commission of a robbery, and sentenced to death in state court. He comes before this

Court seeking habeas corpus relief under 28 U.S.C. § 2254. Mr. Diaz's conviction and

sentence are constitutionally infirm and must be reversed because the representation provided

by his court-appointed trial counsel fell below the minimum standards required by the Sixth

Amendment. First, counsel failed to give any meaningful advice to Mr. Diaz regarding

whether to accept the State's plea offer of life imprisonment in exchange for a guilty plea.

Instead, they allowed him to make a uninformed plea of not guilty and contested the State's

substantial case on guilt-innocence solely by challenging the robbery element of the offense

– a wholly misguided approach that was doomed from the start, as discussed at length below.

Counsel's almost total failure to consult with their client on what was literally a life-or-death

decision denied Mr. Diaz his constitutional right to effective assistance of counsel at the

guilt-innocence phase of trial.

Second, Mr. Diaz's trial attorneys essentially did nothing on his behalf at the punishment phase, as they failed to conduct any meaningful investigation into potential mitigation witnesses. Even minimal effort on their part would have revealed numerous family members who were available to testify about the tragic circumstances of Mr. Diaz's impoverished, fatherless childhood and the criminal family members who were his male role models throughout his formative years. Instead, trial counsel presented only one witness, an obviously ill-prepared psychologist whose testimony was extremely prejudicial to the defense. Finally, counsel's closing argument on punishment was devoted almost entirely to "residual doubt" – a rehash of the same arguments made at guilt-innocence that the jury already had rejected beyond a reasonable doubt. Trial counsel's complete abdication of their constitutional duty to investigate and present mitigating evidence denied Mr. Diaz a fair punishment phase hearing.

The fairness of the punishment proceedings was further undermined by the trial court's admission of constitutionally inadmissible evidence of Mr. Diaz's membership in a gang. This evidence was not offered in response to any evidence proffered by the defense and was not accompanied by any proof of the alleged gang's beliefs, practices, or propensity for violence. Because this evidence was irrelevant to the special issues submitted to the jury at punishment, its admission infringed on Mr. Diaz's First Amendment right of association and denied him a fair sentencing proceeding.

In addition, the prosecutor infringed on Mr. Diaz's right to remain silent at the punishment phase when he elicited testimony from Dr. Pinkerman that Mr. Diaz had refused to discuss the facts of the offense with him on the advice of his attorneys. This error, combined with trial counsel's ineffectiveness and the erroneous admission of gang membership evidence, also undermined the fundamental fairness of the sentencing proceedings.

## STATEMENT OF THE CASE

### I.    State Court Proceedings

On February 11, 2000, a jury found Mr. Diaz guilty of capital murder in cause number CR-1464-99-G in the 370th District Court of Hidalgo County. On February 16, 2000, following a separate punishment hearing, the jury answered the statutory special issues submitted to it, following which the trial court sentenced Mr. Diaz to death. Mr. Diaz appealed, and on September 18, 2002, the Texas Court of Criminal Appeals affirmed. *Diaz v. State,* No. 73821, opinion attached hereto as Exhibit A. On June 18, 2003, the Court of Criminal Appeals denied Mr. Diaz's state habeas corpus petition. *Ex parte Diaz,* No. 55,850-01.

### II.   Federal Court Proceedings

On July 15, 2003, Mr. Diaz's state habeas counsel filed a motion for appointment of counsel in this Court. Therein, he represented that Mr. Diaz "now wishes to pursue his federal remedies and seek appointment of qualified counsel to pursue and represent him in

federal court." State writ counsel advised the Court that he was "not available for appointment" because he was not licensed to appear in federal court and was "not competent to prepare and handle federal writs." Motion at 1. On December 12, 2003, the Court appointed the undersigned counsel to represent Mr. Diaz.

### III.    Statute of Limitations

Under the The Antiterrorism and Death Penalty Act ("AEDPA"), 28 U.S.C. § 2254,

(d)(1) A 1-year period of limitation shall apply to an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court. The limitation period shall run from the latest of--

(A) the date on which the judgment became final by the conclusion of direct review or the expiration of the time for seeking such review;

(B) the date on which the impediment to filing an application created by State action in violation of the Constitution or laws of the United States is removed, if the applicant was prevented from filing by such State action;

(C) the date on which the constitutional right asserted was initially recognized by the Supreme Court, if the right has been newly recognized by the Supreme Court and made retroactively applicable to cases on collateral review; or

(D) the date on which the factual predicate of the claim or claims presented could have been discovered through the exercise of due diligence.

(2) The time during which a properly filed application for State post-conviction or other collateral review with respect to the pertinent judgment or claim is pending shall not be counted toward any period of limitation under this subsection.

28 U.S.C. § 2244 (West Supp. 2003).

Here, Mr. Diaz's state habeas petition was filed on January 14, 2002, and his conviction was affirmed on September 18, 2002. Because the habeas petition was filed while his appeal was pending, the one-year limitations period did not begin to run until the Court of Criminal Appeals denied habeas relief on June 18, 2003. *See Brewer v. Johnson,* 139 F.3d 491, 492 (5th Cir. 1998) ("a properly filed application for state . . . collateral review . . . is not counted toward the limitations period"). Thus, Mr. Diaz's federal filing deadline is June 18, 2004.

Mr. Diaz's current counsel have not been afforded the full year-long statutory period to prepare his federal petition because almost six months had elapsed before they were appointed. Accordingly, the undersigned conferred with counsel for Respondent, who agreed that if Mr. Diaz timely filed his petition by June 18th, Respondent would not oppose the filing of an amended petition by December 12, 2004 – one year from the date that federal habeas counsel were appointed. *See* letter confirming agreement attached hereto as Exhibit B. The instant petition is timely filed, and Mr. Diaz intends to file an amended petition by December 12th.

## STATEMENT OF THE FACTS

Mr. Diaz was convicted of capital murder for having killed Michael Ryan Nichols in the course of committing or attempting to commit robbery of Mr. Nichols on April 3, 1999.[1] The facts are set out in the opinion of the Court of Criminal Appeals. *See* Exhibit A at 2-8.

---

[1] In addition, in the same trial Mr. Diaz was convicted of attempted capital murder of John Shepherd and of aggravated robbery of Mr. Shepherd.

The evidence adduced by the State showed that Mr. Diaz and one Jose Luis Cordova were present at Mr. Nichols's apartment when he was killed. John Shepherd, Mr. Nichols's roommate, was stabbed but survived. He identified Mr. Diaz as the killer. A tennis-shoe print found in the apartment parking lot matched Mr. Diaz's shoe, and a beer bottle with Mr. Diaz's DNA on it was found in the apartment. Mr. Diaz and Mr. Cordova spent the night at the home of one Manuel Montes, and the next day a trash bag of clothing stained with Mr. Cordova's and Mr. Nichols's blood was discovered there. In addition, Mr. Montes testified that he heard Mr. Diaz describing how he and Mr. Cordova had committed a murder. The defense did not present any evidence at the the guilt-innocence phase of trial.

### A.      The plea offer

At a pretrial hearing held on Thursday, October 28, 1999, the State offered Mr. Diaz and Mr. Cordova a plea bargain of a life sentence for capital murder and  a 40-year sentence for an unrelated murder in exchange for pleas of guilty. 6 RR 2-7. The prosecutor stated that "the offer exists only until Monday.  Once they tell us no, there is no back-peddling [sic] after that, there is no nothing.  We're going to proceed forward in seeking the death penalty." 6 RR 6. Defense counsel asked for time to discuss the offer with their client, and the court advised the defendants that they had until the following Monday, November 1st, to accept the offer. 6 RR 10-11. In response to an inquiry from Mr. Cordova's counsel, the court stated that it would allow the defendants and their attorneys to remain in the courtroom to discuss the offer. 6 RR 10.

6

On November 1, 1999, the parties again appeared in court, and defense counsel stated that Mr. Diaz had rejected the plea offer. 7 RR 1. The trial court then had Mr. Diaz sworn as a witness, and he responded affirmatively to the court's question "whether or not you are going to proceed with a jury and proceed with selecting the jury with the intention of the District Attorney's Office seeking the death penalty against you?" 7 RR 2. Mr. Cordova also rejected the offer. 7 RR 8-10. The State then withdrew the plea offer as "[t]o either of the defendants." 7 RR 21.[2]

Subsequently, on January 26, 2000, a week before commencement of the guilt-innocence phase of trial, the trial court *sua sponte* called Mr. Diaz to the stand to question him regarding "any plea bargains that may have been offered." The trial judge stated that he was doing so "just simply to make sure that you understood everything that was going on." 25 RR 11. Mr. Diaz testified that the decision to go to trial was his and was made after discussing his options with his attorneys. 25 RR 12-13. The trial court did not ask, and Mr. Diaz did not testify, about the nature and extent of those discussions, nor did the court admonish Mr. Diaz or question him in any detail to ensure that his plea of not guilty was knowing and voluntary.

Had the court inquired further, it would have learned that trial counsel failed to discuss the plea offer in any depth with their client and failed to advise him of the likely consequences of the two options available to him. *See* Affidavit of Arturo Diaz, attached

---

[2] Apparently, the State later re-extended the offer to Mr. Cordova, as he did not go to trial and instead pled guilty to capital murder in exchange for a life sentence.

hereto as Exhibit C.  Mr. Diaz avers that his attorneys spent only about fifteen minutes

discussing the offer with him in the courtroom immediately after the hearing at which the

State extended the offer.  Mr. Diaz's trial counsel

> told me that if I pled not guilty and went to trial, the State was sure to get a
> murder conviction, but that I might be acquitted of capital murder if we could
> show that the murder did not take place during a robbery.  They did not tell me
> what sentence I would get if I were convicted of murder or when I would be
> eligible for parole.  They made it sound like we had a 50-50 chance of winning
> on the capital murder charge if we went to trial.  My attorneys did not advise
> me whether to accept the offer and told me that it was up to me."

Exhibit C at 1.  In addition, "[m]y attorneys never told me that if I were convicted of murder,

I could receive a life sentence and would not be eligible for parole for thirty years.  If I had

known that, I would have accepted the State's offer of a life sentence."  Exhibit C at 2.

### B.    The defense's theory of the case

The defense's opening statement to the jury occupies less than two pages of the

record.  27 RR 35-37.  Their theory of the case consists of three sentences:  "I want to make

one thing clear to you, that the evidence is going to show that Arturo Diaz is not guilty of

capital murder.  And what evidence am I talking about?  Conflicting testimony and no

evidence of a robbery."  27 RR 36-37.

The defense called no witnesses at the guilt-innocence phase of trial, and defense

counsel's closing argument was an incoherent mishmash that hinted at various defensive

theories, many of them inconsistent, and none of which had any support in the evidence.  35

RR 59-76.  The sum and substance of the "no robbery" defense was that there were

8

inconsistencies among the State's exhibits depicting the crime scene (a sketch, a videotape, and photographs) as to whether the victim's wallet was on the table, and if so, whether a credit card was on top of it. These inconsistencies, Mr. Diaz's counsel argued, proved that the wallet had been moved during the investigation, and that the wallet had been moved somehow proved that Mr. Nichols was not robbed. 35 RR 61-64.

The utter futility of the "no robbery" defense is apparent. On appeal, the Court of Criminal Appeals rejected Mr. Diaz's claim of evidentiary insufficiency, based on a lack of proof that Mr. Nichols was robbed, with the following reasoning:

> [Mr. Diaz] omits the wounded Nichols's statement, "Do what he says, get the money and they'll leave." This was strong evidence that [Mr. Diaz] was in the course of committing or attempting to commit robbery of Nichols.
> . . .
>
> There is other evidence of this element of the offense. A reasonable juror could infer that Nichols's $50 bill being missing was evidence that the robbery of him was completed.
>
> [Mr. Diaz's] action of robbing Shepherd (which could have been, but was not, alleged as the element that elevated the murder to capital murder) is a circumstance tending to show that [Mr. Diaz] was engaged in robbing the residents of the apartment. That he was not seen to steal anything from Nichols after he stole from Shepherd implies that he had robbed Nichols before he robbed Shepherd.
>
> The private meeting between the appellant and Arcy Reyes, which was followed by her telephone call and appearance at Nichols's apartment, suggests that a plan had been devised earlier in the evening.
>
> There was ample evidence to support the verdict that [Mr. Diaz] murdered Nichols in the course of robbing or attempting to rob him.

*Diaz v. State,* slip opinion at 9-10.

Moreover, Mr. Diaz's defensive theory was not presented to the jury in any coherent fashion, as it was intertwined with various other unfounded suggestions, including a challenge to the State's evidence placing Mr. Diaz at the crime scene, 35 RR 65-66, and the assertion that Mr. Shepherd had killed Mr. Nichols because they were involved in a homosexual relationship and Mr. Shepherd was jealous of Mr. Nichols's other suitors. 35 RR 74.

The jury could not have been impressed. Defense counsel's argument that Mr. Diaz was not at the scene was both inconsistent with the "no robbery" theory and contradicted by a wealth of evidence, discussed *supra* at 5. Likewise, the suggestion of a homosexual passion attack had no evidentiary support whatsoever and was based solely on Detective Ramirez's initial suspicion, quickly abandoned, that Mr. Nichols might have been the victim of such an attack. 33 RR 187, 198-99, 210-11. The jury took less than four hours, including a lunch break, to find Mr. Diaz guilty of capital murder. 35 RR 96.

## C.   The punishment phase of trial

At the commencement of the punishment phase of trial, a hearing was held outside the jury's presence regarding the State's intention to introduce evidence of extraneous offenses. 37 RR 1 *et seq.* The defense objected to the admission of any evidence that Mr. Diaz belonged to a gang. 36 RR 7. Defense counsel also advised the court that Mr. Diaz's grandmother was present in the courtroom and asked that she be excused from the Rule because she was not going to testify, a request that the court granted. 36 RR 26-27.

10

Thereafter, the State introduced evidence before the jury that Mr. Diaz belonged to a gang called the Pistoleros. Rolando Badillo, a shift supervisor at the Hidalgo County jail, testified that Mr. Diaz was housed in the Echo Two area of the jail and that there were seven or eight inmates in that area who were placed there "because of their charges, because of their gang affiliation." 36 RR 144. Defense counsel objected to evidence of gang affiliation, but the court overruled the objection. 36 RR 144-45. Mr. Badillo then testified that the Echo Two area was used to house members of the Pistoleros gang, that they got along, and that "[w]e have had no problems." 36 RR 146. Two other witnesses, shift supervisor Robert Lopez and Lieutenant Danny Perez, also testified that members of the Pistoleros were housed in Echo Two. 36 RR 154, 165.

The State introduced evidence of several extraneous offenses – another murder committed ten days before the primary offense, and several offenses that occurred while Mr. Diaz was incarcerated in the Hidalgo County jail awaiting trial. These latter offenses included an escape attempt, two assaults, and participation in a prisoner uprising at the jail. 36 RR 151-66, 170-79, 197-202.

The defense presented only one witness, a psychologist, Dr. John Pinkerman. 37 RR 123 *et seq.* Prior to trial, the court had granted Mr. Diaz's request for appointment of a psychiatrist or psychologist and appointed Dr. Pinkerman "to examine and assist the Defendant . . . . " CR 218. The order provided that Dr. Pinkerman "deliver in a sealed envelope any and all reports generated from his evaluation and examination of [Mr. Diaz]

11

only to his attorney, Daniel R. Reyes." CR 219.

From the outset of Dr. Pinkerman's testimony, defense counsel's unpreparedness was apparent. After the witness had testified that he was employed as "a private psychologist," 37 RR 124, the following ensued:

> MR. REYES: Your Honor, at this time, we tender Doctor John Pinkerman as an expert in the field of psychiatry and psychology of psychiatry and psychology [sic].
>
> MR. THOMPSON: I believe that the area was in psychology.
>
> Q. BY MR. REYES: Have you testified in psychiatry?
>
> A. No, sir.

37 RR 128.

Things went downhill from there. Dr. Pinkerman testified that he had conducted a two-part evaluation of Mr. Diaz that took approximately seven hours. 37 RR 129-30. In response to a question about whether Mr. Diaz had sustained trauma, Dr. Pinkerman testified that Mr. Diaz "had been knocked out a couple of times in fights, and also was in an automobile accident in which he suffered a head injury." 37 RR 131. Defense counsel then tried–and failed miserably–to establish that Mr. Diaz suffered lingering effects of that trauma:

> Q.    Okay. And were you able to determine whether or not he suffered any bouts of unconsciousness or fainting because of that trauma to the head?
>
> A.    *He denied having any episode of fainting or passing out.*

12

Q.     Okay.  Did you prepare a report with respect to your evaluations of Mr. Diaz?

A.     I did.

Q.     Okay.  If you are to refer to that report, would that assist you?

A.     Yes, it would.

Q.     Okay.  Can you look at Page 3 of your report, the first paragraph.

A.     Okay.

Q.     Were you able to determine when he had any bouts of unconsciousness or suffering from unconsciousness or fainting that he had had trauma?

A.     *He denied to me that he had any difficulties with faintings or periods of unconsciousness.*

[Defense counsel approaches witness.]


Q.     BY MR. REYES:  Did you review Page 3 of your report, doctor, the first paragraph, the first couple of lines.  If you can read that to yourself.

A.     (Complies.)

Q.     Based on your evaluation to [sic] Mr. Diaz, were you able to determine that because of the trauma to the head he suffered periods of unconsciousness and fainting; isn't that correct?

A.     What I state is, he was assessed regarding his past history of head trauma, periods of unconsciousness or fainting.  *He didn't ever spontaneously [sic] fainting or passing out.*  He acknowledged that he had been knocked out a couple of times briefly as a result of fights.

Q.     If an individual suffers from trauma to the head, would that be consistent with having periods of unconsciousness or fainting in your experience?

13

A.      Would you repeat that question, please.

A.      If a person suffers trauma to the head, whether it be from a prior accident or maybe --

[Objection overruled.]

Q.      BY MR. REYES:  – would that in your experience lead a person who had periods of unconsciousness or fainting?

A.      *Not necessarily.*

37 RR 131-33 (emphasis added).

Dr. Pinkerman testified that Mr. Diaz's IQ was 89 and that sub-average cognitive abilities "can be associated with an increased risk for behavioral patterns . . . ." 37 RR 136. His tests revealed that Mr. Diaz suffered from cognitive disabilities in some areas, but not others. 37 RR 137. Dr. Pinkerman testified that Mr. Diaz may have suffered "cognitive impairment that could stem from prolonged alcohol or substance abuse . . . ." 37 RR 138. When counsel asked about the origins of antisocial behavior, Dr. Pinkerman responded that Mr. Diaz had "identified that he had begun an early history in childhood between the ages of 5 and 10 of behavior that we have come to learn has a high probability of turning toward delinquency and adult criminal behavior." 37 RR 139. Counsel concluded his direct examination by questioning Dr. Pinkerman regarding Mr. Diaz's drawing of a person as part of his evaluation. 37 RR 140-41.

When the prosecutor attempted to use Dr. Pinkerman's report to cross-examine him, the defense objected because the report was not in evidence. 37 RR 143. Then, when the

14

prosecutor sought to have Dr. Pinkerman's report admitted in evidence, the defense objected

that it was not the best evidence. 37 RR 144-45. After a hearing outside the jury's presence,

the trial court overruled the defense's objections and admitted the report. 37 RR 150.

Thereafter, the report in hand, the prosecutor quickly turned Dr. Pinkerman into the

State's star witness, eliciting testimony that Mr. Diaz "approached the assessment in

somewhat of an exaggerated manner which may reflect an inability to cooperate with the

testing or malingering in an attempt to present himself with the false claim of mental illness,"

37 RR 152; that Mr. Diaz denied ever having been in an automobile accident in which he

suffered a head injury, 37 RR 153; and that Mr. Diaz had refused to discuss the facts of the

offense based on his attorneys's advice. 37 RR 155. The defense did not attempt a redirect

examination of Dr. Pinkerman, and thus the last testimony the jury heard before retiring to

deliberate on punishment was the conclusion of the prosecutor's cross-examination of the

defendant's expert witness.

> Q.   You said that Mr. Diaz, the defendant's profile matches those of type C offenders; is that correct?
>
> A.   Yes, sir.
>
> Q.   And you describe those as the most difficult criminal offenders?
>
> A.   Yes, sir.
>
> Q.   Distrustful, cold, irresponsible, and unstable; is that right?
>
> A.   What I wrote was, they are viewed as distrustful, cold, irresponsible, and unstable.

15

37 RR 156.

Defense counsel's closing argument on punishment was every bit as inept as their presentation of Dr. Pinkerman's testimony. Incredibly, the vast majority of it was devoted to rehashing the unfounded–and, obviously, already rejected–arguments put forth at guilt-innocence – that the State failed to prove a robbery, 38 RR 39-45; that Mr. Shepherd murdered Mr. Nichols out of homosexual jealousy, 38 RR 46-47; and that the presence of defensive wounds on Mr. Nichols's arms cast doubt on Mr. Shepherd's testimony that Mr. Nichols was tied up when he was killed. 38 RR 47-48. Defense counsel also attempted to discredit the probative value of the extraneous-offense evidence offered by the State, 38 RR 48-51, and argued that Mr. Diaz's prison record during a previous incarceration showed that he would not be a future danger if given a life sentence. 38 RR 51-52.

Finally, counsel argued briefly, almost in passing, that mitigating evidence existed that warranted sparing Mr. Diaz's life. The totality of defense counsel's argument on this point takes up two pages of the record. He citing as mitigating that Mr. Diaz (1) was married with a five-year-old daughter and that he grew up with his grandmother; (2) had learning disabilities, and (3) had strong feelings of guilt and depression and felt that he deserved to suffer. 38 RR 52-54. Trial counsel did not argue that the circumstances of Mr. Diaz's background and upbringing mitigated against a death sentence – nor could he have, as no evidence was introduced that might have supported such an argument. Illustrative of counsel's comments are the following:

16

What you are going to know by reviewing those exhibits is that the doctor determined [sic] his evaluation of Arturo, that he had learning disabilities, impairments, and said whatever you want to. Okay. And you and I know that we don't get that ourselves. We don't get that way ourselves. It is – it comes from the parents. Our genes are determined from our parents. If I am a slow learner, it is not our [sic] fault. We told you that the problem that individuals have, start from their childhood.

\*       \*       \*       \*       \*

MR. REYES: In answering Special Issue No. 3, the answer to that question has to be yes. That's the only possible answer you can come back with when you answer Special Issue No. 3. There is a sufficient mitigating circumstance. There are reasons why Arturo Diaz should get a life sentence and not the death penalty. There is [sic] plenty of them.

38 RR 52, 54.

Defense counsel's arguments about mitigating evidence were wholly unpersuasive as well as abbreviated. In the prosecutor's final argument, he reminded the jury that "[w]e have lots of people that are raised by grandmothers. There are people who aren't as lucky who have foster parents. But we don't call that an excuse for capital murder. We don't call that a mitigating circumstance." 38 RR 63. Further, defense counsel's assertion that Mr. Diaz's cognitive disabilities were of genetic origin was not supported by the record, as Dr. Pinkerman in fact testified that Mr. Diaz "may experience cognitive impairment that could stem from prolonged alcohol or substance abuse . . . ." 37 RR 138. Finally, as to Mr. Diaz's feelings of guilt, counsel cited to Dr. Pinkerman's report, 38 RR 52-53, which he previously had attempted to have excluded. 37 RR 144-45.

17

## PETITIONER'S GROUNDS FOR RELIEF

Mr. Diaz raises the following claims for relief:

1.   Trial counsel rendered ineffective assistance with regard to the guilt-innocence phase of trial by failing to adequately investigate the State's case and fully discuss it with Mr. Diaz to ensure that his plea of not guilty was knowing and voluntary.

2.   Trial counsel rendered ineffective assistance at the punishment phase of trial by (1) failing to adequately investigate and present readily available mitigating evidence, (2) failing to prepare for the only witness offered by the defense, a psychologist whose testimony was devastating to Mr. Diaz, and (3) devoting almost their entire closing argument to repeating the defensive theory that the jury had rejected beyond a reasonable doubt at the the guilt-innocence phase of trial.

3.   The trial court denied Mr. Diaz a fair punishment hearing by admitting evidence that he was a member of a gang.

4.   The prosecutor infringed on Mr. Diaz's right to remain silent by eliciting testimony from his expert witness that he had refused to discuss the facts of the offense.

## ARGUMENT AND AUTHORITIES

### I.    Standard of Review

Under the AEDPA, a state prisoner is entitled to relief with respect to any claim that was adjudicated on the merits in State court proceedings when the adjudication

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

The Supreme Court has "made clear that the 'unreasonable application' prong of § 2254(d)(1) permits a federal habeas court to 'grant the writ if the state court identifies the correct governing legal principle from this Court's decisions but unreasonably applies that principle to the facts' to the facts of petitioner's case.'" *Wiggins v. Smith,* 123 S. Ct. 2527, 2534-35 (2003) (quoting *Williams v. Taylor,* 529 U.S. 362, 413 (2000)). "In other words, a federal court may grant relief when a state court has misapplied a 'governing legal principle' to 'a set of facts different from those of the case in which the principle was announced.'" *Wiggins,* 123 S. Ct. at 2535 (quoting *Lockyer v. Andrade,* 123 S. Ct. 1166, 1175 (2003)).

## II.     Trial Counsel Failed To Adequately Advise Mr. Diaz Regarding the Plea Offer.

Under the familiar two-prong test of *Strickland v. Washington*, 466 U.S. 668 (1984), a habeas corpus petitioner makes out a claim that trial counsel's representation was constitutionally inadequate when he shows

> that counsel's performance was deficient. This requires showing that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.

*Strickland* 466 U.S. at 687, *quoted in Williams v. Taylor,* 529 U.S. 362 at 390.

> To establish ineffectiveness, a "defendant must show that counsel's representation fell below an objective standard of reasonableness." To establish prejudice he "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome."

*Williams v. Taylor,* 529 U.S. at 390-91 (quoting *Strickland,* 466 U.S. at 688, 694).

"Prior to trial an accused is entitled to rely upon his counsel to make an independent examination of the facts, circumstances, pleadings and laws involved and then to offer his informed opinion as to what plea should be offered." *Van Moltke v. Gillies,* 302 U.S. 708, 721 (1948), *quoted in United States v. Day,* 969 F.2d 39, 43 (3rd Cir. 1992). Accordingly, the Supreme Court has held that a defendant who has pled guilty makes out a claim of ineffective assistance of counsel when he alleges that, but for counsel's unprofessional errors, he would have pled not guilty and insisted on going to trial. *Hill v. Lockhart,* 474 U.S. 52, 59 (1985). Conversely, ineffectiveness is demonstrated when counsel errs in advising his client to reject the government's plea offer and insist on a jury trial. *See, e.g., Turner v. Calderon,* 281 F.3d 851, 879 (9th Cir. 2002); *United States v. Faubion,* 19 F.3d 226, 228-29 (5th Cir. 1994). "[A] defendant has the right to make a reasonably informed decision whether to accept a plea offer." *United States v. Day,* 969 F.2d at 43 (citing *Hill v. Lockhart,*

474 U.S. at 56-57). The defendant's burden on such a claim is the mirror image of *Hill v. Lockhart*. He must show a reasonable probability that, had he been correctly advised, he would have accepted the plea agreement. *United States v. Faubion,* 19 F.3d at 230 n.20 (citing *United States v. Day*, *id.*).

Given these considerations, it cannot be gainsaid that trial counsel performs deficiently when he allows his client to plead not guilty before a jury in the face of overwhelming evidence of guilt. At a minimum, counsel should advise their client as to the strengths and weaknesses of the State's case, their proposed defensive theories, and a realistic appraisal of the jury's likely assessment of the evidence. In addition, the defendant must be told of the advantage that might be gained by pleading not guilty, whether it be a possible acquittal or, as in this case, conviction of a lesser included offense. Finally, the defendant must be informed of the punishment to which he is exposed under the available options, as there can be no advantage in proceeding to trial without the possibility of receiving substantially lower punishment. Otherwise, the defendant–usually, as in Mr. Diaz's case, barely educated, and often mentally deficient–is deprived of the guiding hand of constitutionally effective counsel at perhaps the most critical stage of any criminal proceeding, when the choice literally is between life and death.

A decision to plead not guilty and proceed to trial is not subject to attack, obviously, when "the government offer[s] no deal" or "offers no concessions." *United States v. Faubion,* 19 F.3d at 229, 230. Likewise, such a claim will fail when the defendant "has

identified nothing in the record which establishes that his guilt was so overwhelming that no reasonable attorney would have recommended against pleading 'not guilty.'" *United States v. Walder*, 2002 WL 1906205 *2 (N. d. Tex. 2002).

Neither circumstance is present here. That there was a plea offer made by the State is a matter of record. That the evidence of Mr. Diaz's guilt was overwhelming, there also can be little doubt. Trial counsel's file contains only a single page of notes that merely sets out the details of the plea offer, thus confirming Mr. Diaz's account of the abbreviated discussion that he and his attorneys had on this matter. *See* Affidavit of James M. Terry, Jr., attached as Exhibit D. Had trial counsel taken more than fifteen minutes to discuss these matters with their client, and had they actually attempted to advise him, as was their constitutional duty, there is a reasonable probability that he would have accepted the offer. A full and frank discussion of Mr. Diaz's alternatives would have revealed the following:

> In order to avoid a capital murder conviction, the defense had to convince the jury that Mr. Diaz did not rob Mr. Nichols.

> The defense planned to attack the robbery element of the offense by showing that Mr. Nichols's wallet was moved during the investigation of the crime scene.

> If convicted of murder, Mr. Diaz faced a range of punishment of imprisonment from five years to ninety-nine years or life. Tex. Penal Code Ann. §§ 19.02(c), 12.32(a).

> If given a sentence of life or sixty years or more, Mr. Diaz would not be parole-eligible for thirty years. Tex. Code Crim. Proc. Ann. art. 37.07 § 4(a).

> Given these considerations, particularly in light of the utter insubstantiality of the

proposed "no robbery" defense, the decision to plead not guilty is incomprehensible. The cautious trial judge obviously recognized as much, as he took the highly unusual step of *sua sponte* calling Mr. Diaz to the stand months after the offer had been rejected and asking him again about his decision "just simply to make sure that you understood everything that was going on." 25 RR 11. Although Mr. Diaz "concedes that he was notified of the terms of the plea bargain, he alleges that the advice that he received was so incorrect and so insufficient that it undermined his ability to make an intelligent decision . . . ." *United States v. Day*, 969 F.2d at 43. He thus "states a Sixth Amendment claim." *Id.*

In addition to deficient performance, the record also shows *Strickland* prejudice. The bottom line is that the defense rejected a deal for a life sentence and proceeded to trial hoping to convince the jury to convict of a lesser included offense that also was punishable by imprisonment for life – the only benefit being a parole-eligibility date of thirty years rather than forty. Mr. Diaz has averred that if he had been fully advised, he would have accepted the State's offer instead of proceeding to trial. "My attorneys never told me that if I were convicted of murder, I could receive a life sentence and would not be eligible for parole for thirty years. If I had known that, I would have accepted the State's offer of a life sentence." Exhibit C at 2. Trial counsel's failure to fully discuss the plea offer with Mr. Diaz and advise him accordingly rendered their assistance constitutionally inadequate with regard to the guilt-innocence phase of trial.

## III.    Trial Counsel Failed To Investigate and Present Mitigating Evidence .

It is a basic principle of capital sentencing jurisprudence that "evidence about the defendant's background and character is relevant because of the belief, long held by this society, that defendants who commit criminal acts that are attributable to a disadvantaged background . . . may be less culpable than defendants who have no such excuse." *Penry v. Lynaugh,* 492 U.S. 302, 319 (1989), *quoted in Roberts v. Dretke,* 356 F.3d 632, 641 (5th Cir. 2004). Thus, mitigating evidence of a defendant's character or background is of constitutional dimension at the punishment phase of a capital trial because of its significance in the jury's ultimate decision whether to impose the death penalty. *Moore v. Johnson,* 194 F.3d 586, 612 (5th Cir. 1999). *See also Wiggins,* 123 S. Ct. at 2543 ("life history is part of the process of inflicting the penalty of death") (quoting *Eddings v. Oklahoma,* 455 U.S. 104, 112 (1982)).

Given the undeniable importance of mitigating evidence in a capital sentencing proceeding, counsel has an "obligation to conduct a thorough investigation of defendant's background." *Williams v. Taylor,* 529 U.S. at 396. Indeed, it is "undisputable" that counsel's investigation into potential mitigating evidence must be "reasonably substantial" as well as "independent." *Lewis v. Dretke,* 355 F.3d 364, 367 (5th Cir. 2003) (quoting *Neal v. Puckett,* 286 F.3d 230, 236 (5th Cir. 2002)). Accordingly, "investigations into mitigating evidence should comprise efforts to discover all reasonably available mitigating evidence . . . [including evidence of] family and social history." *Wiggins v. Smith,* 123 S. Ct. at 2535-37, *quoted in Roberts v. Dretke,* 356 F.3d at 638.

24

> In assessing counsel's performance, we look to such factors as what counsel did to prepare for sentencing, what mitigating evidence he had accumulated, what additional leads he had, and what results he might reasonably have expected from those leads.  The focus of this inquiry is not whether counsel should have presented a mitigation case, but whether the investigation supporting counsel's decision not to introduce mitigating evidence . . . *was itself unreasonable.*  A limited investigation into mitigating evidence may be reasonable only if counsel has a basis for believing that further investigation would be counterproductive or futile.

*Lewis,* 355 F.3d at 367 (citations and quotations marks omitted) (quoting *Neal v. Puckett,* 286 F.3d at 236, and *Wiggins v. Smith,* 123 S. Ct. at 2536, 2537) (original emphasis).

Counsel's performance is deficient  when, as in Mr. Diaz' case, "counsel's decision to limit the scope of their investigation into potential mitigation evidence" was unreasonable. *Wiggins,* 123 S. Ct. at 2535. In such instances, counsel simply are "not in a position to make a reasonable strategic choice" about whether to present evidence in mitigation of punishment. *Id.* at 2543.  *See, e.g., Hamblin v. Mitchell,* 354 F.3d 482, 493 (6th Cir. 2002) (counsel ineffective where he "did not present any meaningful mitigation evidence at the sentencing phase because he was not *prepared* due to his lack of knowledge and understanding of the sentencing phase of a capital case") (original emphasis).

With regard to the prejudice prong of *Strickland* at the punishment phase of a capital trial, relief is warranted when a defendant shows "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Bell v. Cone,* 535 U.S. 685, 695 (2002), *quoted in Guy v. Cockrell,* 343 F.3d 348, 352 (5th Cir. 2003).  A reviewing court should "evaluate the totality of the available mitigation

evidence–both that adduced at trial, and the evidence adduced in the habeas proceeding in reweighing it against the evidence in aggravation." *Williams v. Taylor,* 529 U.S. 397-98. *Strickland* prejudice is shown when, "[h]ad the jury been able to place the petitioner's excruciating life history on the mitigating side of the scale, there is a reasonable probability that at least one juror would have struck a different balance." *Wiggins,* 123 S. Ct. at 2543. *See also Williams v. Taylor,* 529 U.S. at 398 (prejudice prong met where available mitigating evidence "might well have influenced the jury's appraisal" of the defendant's moral culpability), *quoted in Wiggins,* 123 S. Ct. at 2544.

### A.    The uncalled witnesses

That Mr. Diaz's trial counsel performed deficiently at the punishment hearing, there can be no doubt. The defense's only punishment-phase witness, Dr. Pinkerman, was able to provide the jury with very limited information about Mr. Diaz's background and instead focused on the results of his psychological evaluation. His testimony "revealed nothing . . . of [Mr. Diaz's] life history." *Wiggins v. Smith,* 123 S. Ct. at 2536. Uncalled were numerous family members who were available and willing to offer testimony favorable to the defense – evidence about Mr. Diaz's troubled upbringing that was constitutionally mitigating because it lessened his moral culpability.

Available and willing to give mitigation testimony on Mr. Diaz's behalf were his sister, grandmother, mother, cousin and a former teacher. *See* Petitioner's Exhibits E, F, G, H, I (affidavits of Veronica Veleta, Maria Elena Camacho, Angelica Ruiz, Rosalinda

presentation of mitigating evidence. Exhibit C at 2. The state habeas court never heard Mr.

Diaz's side of the story, however, as his state habeas counsel did not present it – nor could

he have, as he never had any communication with Mr. Diaz, not even responding to his

client's letter inquiries, and instead simply followed trial counsel's lead in failing to conduct

any investigation whatsoever into potentially mitigating evidence.

Moreover, and of greater significance, even if Mr. Diaz did so instruct his trial

attorneys, they nonetheless were obligated to investigate to the extent necessary to confirm

the voluntariness of his instructions. This is because "if the defendant was not competent to

make those instructions then he may pursue his *Strickland* claim." *Roberts v. Dretke,* 356

F.3d at 639 (citing *Autry v. Estelle,* 722 F.2d 358, 362 (5th Cir. 1984)). "Where . . . counsel

is aware of the client's history of mental problems, the reasonableness of a decision made by

counsel not to investigate that history is suspect." *Id.* at 639 (citing *Bouchillon v. Collins,*

907 F.2d 589, 597 (5th Cir. 1990)). Thus, a federal habeas court's principal concern in

deciding whether trial counsel exercised reasonable professional judgment, "is not whether

counsel should have presented a mitigation case. Rather, we focus on whether the

investigation supporting counsel's decision not to introduce evidence of [the petitioner's]

background *was itself unreasonable*." *Wiggins,* 123 S. Ct. at 2536 (original emphasis).

Dr. Pinkerman's report stated that Mr. Diaz's "responses are often similar to

individuals who see themselves as dependent, ineffective, and feeling excessive guilt."

Report at 5. Moreover, "Mr. Diaz is very likely to submit to abuse and intimidation when

those experiences fit into his view that he deserves to suffer." *Id.* Thus, trial counsel were put on notice that there were powerful reasons to question their client's purported decision to forego the presentation of testimony about his background and upbringing. "Because counsel does not know what an investigation will reveal is no reason not to conduct the investigation." *Hamblin v. Mitchell,* 354 F.3d at 492. *Accord Blanco v. Singletary,* 943 F.2d 1477, 1501-03 (11th Cir. 1991) (counsel ineffective for "latching onto" client's assertions that he did not wish to call witnesses at penalty phase and failing to conduct an investigation sufficient to allow client to make an informed decision to waive mitigation); *United States v. Gray,* 878 F.2d 702, 711 (3rd Cir. 1989) ("counsel can hardly be said to have made a strategic choice against pursuing a certain line of investigation when s/he has not yet obtained the facts on which such a decision could be made"); *Knighton v. Maggio,* 740 F.2d 1344, 1350 (5th Cir. 1984) (habeas relief warranted if record shows that "counsel could not make a valid strategic choice because he had made no investigation").

In addition, the state habeas record is silent as to just what, if anything, trial counsel discussed with Mr. Diaz before deciding not to investigate. "It is axiomatic–particularly since *Wiggins*–that such a decision cannot be credited as calculated tactics or strategy unless it is grounded in sufficient facts, resulting in turn from an investigation that is at least adequate for that purpose." *Lewis v. Dretke,* 355 F.3d at 368. Trial counsel's file contains little relating to mitigating evidence – nothing in the way of legal research or records of interviews with potential witnesses, and instead merely a few pages of handwritten notes.

*See* Exhibit D.  "There is no evidence in the record that counsel informed [Mr. Diaz] about the importance of mitigation to the penalty phase or the consequences of limiting the penalty phase to [Dr. Pinkerman's testimony]." *Hamblin v. Mitchell,* 354 F.3d at 492.  Thus, assuming *arguendo* that Mr. Diaz in fact instructed trial counsel that he did not wish family members to testify in his behalf, counsel's utter failure to ensure that this decision was informed and voluntary itself constitutes ineffective assistance of counsel.  Counsel's claim of trial strategy is suspect, as "the 'strategic decision' . . . invoke[d] to justify counsel's limited pursuit of mitigating evidence resembles more a *post-hoc* rationalization of counsel's conduct than an accurate description of their deliberations prior to sentencing." *Wiggins,* 123 S. Ct. at 2538.

**B.    Dr. Pinkerman**

Inasmuch as the defense offered the jury virtually no information about Mr. Diaz that might have mitigated against the State's substantial punishment-phase evidence, there was little reason to believe that a death sentence would not be assessed.  Any doubt on this score was removed when the only defense witness, Dr. Pinkerman, testified.  To the extent that his vague testimony that Mr. Diaz suffered from learning disabilities was helpful, it was fully discredited on cross-examination.  After suggesting that Mr. Diaz had attempted to feign mental illness and had refused to discuss the facts of the offense, Dr. Pinkerman concluded with his opinion that Mr. Diaz was among the most difficult class of criminal offenders – "distrustful, cold, irresponsible, and unstable."  37 RR 156.  These were the last words of

testimony that the jury heard before retiring to deliberate on punishment. One can only imagine what impact this testimony had, coming, as it did, from *the defense's expert witness*. Mr. Diaz would have been no worse off had his attorneys simply done nothing.

Trial counsel's ineptitude with regard to Dr. Pinkerman's testimony is clear. Under Rule 615 of the Texas Rules of Evidence,[3] the prosecution was entitled to examine and use Dr. Pinkerman's report in cross-examining him – which it did with devastating effect. It did not have to be that way. Had trial counsel prepared a bit more conscientiously, the prosecutor's cross-examination could have been avoided or, at the least, severely curtailed. The trial court's order appointing Dr. Pinkerman did not require him to prepare a report, and trial counsel could simply have instructed him not to. In that event, while the prosecutor might have made headway in his cross-examination of the defense's expert, he would not have had the witness's report to point the way.

Failing that, defense counsel certainly should have had pause about putting Dr. Pinkerman on the stand after having read his report. Dr. Pinkerman concluded his examination of Mr. Diaz on December 16, 1999, more than six weeks before trial. Reasonably competent trial counsel would have recognized the likely prejudice from his report and would at least have rethought the decision to use him as Mr. Diaz's only

---

[3] The rule provides, in pertinent part, as follows: "After a witness other than the defendant has testified on direct examination, the court, on motion of a party who did not call the witness, shall order the attorney for the state or the defendant and the defendant's attorney, as the case may be, to produce, for the examination and use of the moving party, any statement of the witness that is in their possession and that relates to the subject matter concerning which the witness has testified." Rule 615(a), Tex. R. Ev.

punishment-phase witness.  Trial counsel had ample time to revise their punishment-phase strategy and consider utilizing other types of mitigating evidence.  They could have called family members to testify or they could have sought the services of other expert witnesses. They did not, and the ensuing demolition of Dr. Pinkerman on cross-examination was the result.

### C.     The defense's closing argument

Defense counsel's final error was in devoting almost the entirety of their final punishment-phase argument to the same theory they had aired at the guilt-innocence phase – that Mr. Diaz may have committed murder, but not robbery.  "When examining counsel's closing argument to determine whether it was ineffective, this Court considers the closing argument in its entirety." *Riley v. Dretke,* 339 F.3d 308, 317 (5th Cir. 2003).  The Fifth Circuit has noted "that, in an appropriate capital case, counsel's decision to rely upon the jury's residual doubt about the defendant's guilt may be not only reasonable, but highly beneficial, to a capital defendant." *Moore v. Johnson,* 184 F.3d at 618 (citing *Andrews v. Collins,* 21 F.3d 612, 623 n. 21 (5th Cir. 1994)).[4]  As shown above, however, "[t]his is not a residual doubt case." *Id.*  There was no real issue regarding identity, and the defensive theory that Mr. Diaz did not commit robbery was ill conceived and clumsily presented.  It did not carry the day at guilt-innocence, and their was scant reason to believe that it would

---

[4] *Cf. United States v. Davis,* 285 F.3d 378, 384 n. 7 (5th Cir. 2002) ("we express no view regarding the correctness of the district court's ruling regarding residual doubt qualifying as a legitimate mitigating factor for the jury to consider in assessing punishment").

succeed at punishment. *See Johnson v. Cockrell,* 301 F.3d 234, 240 (5th Cir. 2002) (given overwhelming evidence against defendant at the guilt-innocence phase of trial, jury was unlikely to have retained any residual doubt concerning his guilt). In sum, Mr. Diaz's case vividly illustrates the proposition that "because the jury must find guilt at the culpability phase beyond a reasonable doubt, a 'residual doubt' theory makes no sense." *Hamblin v. Mitchell,* 354 F.3d at 489.

Defense counsel's dilemma was that they had nothing else to argue because they had not presented any other mitigating evidence – the inevitable result of their failure to conduct the sort of investigation that is constitutionally mandated in a capital trial. They did not consult with Mr. Diaz fully enough to make an informed decision on the scope of their punishment-phase investigation, and their failure to conduct a full investigation left them with nothing else to argue, save, of course, for what was provided by Dr. Pinkerman.

The prosecutor had no such dilemma, as he had ample evidence to support his argument – much of it provided by the defense. He first defused the residual doubt argument: "Don't let defense counsel try to get you to change your verdict regarding his guilt of capital murder. That's past. You gave him a fair chance. He had his trial on that issue. The defense argues that to try to deflect you from the issues that you are here to decide, the special issues." 38 RR 56. The prosecutor relied heavily on Dr. Pinkerman's testimony as an indicator of future dangerousness, noting his conclusions that Mr. Diaz "is malingering and faking mental illness," 38 RR 59; that Mr. Diaz "never suffered any head

introduced about the Pistoleros's alleged beliefs and practices. The evidence was, in short, inadmissible because it was not relevant to any issue that the jury was to decide in assessing punishment.

Finally, admission of this evidence resulted in prejudice sufficient to warrant a new punishment hearing. Improperly admitted gang membership evidence may be harmless, for instance, when it consists of nothing more than "two improper questions and display of [a] booklet [on gangs]'s cover . . . ." *Wainwright v. Lockhart,* 80 F.3d 1226, 1234 (8th Cir. 1996). Here, by contrast, the punishment phase of Mr. Diaz's trial was permeated with references to the Pistoleros, including in the prosecutor's closing argument. 38 RR 58.

## V.     Mr. Diaz's Right To Remain Silent Was Violated.

In addition to the errors described above, the fairness of Mr. Diaz's sentencing proceeding was further diminished when the prosecutor impermissibly elicited testimony that infringed on his right to remain silent. On cross-examination, Dr. Pinkerman testified that Mr. Diaz had refused to discuss the facts of the offense based on his attorneys's advice. 37 RR 155. This testimony violated the rule of *Doyle v. Ohio,* 426 U.S. 610 (1976), which forbids comment on a defendant's post-arrest silence to rebut the defendant's exculpatory story. *United States v. Garcia-Flores,* 246, 451, 457 (5th Cir. 2001).

"As a general rule, the government may not 'impeach a defendant's exculpatory story, told for the first time at trial, by cross-examining the defendant about his failure to have told the story after receiving *Mirnada* warnings at the time of his arrest.'" *United States v.*

39

*Rodriguez,* 260 F.3d 416, 420 (quoting *Doyle,* 426 U.S. at 611). "In assessing an alleged *Doyle* violation, the question is whether the disputed statement so infected the trial and sentencing with unfairness that the ultimate conviction and sentence constituted a denial of due process." *Gaskins v. McKellar,* 916 F.2d 941, 951 (4th Cir. 1990).

Here, the punishment phase of Mr. Diaz's trial was rendered unfair by the *Doyle* violation. The facts of this case do not represent a paradigmatic *Doyle* violation in that Mr. Diaz did not testify. Nonetheless, his "exculpatory story" was infringed on in two ways. First, to the extent the defense relied on residual doubt at the punishment phase, their efforts were compromised by this impermissible allusion–and the negative inferences the jury was likely to draw from it–to his exercise of his constitutionally protected right to remain silent. Second, to the extent that the defense relied on Dr. Pinkerman's testimony to argue against a death sentence, his credibility was called into question as being based on less than complete information from the defense.

Although not commenting directly on Mr. Diaz's silence, the prosecutor nonetheless made this point in closing: "The defendant that the doctor says exaggerated, and is malingering and faking mental illness." 38 RR 59. This compounded the *Doyle* violation, because even when post-arrest silence is properly used for impeachment, "the government may not then argue that the defendant's silence was inconsistent with his claim of innocence." *United States v. Rodriguez,* 260 F.3d at 421 (citing *United States v. Shue,* 766 F.2d 1122, 1130 (7th Cir. 1985).

## CONCLUSION

For the above reasons, Petitioner requests that this Court

1.    Grant discovery and expansion of the record as necessary;

2.    Conduct an evidentiary hearing; and

3.    Grant a writ of habeas corpus and order his release from confinement
      unless the State of Texas affords him a new trial or a new punishment
      hearing within a reasonable period of time.

Respectfully submitted,

CHARLES A. PALMER
Texas Bar No. 15426500
Southern District No. 1523

JAMES M. TERRY, JR.
Texas Bar No. 24005119
Southern District No. 23811

5900 Balcones – Suite 210
Austin, Texas 78731
Telephone 512.458.3100
Facsimile 512.458.3119
charles.palmer@sbcglobal.net
jim.terry@direcway.com

ATTORNEYS FOR PETITIONER

## CERTIFICATE OF SERVICE

I, Charles A. Palmer, do hereby certify that a true and correct copy of the foregoing Petition for Writ of Habeas Corpus has been served by placing it in the United States Mail, postage prepaid, on this the 15th day of June, 2004, addressed to Ms. Carla E. Eldred, Assistant Attorney General, Postconviction Litigation Division, P. O. Box 12548, Capitol Station, Austin, Texas 78711-2548.

CHARLES A. PALMER

# EXHIBITS TO PETITION FOR WRIT OF HABEAS CORPUS

## *ARTURO DIAZ V. DOUG DRETKE,* No. M-03-MC-055

Exhibit A –    Opinion of the Texas Court of Criminal Appeals, *Diaz v. State,* No. 73,821

Exhibit B –    Letter Confirming Agreement Regarding Statute of Limitations

Exhibit C –    Affidavit of Arturo Diaz

Exhibit D –    Affidavit of James M. Terry, Jr.

Exhibit E –    Affidavit of Veronica Veleta

Exhibit F –    Affidavit of Maria Elena Camacho

Exhibit G –    Affidavit of Angelica Ruiz

Exhibit H –    Affidavit of Rosalinda Rodriguez

Exhibit I –    Affidavit of Humberto Bocanegra

Exhibit J –    Hospital Records for Arturo Diaz, December 11, 1994

Exhibit K –    "Poverty and Brain Development in Early Childhood"

Exhibit L –    "Childhood Lead Poisoning Associated with Tamarind Candy and Folk Remedies – California, 1999-2000"

# Exhibit A



# IN THE COURT OF CRIMINAL APPEALS OF TEXAS

### NO. 73,821

ARTURO ELEAZAR DIAZ, Appellant

v.

THE STATE OF TEXAS

### APPEAL FROM HIDALGO COUNTY

*WOMACK, J., delivered the opinion for a unanimous Court.*

A jury has found the appellant guilty of murdering Michael Ryan Nichols in the course of committing robbery, of attempting to do the same to John Shepherd, and of robbing Shepherd with a deadly weapon, all on April 2, 1999. The jury returned verdicts that required the court to sentence the appellant to death for the capital murder[1] and imprisonment for life for each of the other offenses. The sentences were pronounced on February 16, 2000.

---

[1] *See* TEX. CODE CRIM. PROC. art. 37.071, §§ 2(b) & 2(e) (verdicts); *id.,* § 2(g) (sentence).

Diaz--2

The appellant brings sixteen points of error.  The first is that the evidence was legally insufficient to prove his guilt, and the last is that the evidence was insufficient to support the punishment verdict.  All the intermediate points have to do with the law of evidence.  We must set out in detail some of the evidence at the guilt stage of the trial.

## Evidence at Guilt Stage

The deceased, Michael Ryan Nichols (called "Ryan"), was the 26-year old son of Forrest Nichols. Forrest grew and marketed produce.  His company had offices in Arizona, Florida, and Missouri, and a small office space in McAllen, Texas.  Ryan grew up in Florida, but he had lived and worked on his father's fruit farm in Costa Rica for four years.  He spoke Spanish fluently.  In February, 1999, Ryan went to McAllen to inspect the produce for which his father's company was broker and shipper.

Nichols's company rented a two-bedroom apartment for its employees in McAllen. This apartment was the site of the murder.  The entry to, and exit from, the apartments was through a gate that was closed at night.  Opening the gate to go in required entering a code on an electronic keypad outside the gate.  Opening the gate to go out required entering a different code on a keypad inside the gate.

Ryan Nichols shared the apartment with John Shepherd and another employee who left McAllen before the murder.  Shepherd was about 38 years old.  He had worked for the senior Nichols for about twenty years.

Diaz--3

Ryan Nichols had been absent from the apartment for a couple of days before he was murdered. He had not gone to work or "checked in." Nichols's whereabouts before the murder were the subject of Danielle Thomas's testimony.

Thomas was known as "Candy" when she performed "exotic" dances at "parties and private dances." She had met Nichols when she went to the apartment to dance for Nichols's and Shepherd's co-worker. She had been told the entry code for the gate at the apartments.

Thomas testified that on April 1, the night before the murder, she and Nichols "went out." During the evening a teller machine destroyed Nichols's bank card, and Thomas lent him $100. When the nightclubs closed at 2:00 a.m., they went to Thomas's trailer. The appellant was there, along with Arcelia Reyes, who was called "Arcy." Arcy Reyes was an unusually large woman who provided "security" when Thomas danced. The four of them watched movies until 4:00 or 5:00 a.m., when Thomas and Reyes borrowed Nichols's truck to go to a motel for a dance. Reyes returned the truck to Nichols before the dance was over. Thomas called the trailer several times during the day, speaking sometimes to the appellant and sometimes to Nichols. When she and Reyes got home at about 8:00 p.m. on April 2, no one was there.

Nichols had gone to his apartment with the appellant and a man called Joe Cordova. Shepherd testified that they arrived between 6:00 and 7:00 p.m. He noticed

Diaz--4

that the appellant had letters tattooed on his forearms. The appellant's tattooed forearms were displayed to the jury, over his objection.

Shepherd felt uncomfortable with Nichols's companions. He left to buy beer and cigarettes. When he returned he saw that Nichols's truck was in the center of the parking lot. The appellant, Cordova, and Nichols were watching television in the living room. Before long Shepherd went to bed.

While Shepherd was in bed, Candy Thomas and Arcy Reyes came to the apartment. Thomas testified that she had come to get repayment of the $100 she had lent Nichols the previous night. She saw that Nichols had two $50 bills in his wallet. He gave her one and kept the other. Nichols's $50 bill was not found in his wallet, or anywhere else, after he was killed that night. What was found in his wallet was a piece of paper with the appellant's telephone number and first name.

While Arcy Reyes was at the apartment, she and the appellant went into a bedroom for a private conversation. Then Thomas and Reyes left the apartment and went home.

Later Shepherd was awakened by a loud noise. He went to the living room and found Nichols bleeding from a wound on his arm. The appellant was holding a large butcher knife. After Shepherd asked three times, "What's going on," Nichols said, "Do what he says, get the money and they'll leave."

Cordova said some things, in Spanish and English, about Shepherd's getting money. The appellant spoke angrily in Spanish. He grabbed Shepherd's shirt and pushed

Diaz--5

him down the hall to his room. Shepherd got some cash from his pants pocket and gave it to the appellant. The appellant checked Shepherd's pants for more money. Then he grabbed Shepherd's shirt again and took him back to the living room. Cordova told Shepherd to sit on the couch and do what he was told. The appellant and Cordova put Nichols on the floor and bound and gagged him with shoelaces and strips of bedding.

The telephone rang, and Cordova answered it. Shepherd testified that Cordova told the caller to "'come to get us, or come over here,' something like that. ... Pretty quick there was a knock on the door." (Candy Thomas testified that Arcy Reyes had received a telephone call about midnight. She borrowed Thomas's car, and left for 45 minutes. Thomas knew where she was going.)

Shepherd testified that he saw a big, Hispanic woman (presumably Arcy Reyes) come into the apartment. "She asked them what was going on. [Cordova] told her something in Spanish. She wasn't happy with what they said." Cordova told her to turn around and face the door, and he told Shepherd not to look at her.

The appellant and Cordova beat Nichols.. Then they put Shepherd on the floor and bound and gagged him. They turned their attention back to Nichols. Cordova lifted him up from the floor and held him while the appellant stabbed Nichols many times in the torso. (A pathologist found eighteen perforations of the liver, three of the left kidney, three of the left lung, two of the heart, and one of the right lung. A knife thrust had

Diaz--6

fractured a rib and broken off the tip of the knife, which was left in the rib. There were

other lacerations of the scalp, neck, and flanks.)

Cordova noticed that Shepherd had freed one of his hands. He and the appellant

beat Shepherd and stabbed him; the most serious wounds were to his neck and head.

Shepherd pretended to be dead, and lost consciousness.

The appellant and another man whom Candy Thomas knew as "Danny" arrived at

her trailer about 3:00 a.m. on April 3, very nervous and in a hurry to leave. She said that

Reyes was very upset when she returned.

When Shepard awoke, the apartment was dark. The evidence indicates it was

between 3:00 and 4:00 a.m. Shepherd freed himself from the bindings and made his way

out of the apartment. He noticed Nichols's truck was sitting at the apartment gate with the

driver's door open. At Shepherd's request, a neighbor called police.

When police officers arrived at the apartment complex, they found the gate locked

and Nichols's truck parked next to the keypad-box inside the gate. There was blood in

the truck. On the ground was some bedding material. There was a tennis-shoe print on

top of the control box, where a person could step to jump over the fence. The print

matched the appellant's shoe.

Nichols was found dead in the apartment. On the floor was a beer bottle that had

the appellant's DNA on it.

Diaz--7

Manuel Montes testified that, about 4:00 a.m. on April 3, Joe Cordova telephoned him. Cordova was Montes's neighbor and the older brother of Montes's best friend. He asked to be picked up in another neighborhood. Montes did as he was asked, and gave a ride to Cordova, the appellant, and a big woman. Cordova had a bloody shirt wrapped around his arm. (When he was arrested, Cordova had wounds in his arm and thigh.) Montes took Cordova home, but Cordova wanted to go to Montes's house. Cordova, the appellant, and the woman spent the rest of the night in Montes's living room.

After daylight Cordova borrowed a pair of Montes's pants so that he could go home and get pants for himself and the appellant. After the appellant and Cordova changed clothes, Cordova said he would take care of the trash bag that (presumably) contained the dirty clothes. Police later found, in Montes's house, a trash bag of clothing that was stained with Cordova's and Nichols's blood.

Montes overheard the appellant, in Cordova's presence, telling some other men about a murder. Montes heard that the appellant and Cordova had stabbed someone; Cordova had held the man, and the appellant had stabbed him.

### First Point of Error

In his first point of error, the appellant argues that the evidence is legally insufficient to prove that the murder was a capital murder.

Diaz--8

One way in which murder becomes capital murder is that it is committed

intentionally and in the course of committing robbery.[2]

> In order for [such] a murder to [be a] capital murder ..., the killer's intent to
> rob must be formed before or at the time of the murder. *Robertson v. State*,
> 871 S.W.2d 701, 705 (Tex. Cr. App. 1993), *cert. denied*, 513 U.S. 853
> (1994). Thus, "proof of a robbery committed as an afterthought and
> unrelated to a murder (will) not provide sufficient evidence of capital
> murder." *Moody v. State*, 827 S.W.2d 875, 892 (Tex. Cr. App.), *cert.
> denied*, 506 U.S. 839 (1992). If there is evidence, however, from which the
> jury could rationally conclude beyond a reasonable doubt that the defendant
> formed the intent to obtain or maintain control of the victim's property
> either before or during the commission of the murder, then the State has
> proven that the murder occurred in the course of robbery. *Robertson v.
> State*, 871 S.W.2d at 705. The jury may infer the requisite intent from the
> conduct of the defendant. *Id.*[3]

The victim of the robbery may be a person other than the individual who was

murdered.[4] An intentional murder of Nichols would be a capital murder if it were

committed in the course of robbing either Nichols *or* Shepherd. In this case, however, the

State alleged that the appellant acted only "in the course of committing and attempting to

commit robbery of Michael Ryan Nichols,"[5] and the court's charge authorized conviction

only if the jury found that the appellant caused Nichols's death "in the course of

---

[2]*See* TEX. PENAL CODE § 19.03(a)(2).

[3]*Alvarado v. State*, 912 S.W.2d 199, 207 (Tex. Cr. App. 1995) (plurality opinion).

[4]*See Rougeau v. State*, 738 S.W.2d 651, 656 (Tex. Cr. App. 1987), *cert. denied*, 485
U.S. 1029 (1988).

[5]Indictment, Clerk's Record at 2.

Diaz--9

committing or attempting to commit the offense of Robbery of Michael Ryan Nichols."[6] Having thus narrowed its theory of liability, the State was required to prove that the appellant murdered in the course of robbing the deceased Michael Ryan Nichols.

We view the evidence in the light most favorable to the jury's verdict, asking whether a rational juror could have found that each required fact was proved beyond a reasonable doubt. If the evidence meets that standard, it is legally sufficient.[7]

The appellant argues that the State had only three bits of evidence to prove robbery of Nichols. One is the movement of Nichols's truck, which he says is insufficient to show the appellant had intent to steal before the murder. Another is the robbery of Shepherd, which he says fails to show any theft from Nichols. The third is the evidence of Nichols's having $50 before he was murdered and none afterward; as to this the appellant says there was no proof that anyone other than Candy Thomas knew of the $50 bill. He also says it was unlikely that the appellant and Cordova came to the apartment with intent to steal, and that the murder could have been done in "anger over the fact that Mr. Nichols did not have the money to pay his debt" to Thomas.

He omits the wounded Nichols's statement, "Do what he says, get the money and they'll leave." This was strong evidence that the appellant was in the course of committing or attempting to commit robbery of Nichols. In another point of error the

---

[6]Charge of the Court, *id.* at 255.

[7]*See Griffin v. State*, 614 S.W.2d 155, 159 (Tex. Cr. App. 1981).

Diaz--10

appellant argues that Nichols's statement should not have been admitted in evidence. But even erroneously admitted evidence is considered on the issue of sufficiency.[8] We must take this evidence into account, and it alone would permit a rational juror to find beyond a reasonable doubt that the murder was committed in the course of robbing Nichols.

There is other evidence of this element of the offense. A reasonable juror could infer that Nichols's $50 bill being missing was evidence that the robbery of him was completed.

The appellant's action of robbing Shepherd (which could have been, but was not, alleged as the element that elevated the murder to capital murder) is a circumstance tending to show that the appellant was engaged in robbing the residents of the apartment. That he was not seen to steal anything from Nichols after he stole from Shepherd implies that he had robbed Nichols before he robbed Shepherd.

The private meeting between the appellant and Arcy Reyes, which was followed by her telephone call and appearance at Nichols's apartment, suggests that a plan had been devised earlier in the evening.

There was ample evidence to support the verdict that the appellant murdered Nichols in the course of robbing or attempting to rob him. Point one is without merit.

---

[8]*Deeb v. State*, 815 S.W.2d 692, 701 (Tex. Cr. App. 1991). *See Lockhart v. Nelson*, 488 U.S. 33 (1988).

Diaz--11

In eight points, the appellant says that the trial court erred in admitting hearsay evidence. Several of these points complain of more than one ruling of the trial court.

## Second Point of Error

The second point is based on the testimony of John Shepherd. Shepherd testified that he was awakened by a loud noise. He walked down the hall to the living room, where he saw Nichols sitting on the couch, his left arm bleeding, and the appellant holding a large knife. The appellant complains about the following testimony:

A. … I asked Ryan again what was happening. He did not say nothing. I asked him again. He told me to —

[DEFENSE COUNSEL]: Objection, Your Honor, calls for hearsay.

[PROSECUTOR]: … May I reask the question, Your Honor.

THE COURT: Yes, sir.

Q. Did Ryan speak to you when you asked him the third time what was going on?

A. Yes.

Q. Based on what he said, did you do anything in particular?

A. Yes.

Q. What is it that you did?

A. I was taken to the back bedroom to get my money which is what he told me to do.

Q. Okay. Let me stop you there. What is it that Ryan told you to do that would caused [sic] you to go to the bedroom?

Diaz--12

A. Give them the money.

> [DEFENSE COUNSEL]: Objection, Your Honor, calls for hearsay.

> [PROSECUTOR]: Asking on the basis of his movement, not
> offered for the truth of the matter asserted, but for the reason
> why he went back there.

The court excused the jury and held a hearing on the hearsay question.  At the hearing,

Shepherd testified that Nichols told him "[t]o give them what money I had and they

would leave."  While the appellant argued that the State was offering Shepherd's

testimony for the truth of the matter asserted — that a robbery occurred — the State

argued that it was simply a statement made, heard, and acted on by Shepherd.  The court

allowed the statement, and questioning resumed before the jury.

> Q. Mr. Shepherd, before the jury left, you were telling us that you had
> stepped into your living room, saw Ryan bleeding on the couch and you
> were asking him what?

> A. What was going on.

> Q. And how did he react when you asked him this?

> A. He didn't answer me.  He turned his head one time away from me.

> Q. Go on.

> A. I asked him again.  He didn't answer me again.  The third time he
> answered me, which was about the money.

> Q. What is it that he said?

> [DEFENSE COUNSEL]: Objection, Your Honor.

Diaz--13

THE COURT: Objection is overruled based on the rulings that I gave outside the presence of the jury.

Q. What is it that he said?

A. Do what he says, get the money and they'll leave.

The issue is the correctness of the trial court's ruling that admitted the evidence, not the judge's explanation of the ruling.[9] Two aspects of the law of hearsay support the ruling.

One is the admission by a party-opponent. Our Rules of Evidence say, "A statement is not hearsay if ... [it] is offered against a party and is ... a statement of which the party has manifested an adoption or belief in its truth."[10] "Adoption or acquiescence may be manifested in any appropriate manner,"[11] including nonverbal conduct [12] and

---

[9]*See, e.g., Willover v. State*, 70 S.W.3d 841, 845 (Tex. Cr. App. 2002) ("the appellate court must uphold the trial court's ruling if it is reasonably supported by the record and is correct under any theory of law applicable to the case").

[10]TEX. R. EVID. 801(e)(2)(B).

[11]Advisory Committee Note (2)(B) to FED. R. EVID. 801(d)(2).

[12]*See* STEVEN GOODE, OLIN GUY WELLBORN, III, AND M. MICHAEL SHARLOT, 2 TEXAS PRACTICE — GUIDE TO THE TEXAS RULES OF EVIDENCE: CIVIL AND CRIMINAL § 801.9 n. 2.

Diaz--14

silence.[13] "When silence is relied upon, the theory is that the person would, under the circumstances, protest the statement made in his presence, if untrue."[14]

In this case the victim, Nichols, spoke in the presence of the appellant and his companion. He said, in effect, that they were committing robbery. They could be expected to protest against a false accusation of such a serious crime. Not only did the appellant fail to protest that the statement was false, he immediately confirmed its truth in the strongest possible way by proceeding to rob Shepherd at knifepoint. His silence and his conduct were a convincing adoption of Nichols's statement, and, therefore, an admission by the appellant. Having been adopted by the appellant, Nichols's statement was not hearsay.

If Nichols's statement be regarded as hearsay, the exception for excited utterances would become relevant. Our Rules of Evidence say, "The following [is] not excluded by the hearsay rule, even though the declarant is available as a witness: A statement relating to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition."[15] "The theory of [this e]xception ... is simply that circumstances may produce a condition of excitement which temporarily stills

---

[13]Advisory Committee Note, *supra* note 11; GOODE ET AL., *supra* note 12, at § 801.9.

[14]Advisory Committee Note, *supra* note 11.

[15]TEX. R. EVID. 803(2).

Diaz--15

the capacity of reflection and produces utterances free of conscious fabrication."[16]  "[I]n

most cases there is present at least circumstantial evidence that something of a startling

nature must have occurred[, as in] cases in which the evidence consists of the condition of

the declarant (injuries, state of shock) ...."[17]

In the case before us there was evidence that Nichols was suffering from both

injuries and a state of shock.  He also was in the threatening presence of the men who, the

evidence indicates, were in the process of committing against him the very robbery of

which he spoke.

These rules justify the admission of Nichols's statement, and the trial court did not

err in ruling accordingly.

### Third Point of Error

In his third point of error, the appellant complains of the trial court's overruling

two objections to Shepherd's testimony about statements of Joe Cordova.  The first

statement was made when Shepherd was brought back to the living room after the

appellant robbed him.

Q.  What did he say?

[DEFENSE COUNSEL]:  Objection Your Honor, calls for hearsay.

[PROSECUTOR]:  [Rule of Evidence] 801(e)(2)(E), Your Honor, the
exception.

---

[16]Advisory Committee Note (2)(B) to FED. R. EVID. 803(1) & (2).

[17]*Ibid.*

Diaz--16

THE COURT: Overruled.

Q. What was it he said to you?

A. He told me to sit down and do what I was told.

Cordova made the second statement after he and the appellant bound and gagged and beat Nichols, bound and gagged Shepherd, and began stabbing Nichols. When they noticed that Shepherd had managed to free one of his hands, they stopped murdering Nichols and "dropped him on the floor."

Q. They dropped who on the floor?

A. Ryan, just dropped him. They came over to me and said in Spanish, and the only thing I understood was Gringo.

[DEFENSE COUNSEL]: Objection, Your Honor, calls for hearsay.

[PROSECUTOR]: [Rule of Evidence] 801(e)(2)(E) and statement by party-opponent, Your Honor.

THE COURT: Overruled.

Under Rule of Evidence 801(e)(2)(E), certain statements of a co-conspirator are not hearsay. The applicability of that rule need not concern us, for these statements were not hearsay as it is defined in another rule. "'Hearsay' is a statement, other than one made by the declarant while testifying at the trial or hearing, offered to prove the truth of the matter asserted."[18]  Cordova's statements were not offered for the truth of the matters

---

[18]TEX. R. EVID. 801(c).

Diaz--17

asserted (that is, that Shepherd should sit down and do what he was told, and that he was a Gringo).

The appellant argues that the second statement was inadmissible for the additional reasons that it "(1) indicated an independent impulse by the other man [Cordova] and (2) demonstrated ... appellant's racial animus against the witness and the deceased." He may not present those complaints for appellate review because he did not make them to the trial court.[19]

The third point is overruled.

### Fourth Point of Error

Point of error four is another complaint that Shepherd's testimony included inadmissible hearsay.  The testimony was about the woman who came to the apartment while the appellant and Cordova were beating Nichols.

A. Second person [Cordova] answered the door.  It was a woman coming into the apartment.  She looked at both of them.  She asked in English, what is going on here?

[DEFENSE COUNSEL]:  Objection, Your Honor, calls for hearsay.

[PROSECUTOR]: We're not offering it for the truth of the matter asserted. ...

THE COURT:  Overruled.

...

Q. All right.  You saw her.  What happened?

---

[19]See TEX. R. APP. P. 33.1(a).

Diaz--18

A. She asked them what was going on —

[DEFENSE COUNSEL]:  Objection, Your Honor, calls for hearsay.

THE COURT:  Overruled.

A. The second person that was with the defendant told her something in Spanish. She wasn't happy with what they said. You could tell by the expression on her face and the change in the tone of her voice. They told her to turn around and face the door.

The woman's statement ("What is going on here?") could not have been "offered to prove the truth of the matter asserted,"[20] because it made no assertion. Therefore it was not hearsay.

The description of the woman's expression and tone of voice was not a statement by her. Therefore it was not hearsay. The fourth point of error is overrruled.

### Fifth Point of Error

The fifth point of error comprises complaints about six rulings that admitted Manuel Montes's testimony about Joe Cordova's out-of-court statements. The appellant says they were inadmissible hearsay. The appellant makes only one argument about all these rulings:  "The statements are not in furtherance of a conspiracy, but are casual admissions of culpability to someone the declarant had individually decided to trust." We shall address each ruling.

---

[20]TEX. R. EVID. 801(c).

046

Diaz--19

## A.

Joe Cordova had made a telephone call to Montes around 4 a.m. on April 3, 1999. Montes was not asked about the content of the call, other than to identify "Joe" as the caller. He said that after he hung up the telephone, he went to pick up Cordova at La Balboa neighborhood.

> Q. How is it that you knew that you could pick him up in the Balboa neighborhood?
>
> A. He just told me to —
>
> [DEFENSE COUNSEL]: Objection, Your Honor, calls for hearsay.
>
> THE COURT: Sustained.
>
> Q. Without telling us exactly what he told you, how is it that you knew he would be in the Balboa neighborhood?
>
> A. Well, he told me that.
>
> [DEFENSE COUNSEL]: Objection, Your Honor, calls for hearsay.
>
> ...
>
> THE COURT: It will be admitted.

The statement was not hearsay because it was not "offered to prove the truth of the matter asserted,"[21] that Cordova was in La Balboa. It was offered to prove why Montes went to La Balboa to seek Cordova.

---

[21]TEX. R. EVID. 801(c).

Diaz--20

### B.

Montes testified that in La Balboa he picked up Cordova, the appellant, and a big woman, and they went to a store where the woman got something to eat.

Q. ... Why did you take this particular route?

A. They offered me where to go, back home or to go to the store.

Q. Is that where you were headed was back home?

A. Yes.

Q. Why is it — who decided you were going to go home?

A. Joe said, I had asked him where he wanted me to go and he said —

[DEFENSE COUNSEL]:  Objection, Your Honor, calls for hearsay.

...

THE COURT:  Overruled.

Q. Joe asked you to take him home; is that right?

A. Yes.

Again, the statement was not hearsay because it was not offered to prove that Cordova had a desire to go home; it was offered to explain why Montes drove to Cordova's home. (As it turned out, Cordova decided not to go into his house, and he asked to go home with Montes.)

## C.

The next portion of the record that the appellant quotes in his brief is:

Q. What about — he had asked you to borrow a pair of jeans?

A. Yes.

Q. What was his intention as far as you knew?

A. To go to his house and get more clothes.

Q. More clothes for who?

[DEFENSE COUNSEL]:  Objection, Your Honor, anything he learned about is through hearsay.

[PROSECUTOR]:  You Honor, this is again an 802 — 801(e)(2)(E), Your Honor, exception.

The appellant's brief omits the next few lines of the record, in which he withdrew

his objection:

THE COURT:  Any problems?

[DEFENSE COUNSEL]:  No, Your Honor.

THE COURT:  What?

[DEFENSE COUNSEL]:  No.

THE COURT:  It will be allowed.

Having specifically said he had no problems with the prosecutor's theory of

admissibility, the appellant may not say the opposite on appeal.

Diaz--22

### D.

The appellant complains that the following testimony contains objectionable hearsay:

> Q. Now in the morning, in the light of day, you were introduced to the people that Joe was with, the people that were there?
>
> A. No. He just named, Joe said the name of the guy.
>
> Q. Okay. What name did he give?
>
> [DEFENSE COUNSEL]: Objection, Your Honor, calls for hearsay.
>
> ...
>
> THE COURT: Overruled. I will allow it.
>
> Q. What did Jose Luis Cordova tell you this person's name was?
>
> A. Arturo.

We agree with the State's argument that the statement was not offered for the truth of the matter stated, that is, that the man's name was Arturo. It was offered to show that this was the name stated. The court was within its discretion in admitting it. (We notice that the next bit of testimony was Montes's in-court identification of the appellant as the person whom Cordova called "Arturo.")

### E.

Montes testified that, later in the day, his wife telephoned him at work. She was scared. She had gone to a neighbor's house, while the appellant and the others remained at the Monteses' house. Montes called his house and told Cordova to leave.

050

Diaz--23

Q. What did Joe tell you?

A. That he was going to leave.

[DEFENSE COUNSEL]:  Objection, Your Honor, calls for a hearsay [*sic*].

...

THE COURT:  Overruled.

Once more, Joe's statement was not offered to prove the truth of the matter asserted.  So it was not hearsay.  (As it turned out, Cordova and the others were still there when Montes got home.)

F.

The last testimony in issue was about a trash bag in which police found clothing that was stained with the victim's blood.

Q. Did you make any comment regarding the black plastic trash bag to the defendant or Joe?

A. I told Joe what the bag was.

Q. You asked him what the bag was?

A. Yes.

Q. And who did you ask that to?

A. Joe.

Q. And what was it that Joe told you?

[DEFENSE COUNSEL]:  Objection, Your Honor, calls for hearsay.

[PROSECUTOR]:  801(e)(2)(E), Your Honor.

Diaz--24

THE COURT: Overruled.

Q. What was it that Joe told you regarding the trash bag?

A. He said he was going to take care of it.

Under our Rules of Evidence, a statement is not hearsay if it is offered against a party and it is "a statement by a co-conspirator of a party during the course and in furtherance of the conspiracy."[22] We have held that a statement made after a murder, in which the declarant told the witness to dispose of a box and some bloody clothes, was made during the course and in furtherance of the conspiracy.[23]

Cordova's statement that he would take care of the bag of bloody clothes that he and the appellant had worn during the offenses, was made as part of his effort to conceal or dispose of that evidence. The trial court did not abuse its discretion in ruling that the statement was made during the course and in furtherance of the conspiracy under Rule 801(e)(2)(E). Point of error five is overruled.

### Sixth Point of Error

The appellant says in his brief:

Manuel Montes testified to a conversation he overheard between Joe Cordova and appellant in which Joe Cordova says in conversations with the Trevino brothers how Joe had held a person who was stabbed while appellant stabbed him. (Vol. 32, p. 184 – 186). The defense objected to the

---

[22]TEX. R. EVID. 801(e)(2)(E).

[23]*Denney v. State*, 558 S.W.2d 467, 468–69 (Tex. Cr. App. 1977), *cert. denied*, 437 U.S. 911 (1978).

statement on the basis that it is hearsay. The court allowed the statement under the authority of Rule 801(e)(2(E), Texas Rules of Evidence.

He goes on to argue that Cordova's statement did not further the conspiracy. He also argues that, if the State argues that Cordova made a statement against his penal interest, he did not have fair notice of that theory at trial.

The record shows that the appellant did make a hearsay objection, but it was not to a question about anything that Cordova said. The objected-to question asked what the appellant said. The State relied, not on the rule for co-conspirators' statements or the exception for statements against penal interest, but on the rule for admissions by a party.

Q. And when you got home, did you overhear the defendant and Joe talking with the Trevino brothers about things that made you uncomfortable?

A. Yes.

Q. Things that made you want them out of your house?

A. Yes.

Q. Things that made your wife want them out of your house?

A. Right.

Q. What was it that you overheard *the defendant* saying that made you want him out of your house?

[DEFENSE COUNSEL]: Objection, Your Honor, calls for hearsay.

[PROSECUTOR]: This is a statement by a party opponent, Your Honor.

THE COURT: You are asking what they said, not the Trevinos.

[PROSECUTOR]: That's correct, Your Honor.

Diaz--26

THE COURT: Overruled.

Q. Not talking about the Trevino brothers, what was it that you overheard *the defendant* say that made you want him out of your house?

A. They were talking about a murder.

The testimony to which the appellant's brief refers was an unresponsive answer

(italicized below) that Montes gave eight questions after the hearsay objection.

Q. A murder?

A. Yes.

Q. What did you hear the defendant say about the murder?

A. Well, that they had stabbed somebody.

Q. From the conversation, did you hear whether it was one person or two persons or more persons?

A. No, only one.

Q. Did you hear where this had taken place?

A. No.

Q. Do you recall them speaking about the number of – do you recall them speaking about the way in which they had committed this stabbing?

A. Yes.

Q. How is it that they said that the stabbing had taken place?

A. Just, you know, just like the procedure you take to stab somebody, that's all I saw.

Q. What was — was Joe there when the defendant was talking about this stabbing?

Diaz--27

A. *I think he just said that he was holding him.*

Q. He was – the defendant was holding Joe?

A. No, Joe was holding the guy.

Q. What guy?

A. The guy we're talking about.

Q. That guy that was stabbed.

A. Yes.

Q. Did you hear who was doing the stabbing?

A. The defendant.

The trial court did not err in overruling the objection to the question that was asked. A statement is not hearsay when it is offered against a party and is "the party's own statement in either an individual or representative capacity."[24]

There was no objection to any other question or to the unresponsive answer, "I think he just said he was holding him." The record does not show any erroneous ruling, and the point is overruled.

---

[24]TEX. R. EVID. 801(e)(2)(A).

Diaz--28

## Seventh Point of Error

The seventh point of error is, "The trial court erred in allowing the hearsay testimony of Manuel Montes about what he heard on the phone." That is not what the trial court did. The record shows:

Q. The first time that you heard that the defendant had killed somebody, when was that?

A. My wife told me over the phone.

[DEFENSE COUNSEL]: Objection, Your Honor, calls for hearsay.

THE COURT: Sustained.

[DEFENSE COUNSEL]: I would ask the Court to instruct the jury to disregard.

THE COURT: The question is, the first time that you heard that the defendant had killed somebody, when was that?
    There was an answer given by this witness. At this time, I am instructing this jury to disregard the last statement given by this witness, and at this time, you are instructed to disregard it, not consider it for any purpose in any way in this case at this point.

[DEFENSE COUNSEL]: Your Honor, we appreciate the Court's ruling. We feel that prejudice and error has attached, we therefore ask for a mistrial.

THE COURT: Denied.

[PROSECUTOR]: May I proceed, Your Honor?

THE COURT: Yes.

Q. Don't tell me who told you. But when was the first time that you heard the defendant and Joe had committed a murder?

A. Over the phone.

Q. Was it before you got home from work?

A. Yes, sir.

The appellant's brief is not correct to say that the court admitted hearsay. The court sustained the hearsay objection and instructed the jury to disregard the answer. The next answer, which the appellant includes in his complaint, was not objected to. The trial court cannot be said to have admitted it in error, since there was no objection.

The ruling at issue is the denial of the motion for mistrial. We think it was not error, for two reasons. First, there was copious evidence that the appellant had killed somebody. The incremental prejudice in this answer about what Montes heard on the telephone from his wife did not require a mistrial after the court's instruction to disregard.

> Generally, a mistrial is only required when the improper evidence is "clearly calculated to inflame the minds of the jury and is of such a character as to suggest the impossibility of withdrawing the impression produced on the minds of the jury." *See Hernandez v. State*, 805 S.W.2d 409, 414 (Tex. Cr. App. 1990) (quoting *Gonzales v. State*, 685 S.W.2d 47, 49 (Tex. Cr. App. 1985). In all other situations, the jury is presumed to follow the trial court's motion to disregard improperly admitted evidence. *See Waldo v. State*, 746 S.W.2d 750, 754 (Tex. Cr. App. 1988). Whether the erroneous admission of evidence requires a mistrial is determined by looking at the facts and circumstances of the case. *See Hernandez*, 805 S.W.2d at 414.[25]

Second, the appellant did not object when Montes promptly gave the same, unresponsive answer. Our rule is, a ruling that admits evidence is not reversible error if

---

[25]*Hinojosa v. State* 4 S.W.3d 240, 253 (Tex. Cr. App. 1999).

Diaz--30

the same evidence is admitted without objection.[26] If the appellant were concerned about

the prejudicial effect of this answer, he should have renewed his objection and motion for

mistrial. Point of error seven is overruled.

### Eighth Point of Error

The appellant complains the trial court erred in admitting hearsay statements

through the testimony of Detective Ralph Ramirez. What follows is the entirety of

Ramirez's testimony on this aspect of the case:

> A. Well, through investigation we were able to come up with another name
> as to a person who may have knowledge after the fact of the crime. This
> person had been identified by the name of Felix Quintanilla, and he was
> located and brought in for and interview [*sic*].
>
> Q. Did he give you a statement?
>
> A. Yes.
>
> Q. Were you able to — how did his statement compare with other
> information you had in the case?
>
> A. Well, his information, the information of Felix Quintanilla pretty much
> corroborated —
>
> [DEFENSE COUNSEL]: I object as to hearsay, Your Honor.
>
> [PROSECUTOR]: The question is how did it compare?
>
> [DEFENSE COUNSEL]: And the witness was about to testify this information
> was —

---

[26]*See, e.g., Leday v. State*, 983 S.W.2d 713 (Tex. Cr. App. 1998).

058

Diaz--31

[PROSECUTOR]:  Consistent or inconsistent.  He was about to say what he was told, Your Honor.  [The record is thus, although it seems likely that the latter sentence was spoken by the defense counsel.]

THE COURT:  Overruled.

Q.  Let me ask you again:  How did the information Felix Quintanilla gave you, did you compare to the other information in the case?  [*Sic.*]

A.  Well, it pretty much was consistent with other information obtained from other witnesses, other persons that we talked to in this case to include Danielle Hernandez [*sic*] and Arcelia Reyes, yes, sir.

Q.  Was Felix Quintanilla treated as a suspect in this case?

A.  Not — not really.  I believe we took a statement.  I don't recall if it is a statement of accused or not.  But he had not been placed in the apartment by any of the people we have spoken to.  I don't know if I can recall my notes here as far as what kind of statement we took from him.

(Brief Pause.)

A.  Well, my notes indicate that just a regular statement was obtained from Felix Quintanilla as to his information.

Q.  Were you aware of Felix Quintinilla's reputation at the time that these statements were taken from him?

A.  Yes.

Q.  Would that cause you to believe that just based on who Felix Quintanilla was, that maybe a statement of accused was taken from you [*sic*]?

A.  I know that the statement — I don't recall as to the — I only put in my supplemental, a statement was obtained.  It could have been a statement of accused, sure.

Q.  Did you have any information implicating him in the commission of the capital murder?

Diaz--32

A.  No, not really.

The appellant's argument is, "The hearsay admitted in the present case is similar to that admitted in [*Schaffer v. State*, 777 S.W.2d 111 (Tex. Cr. App. 1989).] It is hearsay admitted for the purpose of improperly bolstering the state's case." In *Schaffer*, the defendant admitted that he knowingly possessed controlled substances, as the indictment charged, but he said he did so while he was acting as an informant for Officer Jimmy Seals.  In rebuttal the State called Officer Segovia, who testified that he had talked to Seals and that he,  Segovia, would not ask the State to drop the charges against Schaffer. We held that this amounted to hearsay.

We recently contrasted the facts of *Schaffer* with the facts in a child-abuse case in which an investigator testified "about the course of his investigation." He said that he interviewed the child and the child's aunt and mother.  He took statements from the aunt and mother.  He was asked whether their statements were consistent with the the facts related to him by the child.  He said, "Yes."[27]  We held that the trial court did not abuse its discretion in concluding that the answer was not hearsay because it was not offered for the purpose of conveying to the jury the content of the statements, but only to convey that the facts were uniform.[28]  We think the same is true in this case.  Point of error eight is overruled.

---

[27]*Head v. State*, 4 S.W.3d 258, 259–60 (Tex. Cr. App. 1999).

[28]*Id.* at 262–63.

Diaz--33

## Ninth Point of Error

Point nine is a claim of error in admitting hearsay at the punishment phase of the trial. The State offered evidence of the appellant's killing of David Anthony Nichols about ten days before he murdered Michael Ryan Nichols. Rodolfo Villegas testified that he saw the appellant in a fist fight at Villegas's residence. The appellant knocked a man down twice, after which the man was unconscious. The appellant kicked him in the head two or three times, and his companion stomped the man's face. Then they took him to a nearby drainage ditch, where his body was found the next day. The next day the appellant told Villegas there would be no problems because they had smashed the man's face with a hammer so that he could not be identified. When the police came to talk to him, Villegas told them that "Rogelio" had performed these acts. He gave them that name because he was scared that he might end up like the man who was found in the ditch. Later he gave them the "correct" name.

Police Investigator Aurora Salinas testified that she interviewed Villegas at his house and, several days later, again at the police station. From the second interview she learned that Villegas "had not given the proper information in the first statement." He corrected the information, and as a result she had the appellant as a suspect.

> Q. Did he ever inform you as to why he had given you the wrong information?
>
> [DEFENSE COUNSEL]: I'm going to object as to hearsay, whatever she is going to testify to, if Mr. Villegas told her that.

051

Diaz--34

THE COURT: What is your objection, counselor?  Hearsay?

[DEFENSE COUNSEL]: Yes, Your Honor.

THE COURT: Sustained.

Q. Without telling us what he told you, did he ever inform you as to why he gave you the wrong information?

A. He —

Q. Without saying what he told you.

A. Mr. Villegas appeared to be very scared.

Q. Did he — you obtained the reason why he did not give you the correct information the next time?  Yes or no?

A. Yes.

There were no other objections during the direct examination of the witness.  The record does not show any ruling that was adverse to the appellant.  Point of error nine is overruled.

### Tenth Point of Error

The tenth point of error brings us back to the guilt stage of the trial.  The appellant complains of the admission into evidence of a note (and photographs of the note) that was found in a bathroom of Ryan Nichols's apartment.  A police investigator testified:

Q. What do photos 86 and 87, what do they show, State's Exhibits 86 and 87?

A. This a photograph showing the top part of the bathroom sink in the hallway.  It shows the sink, some lotions that are on top of the sink, some

handwriting. The State's position was that "all matters that are in the apartment are relevant to that extent." The court ruled that the photograph was relevant to prove that the police did a thorough job of investigating the apartment, and the content of the note was relevant to prevent the jury's speculating that it was being withheld.

On the question of prejudice, the appellant argued that the jury might think that the appellant wrote the note and was threatening Nichols, and that that was the reason for the murder. The court ruled that "the probative value offered to show that in fact this investigation was as thorough as they could do it … would outweigh any prejudicial effect it would have, if we give them the instruction." Before the note was read to the jury, the judge instructed them:

> As you note, the State of Texas has made an offer of 86 and 87. Contained in 86 and 87, you will see something that contains writing on it. The testimony has been that there was a note that was found in a bathroom.
> Now, you are the fact-finders. So I need to instruct you that the only reason or the only purpose that you may consider that note is to show that, in fact, that is the bathroom and that is what they found, that's what they're testifying about. Now, you and you alone will determine whether you believe that or not.
> However, I must instruct you, that the writing, if any writing is found, that can be made out on that note is not to be taken as true. In other words, they're not offering the note to show that what they're saying in the note is true. They're just offering it to show that they found the note.
> Does everyone understand that?

THE JURY: Yes, sir.

We think the trial court did not abuse its discretion in ruling that the probative value of the note was not greatly outweighed by the danger of unfair prejudice, which is the standard in Rule of Evidence 403. The court admitted the note with instructions that the jury not consider the note for the truth of its content. The note appeared to concern bad checks written to HEB, a supermarket. The danger of unfair prejudice was little or none. Point of error ten is overruled.

### Eleventh Point of Error

In his eleventh point of error, the appellant claims the trial court erred in admitting, at the guilt stage, evidence of the appellant's tattoos after he had already been identified by the witness. He says this was purely for the purpose of implying gang membership.

There was no evidence that the tattoos related to any gang. The judge was familiar with gang tattoos, and he knew of no such implication. (As we shall note in connection with point thirteen, below, the tattooed word was the Spanish equivalent of "from the valley.") The appellant fails to present any other argument or any authority in support of this point of error. Point of error eleven is overruled.

### Twelfth Point of Error

In point of error twelve, the appellant complains the trial court erred in allowing, at the punishment stage, testimony of the appellant's gang membership. At the punishment phase of trial the State offered evidence that it was common practice in the county jail to place inmates of the same gang affiliation together for their own safety. By this process,

the appellant was placed in a cell block with Pistoleros. The appellant argues that the only evidence of the appellant's membership in the Pistoleros was the State's evidence of the decision to place him in the cell block with Pistoleros. The appellant argues that any activities the appellant participated in with the Pistoleros were a result of the appellant's forced association with them in the county jail.

The testimony both during the hearing outside the presence of the jury and before the jury reflects that the appellant was placed with the Pistoleros because he reported at his booking that he was associated with or was a member of that gang.

Lieutenant Badillo of the Sheriff's Office testified out of the presence of the jury that all prisoners were asked during the booking process to identify any gang affiliations. He explained that such classifications were for the protection of both prisoners and jail personnel. He said the appellant's booking sheet would reflect that he was asked a question about gang affiliation. Lieutenant Lopez testified similarly, stating that the appellant was placed with Pistoleros based on information he provided to the prison authorities.

Similar evidence was admitted in Lieutenant Badillo's testimony before the jury:

Q. How is it you determine who is a member of a — what gang?

A. During the booking process, we ask the booking officers, that's one of the questions we ask. Are you gang affiliated? They ask them, remind them that it is for their protection, also, so that we can separate them, to avoid any problems.

Diaz--40

Q. So that information is provided by the person that is being jailed himself; is that correct?

A. Yes, sir.

Q. Is there a particular gang that is housed in Echo Two at this time?

A. The Pistoleros.

The appellant's complaints about the State's "forced association" between the appellant and the Pistoleros are not supported by the record. Point of error twelve is overruled.

### Thirteenth Point of Error

The thirteenth point of error is, "The prosecution committed misconduct in using the tattoo as part of its proof of appellant's gang affiliation when it stated that it would not do so and that the admission was for identity only." When the State asked to display the appellant's tattoos to the jury for identification purposes at the guilt stage, the appellant objected, and the court held a hearing outside the presence of the jury. Defense counsel reminded the court that it had filed a motion in limine asking that there be no mention of gang membership and argued that once the tattoos were shown, the State would attempt to bring in evidence of gang membership. The prosecutor stated that the tattoos were offered now for identity purposes, but he mentioned the possibility that the State might later call an expert who had information on what they meant or stood for. The trial court overruled the appellant's objection and allowed display of the tattoos for identification purposes, warning the State that "until you have more than just those

Diaz--41

tattoos, you are not going to be allowed to get into that area of gang membership or anything like that." The clear understanding was that the State would have to come up with some more evidence of gang membership or expert testimony explaining the significance of the tattoos or something more than just the tattoos themselves. The court took under advisement the admission of a photograph of the tattoo.

Later, Investigator Ramirez testified that he knew what the tattoo read and what it meant: "vayuko," meaning "from the valley" or "valleyite." Outside the presence of the jury, the judge said he had knowledge of gang tattoos, but that "vayuko" had no such significance so far as he knew. The photograph was admitted. We take judicial notice that McAllen is located in the lower Rio Grande Valley, commonly called simply "the valley."

The appellant does not point to, nor have we found, anything in the record to show that the State relied on or alluded to the appellant's "vayuko" tattoo as evidence of gang membership, or that it made such an implication. The appellant's complaint of "misconduct" by the State is unfounded. Point of error thirteen is overruled.

### Fourteenth Point of Error

In point of error fourteen, the appellant claims this case should be reversed due to cumulative error in the repeated admission of hearsay evidence, based on points of error two through ten. We have held that points of error two through ten show no error. *A fortiori*, they are not cumulatively erroneous.

Diaz--42

## Fifteenth Point of Error

In his fifteenth point of error, the appellant claims trial counsel was ineffective in three ways: failing to seek a ruling as to the accomplice-witness status of Danielle "Candy" Thomas, failing to take witness Manuel Montes on *voir dire* to ask whether the appellant was present during all parts of the conversation with the Trevino brothers, and failing to move to strike testimony of gang membership.

There is considerable difficulty in evaluating a claim of ineffective assistance of counsel when there has been no hearing on the issue. Recently we held that an appellate court may not reverse a conviction on ineffective-assistance-of-counsel grounds when counsel's actions or omissions may have been based on tactical decisions, but the record contains no specific explanation for counsel's decisions.[29] The leading opinion of the Supreme Court explains the reason.

> Judicial scrutiny of counsel's performance must be highly deferential. It is all too tempting for a defendant to second-guess counsel's assistance after conviction or adverse sentence, and it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable. A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time. Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action "might be considered sound trial

---

[29]*Bone v. State*, 77 S.W.3d 828 (Tex. Cr. App. 2002).

Diaz--43

strategy." There are countless ways to provide effective assistance in any
given case. Even the best criminal defense attorneys would not defend a
particular client in the same way.

. . .

Thus, a court deciding an actual ineffectiveness claim must judge the
reasonableness of counsel's challenged conduct on the facts of the
particular case, viewed as of the time of counsel's conduct. A convicted
defendant making a claim of ineffective assistance must identify the acts or
omissions of counsel that are alleged not to have been the result of
reasonable professional judgment. The court must then determine whether,
in light of all the circumstances, the identified acts or omissions were
outside the wide range of professionally competent assistance. In making
that determination, the court should keep in mind that counsel's function, as
elaborated in prevailing professional norms, is to make the adversarial
testing process work in the particular case. At the same time, the court
should recognize that counsel is strongly presumed to have rendered
adequate assistance and made all significant decisions in the exercise of
reasonable professional judgment.[30]

### A.

As to Thomas, the appellant seems to imply that the motive for the crime was to

collect the entire amount that Nichols owed Thomas. He points out that the robbery was

committed after Thomas and Arcy Reyes visited the apartment, that "events did not turn

deadly" until Reyes showed up again at the apartment, that the appellant went to

Thomas's and Reyes's trailer after the murder, and that arguably Thomas's testimony was

a *quid pro quo* for not being charged in the crime. He says, "Had defense counsel sought

a ruling from the court that Ms. Thomas should be considered an accomplice-witness her

---

[30]*Strickland v. Washington*, 466 U.S. 668, 689–90 (1984) (citations omitted).

testimony could have been viewed with proper skepticism by the jury ...." This is wrong in two aspects.

First, having "sought a ruling from the court" would not have produced the result that is claimed, or any other result that would show ineffective assistance of counsel. The appellant "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome."[31] The appellant must show that the law would have entitled him to an instruction on the law of accomplice witnesses. On this record, the appellant had no right to a charge that "Thomas should be considered an accomplice-witness," as the appellant argues. The best counsel could have achieved would have been a charge that would have required the jury to decide whether Thomas was, in fact, an accomplice. The record is far from showing a probability that the jury would have so found.

Second, it is not enough to say that an instruction on the law of accomplice witnesses would have allowed her testimony to "have been viewed with proper skepticism." The instruction would have told the jury, if they found (or had a reasonable doubt) that Thomas was an accomplice, not to convict upon her testimony "unless corroborated by other evidence tending to connect the appellant with the offense committed; and the corroboration is not sufficient if it merely shows the commission of

---

[31]*Id.* at 694.

Diaz--45

the offense."[32]  The instruction is not about viewing an accomplice witness's testimony

skeptically.  Such was the charge that was given at common law, but it may not be given

in Texas because of the legislature's decision that the court may not comment on the

evidence.[33]  The prohibition of judges' commenting on the evidence meant that the

benefit of the common-law warning to beware the evidence of an accomplice could be

retained only by turning the warning into a rule of law.[34]  In Texas, as in nearly half of the

conviction may not be had on the uncorroborated evidence of an accomplice,[35] even a

credible one.

To show a reasonable probability that the outcome of this trial would have been

different if counsel had requested a charge on the law of accomplice witnesses, the

appellant must show not only that he was entitled to the charge, but that the charge would

have, in reasonable probability, have led to his not being convicted because Thomas's

testimony was uncorroborated.  In this case, Thomas's testimony was corroborated by

such things as the testimony of an eyewitness who saw the appellant commit the offense

and the appellant's non-custodial statement that he committed the offense.  We cannot say

that counsel's alleged failure amounted to ineffective assistance of counsel.

---

[32]TEX. CODE CRIM. PROC. art. 38.14.

[33]See id. art. 36.14 .

[34]JOHN HENRY WIGMORE, EVIDENCE § 2056 (3d ed. 1940).

[35]Ibid.

Diaz--46

### B.

As to taking Montes on *voir dire*, the appellant's argument is that *if* Montes testified that Cordova made some of the statements to the Trevino brothers, and *if* the evidence would not have permitted the trial court to rule that those statements were adopted by the appellant's admission of them under Rule of Evidence 801(e)(2)(B), then "some of the conversation may not have been admissible." These two possibilities are not demonstrated by this record, and the latter (that the appellant would not have been deemed to have adopted, by silence at least, Cordova's statement that the appellant wielded the knife) seems extremely improbable.

### C.

The appellant's third claim of ineffective assistance of counsel is stated in a single sentence: "After the state tried and failed to establish the appellant's voluntary gang membership it was trial counsel's duty to move to strike that evidence, and to have the jury instructed that it could not consider that evidence in determining the appellant's future danger to society." The record does not show that the State failed. Witness after witness testified that the appellant was in the unit for members of the Pistoleros gang because he had informed the jailers that he was of that gang. One jailer testified that the appellant acted as the leader of the gang members in the unit. The appellant presents no argument that he was prejudiced by counsel's inaction. He therefore fails to satisfy the

Diaz--47

requirements for establishing an claim of ineffective assistance of counsel. Point of error fifteen is overruled.

### Sixteenth Point of Error

The sixteenth point of error is, "The evidence is insufficient to support a finding that appellant will be a continuing threat to society if given a life sentence." Despite the appellant's phrasing of the point, his arguments have nothing to do with the inadequacy of the evidence. They are that it is error not to charge the jury that "society" includes "prison society," and that the Due Process Clause requires this court to conduct a "factual sufficiency" (as distinguished from "legal sufficiency") review of the evidence on this issue. We have rejected both arguments previously.[36] Point of error sixteen is overruled.

The judgment of the trial court is affirmed.


En banc.
Delivered September 18, 2002.
Do not publish.

---

[36]*See, e.g., Ladd v. State*, 3 S.W.3d 547, 572–73 (Tex. Cr. App. 1999) (definition of "society"), *cert. denied*, 529 U.S. 1070 (2000); *McGinn v. State*, 961 S.W.2d 161, 169 (Tex. Cr. App. 1998) (evidence review).

# Exhibit B

# CHARLES A. PALMER

Attorney at Law
**5900 Balcones – Suite 210**
**Austin, Texas 78731**

Criminal Appeals & Writs of Habeas Corpus
State and Federal Court
Board Certified in Civil Appellate Law

Telephone 512.458.3100
Facsimile 512.458.3119
charles.palmer@sbcglobal.net

January 20, 2004

Ms. Carla E. Eldred
Assistant Attorney General
Postconviction Litigation Division
P. O. Box 12548, Capitol Station
Austin, Texas 787711-2548

Re:     *Diaz v. Dretke*, No. M-03–055

Dear Ms. Eldred:

This letter confirms our telephone conversation this morning regarding application of the statute of limitations to the above referenced case. Specifically, we agreed that Mr. Diaz's deadline for filing his federal habeas petition is June 18, 2004, and that if a skeletal petition is filed by that date, you will not oppose allowing him to file an amended petition by December 12, 2004 – one year from the date that I was appointed to represent him.

Thank you.

Yours truly,

Charles A. Palmer

# Exhibit C

### AFFIDAVIT

My name is Arturo Eleazar Diaz, TDCJ No. 9993450. In February 2000, I was found guilty of capital murder and sentenced to death in cause number CR-1464-99-G in the 370th District Court of Hidalgo County. My trial attorneys were Daniel Reyes and Rogelio Garza. My state habeas corpus attorney was Mark Alexander.

I remember that at one of the pretrial hearings, the prosecutor offered me a plea bargain of a life sentence if I would plead guilty to capital murder. The hearing was on a Thursday, and the prosecutor and the judge told me that I had until the following Monday to accept the deal.

When the hearing was over, the judge let me remain in the courtroom with my attorneys to discuss the offer, and we talked for about fifteen minutes. After the courtroom was cleared, Mr. Garza turned to me and asked, "What do you think? Do you want to take the life sentence?" Mr. Garza and Mr. Reyes told me that if I took the offer, I would not be eligible for parole for 40 years. They also told me that if I pled not guilty and went to trial, the State was sure to get a murder conviction, but that I might be acquitted of capital murder if we could show that the murder did not take place during a robbery. They did not tell me what sentence I would get if I were convicted of murder or when I would be eligible for parole. They made it sound like we had a 50-50 chance of winning on the capital murder charge if we went to trial. My attorneys did not advise me whether to accept the offer and told me that it was up to me. I refused the offer because I did not want to spend forty years in prison and my attorneys convinced me we had a chance to beat the capital murder charge

**Arturo Diaz affidavit – page 2**

if we went to trial.

I did not see my attorneys again until the following Monday morning, right before we went into the courtroom. They did not discuss the offer again. Mr. Garza just asked me if my answer was still "no," and I told him that it was. My attorneys never told me that if I were convicted of murder, I could receive a life sentence and would not be eligible for parole for thirty years. If I had known that, I would have accepted the State's offer of a life sentence.

Mr. Reyes visited me in jail before trial and asked whether I had been abused as a child or if I knew of anything else that could help my case. Because I did not know what, if anything, would help me, I could not provide him any information. I did tell him to contact my wife and my grandmother and that they would be willing to testify in my behalf. I never told my attorneys that I did not want them to present witnesses at the punishment phase of trial.

I have never met Mr. Alexander. He did not call me, write me, or come to visit me in prison. I wrote him several letters asking about my case, and he never responded to any of them. The state habeas corpus petition that he filed on my behalf was prepared without any input from me or any other fact witnesses who did not testify at trial.

**Arturo Diaz affidavit – page 3**

I have read the above and declare under penalty of perjury that it is true and correct.

ARTURO DIAZ

Sworn and subscribed before me on this the ___9___ day of June, 2004.

KENNETH STACKHOUSE
NOTARY PUBLIC
STATE OF TEXAS
My Commission Expires 01-16-2006

NOTARY PUBLIC, State of Texas

# Exhibit D

## AFFIDAVIT

My name is James M. Terry, Jr. I am co-counsel for Arturo Diaz in a habeas corpus action pending in federal district court in McAllen, Texas – *Diaz v. Dretke*, No. M-03-MC-055.

I called Mr. Diaz's lead trial counsel, Daniel Reyes, and requested that he provide me with his file. He was not willing to give me the original file, but stated that he would have the entire file copied and sent to me. I subsequently received four large cardboard boxes from Mr. Reyes. He advised me that they contained his entire file except for payment vouchers that he had submitted to the court.

I have reviewed the entire contents of the four boxes provided by Mr. Reyes. My review revealed that the only document in Mr. Reyes's file relating to the State's plea offer of a life sentence is a single page of handwritten notes, attached hereto. My review of Mr. Reyes's file did not reveal any federal caselaw relating to mitigating evidence. The only documents showing that trial counsel had any contact with Mr. Diaz's family members are attached hereto and are as follows:

> A page of handwritten notes reflecting that counsel conferred with Mr. Diaz's mother for a half hour on June 30, 1999, and also containing her address and telephone number.

> Three pages of handwritten notes devoted primarily to locating Mr. Diaz's uncle, Martin Lopez, and which also contain two phone numbers for contacting Mr. Diaz's grandmother.

> A page and a half of handwritten notes from an interview with Mr. Diaz on January 7, 2000.

**Terry Affidavit – Page 2**

I declare under penalty of perjury that the foregoing is true and correct.

JAMES M. TERRY, JR.

SIGNED under oath before me on the ___14th___ day of ___June___, 2004.

NOTARY PUBLIC, State of Texas

JANET K. TEDROW
MY COMMISSION EXPIRES
October 7, 2004

# Exhibit E

## AFFIDAVIT

My name is Veronica Veleta. I am the older sister of Arturo Diaz. My younger sister, Elena, and Arturo and I all had different fathers; I met my father once, but they never knew their fathers. Arturo and I were born less than a year apart; my mother was fifteen years old when I was born and sixteen when Arturo was born.

For the first five years of Arturo's life, we lived with my mother. There was no male head of the household, and she was constantly bringing different boyfriends over to the house. Whenever one of her boyfriends was visiting, Arturo and I had to stay in the closet and be quiet, as if we didn't exist. One time when we were in the closet, my mother tried to steal a man's wallet, and we heard him tell her not to ever dare to do that again.

When Arturo was five years old, my mother "gave" us to my grandmother because she "couldn't stand us" any more. My grandmother did not approve of my mother's lifestyle and numerous boyfriends and did not believe that she was mature enough to care for us. Although my grandmother was like a mom, we always questioned why our mother preferred men to us and why we weren't like the other kids at school, who had two parents.

We were very poor. We lived in a one-bedroom house in the Las Milpas colonia in Hidalgo County, Texas. Also living in the house were my grandmother's second husband, Abel Camacho; my cousin, Rosalinda Rodriguez; one of my aunts, Susana Torres; and three of my uncles – Martin Lopez, Norberto Diaz, and Adelaido ("Lalo") Diaz. Abel Camacho worked as a farm laborer. The only other income for the household was food stamps and Social Security payments that my grandmother received each month, but it was not enough

to provide us all with food and clothes. Many days, all we had to eat was beans and soup.

My grandmother and Abel Camacho slept on a bed in the bedroom, and Susana also had a bed in the same room. The rest of us slept in the living room, either on the couch or on the floor with some blankets. We had a gas stove and used to turn on the burners to warm the house during winter. Eventually, we got a window unit air conditioner, but it was only big enough to cool the bedroom, and we couldn't run it all the time because of the cost of electricity. The living room got very hot, and we had to prop open the doors and windows to try to stay cool. Because we didn't have a water heater, we had to heat water in a pail for baths. We didn't have a tub or shower, just a little room where we sat on a milk rack and poured water over us from a bowl.

Whenever we ate eggs, we would save the shells, and they would be filled with confetti or flour for us to hunt for on Easter. We were never bought an Easter basket. My Aunt Cruz had a little more money than the rest of the family, and she was the only one who would buy Christmas gifts for us children. My grandmother couldn't afford to buy presents for us. By the time we became teenagers, we did not get Christmas gifts any more.

Beginning when he was about eight years old, Arturo would work in the fields picking cotton with Abel. They would work from 7 a.m. to 6 to 8 p.m. each day. Often, Abel would wake Arturo up at 2 a.m. so they could go out together to irrigate the fields.

Arturo looked up to our uncles and took them as his role models. Our uncles were lazy and did not work. Instead, they would sleep until 11 a.m. and then go out to "hang out" all

day. When my uncles drank, they always got drank until they got drunk, and then they would get in fights. I remember when Arturo and Abel would come in from the fields, Uncle Lalo would tell Abel that Arturo was too young to work. Our uncles were constantly in trouble with the law. I remember that Uncle Martin was convicted of theft and burglary and that Uncle Lalo was convicted of theft, burglary, and murder while they were living there with us. Whenever the local authorities were investigating a crime in the Las Milpas area, they always came to our house first to find out whether any of them were involved.

All his life, Arturo was sad and depressed because he never knew his father and our mother had abandoned us. Sometimes he would burn his arms with cigarettes to help take his mind off the pain inside. When Arturo was about fourteen years old, my uncles got him started smoking pot and drinking alcohol. I believe Arturo used alcohol and drugs because of the pain he felt at not having parents.

Because he was our "step-grandfather" and not our real grandfather, Abel Camacho did not believe that it was his role to act as a disciplinarian in the household. My grandmother was the only one to discipline us children. As Arturo grew older, he fell more and more under the bad influence of my uncles, and my grandmother was not able to control his behavior. Starting when he was in junior high school, Arturo began skipping school and staying out on the streets until late at night. When Arturo was fifteen years old, he was convicted of burglary. At that time, my grandmother told the authorities that she could not control Arturo any longer.

About the time I graduated from high school, my mother called and asked for Elena, Arturo and me to come to live with her in Arizona. She told us she loved us and would provide new opportunities for us. We moved to Arizona because we were hopeful of starting a new life. When we got there, however, we found out that we were not really wanted. Arturo and I were made to pay rent, but our in-laws were not. Although my mother cooked for the in-laws, she did not cook for Arturo or wash his clothes, and I had to do so. My mother wouldn't even make Arturo a lunch to take to work. After a while, he returned to Texas. Arturo was very sad, as he felt he had been rejected by our mother for a second time.

Arturo's lawyers never contacted me about testifying at his capital murder trial. If they had done so, I would have told them that I was willing to testify about his background and upbringing and to ask the jury to spare his life.

I declare under penalty of perjury that the foregoing is true and correct.



VERONICA VELETA

SIGNED under oath before me on the ___7___ day of ___June___,

2004.

OFFICIAL SEAL
BRIDGET BERNSTEIN
Notary Public - State of Arizona
MARICOPA COUNTY
My Comm. Expires April 19, 2005

NOTARY PUBLIC, State of Arizona

4

# Exhibit F

## AFFIDAVIT

My name is Maria Elena Camacho. I am the grandmother of Arturo Diaz. Arturo and his two sisters, Veronica and Elena, lived with me in a one-bedroom house in the Las Milpas colonia. Maria, Arturo, and Elena all had different fathers, and we never knew any of them. Also living in the house were my second husband, Abel Camacho; four of my other children – Susana Torres, Martin Lopez, Norberto Diaz, and Adelaido Diaz – and another granddaughter, Rosalinda Rodriguez, whose mother was my daughter Cruz.

The children came to live with me when Arturo was five years old because their mother, Angelica, could not care for them, and I later became their legal guardian. When they were living with Angelica, she never had enough food for them, and many times Arturo and Veronica would come to my house afraid, hungry, and tired, and tell me that she was not at home. When they were living with Angelica, she was always having different men in the house. Many times, I would go to Angelica's house and find Arturo and Veronica locked in a closet so that they would not bother Angelica when she was with her male visitors. Once, I got a call from a child welfare caseworker because Angelica had taken the children to a party late at night, and they were brought to me. Another time, all three children were taken to San Luis Potosi, Mexico, by their mother, and the Mexican police called me to the international bridge to pick them up because Angelica had been beaten up by the man she was with.

We were very poor. Abel Camacho worked as a farm laborer. The only other income for the household was food stamps and Social Security payments that I received each month,

but it was not enough to provide the children with proper food and clothes. I would sell Mexican candies that had tamarind and "chile" in order to make extra money. Arturo would eat a lot of these candies while he lives with me. Beginning when he was about eight years old, Arturo would work in the fields picking cotton with Abel. They would work from 7 a.m. until nearly sundown. Sometimes, Abel would wake Arturo up in the middle of the night so that they could go irrigate the fields. There were times when Abel was not available, and I would wake Arturo up and take him to the fields to do the irrigation work.

It always bothered Arturo that he had been abandoned by his mother. When he was a teenager, he went to live with Angelica in Arizona, but it did not work out, and he returned home angry and hurt. After that, his behavior became much worse. Abel Camacho did not believe that it was his role to act as a disciplinarian in the household, and I was the only one to discipline the children. Arturo was very caring and responsible as a young boy, but he changed as he grew older and became disrespectful and hard for me to control. Arturo's uncles were not a good influence on him. They did not work and were always in trouble with the law. By the time Arturo was fifteen years old, he also was in trouble with the law, and I was no longer able to control him.

I was present in the courtroom for all of the hearings and the entire trial of Arturo's capital murder case. The only time his lawyers spoke to me was when Mr. Reyes would tell me the date of the next court hearing. They never asked me anything about Arturo's childhood or whether I wished to testify. Because they did not tell me, I did not know that

2

I could testify. I feel that Arturo is more like a son than a grandson, and I would have gladly spoken to the jury about his childhood and asked them to spare his life.

I do not read or write the English language. This affidavit was read to me in Spanish by Norma Solis, and I agree with its contents.

I declare under penalty of perjury that the foregoing is true and correct. Executed on June ___10th___, 2004.

Signature mark witnessed by _____   MARIA ELENA CAMACHO

SIGNED under oath before me on the ___10th___ day of June, 2004.

YOLANDA R. VILLANUEVA
Notary Public, State of Texas
My Commission Expires
November 01, 2006

_____   NOTARY PUBLIC, State of Texas

3

# Exhibit G

## AFFIDAVIT

My name is Angelica Ruiz.  I am the mother of Arturo Diaz.  I know that the attorneys who represented Arturo at his capital murder trial were Daniel Reyes and Rogelio Garza.  During the time that Arturo was in jail before his trial, I called both Mr. Reyes at Mr. Garza several times at their offices and left messages asking for them to call me, but they did not return my calls.  Neither Mr. Reyes nor Mr. Garza nor any of their employees or investigators ever contacted me before the trial, and I met the attorneys only because I introduced myself to them at the courthouse during the trial proceedings.  I did not know that I could testify at the punishment phase of trial.  Mr. Reyes and Mr. Garza did not ask me whether I wished to testify or whether I was aware of any evidence that they could offer on Arturo's behalf regarding punishment.  They did not ask me any questions about Arturo's background and childhood.  If they had asked me those questions, I would have told them that I wished to testify and that, if called as a witness, I would testify as follows:

Arturo is the middle child of my three children.  Each of them had a different father, and I was not married to any of their fathers.  My first child, Veronica, was born on January 13, 1975, when I was fifteen years old, and Arturo was born on December 27, 1975, less than a year later, when I was sixteen.  My third daughter, Maria, was born on May 12, 1980.

I worked as an agricultural laborer when I was pregnant with Arturo.  My job

duties included picking peaches, strawberries, cherries, and apples.  These duties involved climbing ladders, lifting up to 45 pounds, stooping, and loading picked produce from sacks to crates.  During that time, I ate only one meal a day.  Because we were poor, we ate meat only about once a month.  Our meals usually consisted of beans, soups, and cream of wheat.

When Arturo was born, he had to stay in the hospital several days because he was born "yellow."  He also was born with a head that was oversized in relation to the rest of his body and stayed that way until he was four years old.  He had difficulty walking as a young child and frequently would lose his balance.  During the first ten years of his life, Arturo suffered from severe tonsilitis with fevers as high as 103 degrees.  Whenever he was sick with the flu or a cold, his tonsils would swell up to the point that he could not swallow.

Arturo and Veronica lived with me until they went to live with their grandmother when Arturo was in the first grade.  The first two years of Arturo's life we lived in a small two-room house in Alamo that had electricity but no running water.  The sheet rock was painted with lead-based paint.  The next place we lived was a two-room house in the Las Milpas colonia that did not have indoor plumbing and that had sheet rock painted with lead-based paint.  There was a canal nearby that Arturo would swim in that was known to be contaminated with refuse and pesticides.

2

The last place we lived was a one-room house in Pharr that had lead-based paint. It had a gas stove that we used to heat the house during the winter. During this time, I continued to work in agricultural labor. I would leave for work at 6 a.m. and would return between 3 and 4 p.m. While I was at work, the children were left in the care of a female friend of my mother. During this time, I was usually overwhelmed and fatigued to the point that I was unable to deal with the children. I did not have a constant male companion, although I had several brief relationships with men who would live with us briefly, then leave. When Arturo entered the first grade, I gave my children to my mother to raise because I was unable to control them and care for them. After that, my mother acted as their mother.

Arturo was a quiet, nervous child. He preferred to be alone or to play with his sisters rather than the other neighborhood children. When it was time for Arturo to begin kindergarten at age five, he became angry and started crying and screaming. I had to grab his arm and actually drag him the few blocks to the school. When we got there, his teacher had to take a strong hold of Arturo to control him.

Since the age of fifteen I have experienced anxiety attacks that have sometimes caused my hair to fall out as well as dizziness, blurred vision, chest pains, stomach pains, and cold sweats. On several occasions I have been taken to the hospital during anxiety attacks because I thought I was having a heart attack. After Maria was born,

3

I began to have epileptic attacks, which were made worse by my anxiety and nervousness. When Arturo was very young, he witnessed me have epileptic attacks on many occasions and would run with Veronica to his grandmother's house for help. Arturo would be very upset when he would see me have an attack.

    I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.



ANGELICA RUIZ

SIGNED under oath before me on ___May 26_____, 2004.

OFFICIAL SEAL
KARA A. HARDING
NOTARY PUBLIC-ARIZONA
MARICOPA COUNTY
My Comm. Expires Dec. 10, 2007

NOTARY PUBLIC, State of Arizona

4

# Exhibit H

## AFFIDAVIT

My name is Rosalinda Rodriguez.  I am Arturo Diaz's cousin.  We both were raised by my grandmother, Maria Elena Camacho.  Also living in the house were my grandmother's second husband, Abel Camacho; Arturo's sisters, Veronica and Elena; one of my aunts, Susana Torres; and three of my uncles – Martin Lopez, Norberto Diaz, and Adelaido ("Lalo") Diaz.

Arturo and I were very close as children.  We established a bond because we both had been abandoned by our mothers and we always were tormented by the thought that there must be something wrong with us, that our mothers had left us because we were bad.  Arturo also was very sad because he never knew his father.  When he was in elementary school, Arturo enjoyed school and took pride in doing well.  By the time Arturo entered junior high, however, he started to have problems in school.  He and I started drinking to ease our pain.  Arturo also would smoke marijuana and burn himself with cigarettes to help him forget the pain inside.

When Arturo was a teenager, he went to live with his mother in Arizona.  He told me that he felt that maybe his mother loved him after all, or she wouldn't have asked him to come live with her.   When he returned from Arizona, however, he was hurt and angry because, he told me, his mother was involved in her own life and he was not part of it.  He had tried to give her a second chance, and she had let him down again.

Arturo looked up to our uncles who lived with us, and they took the place of his father, whom he never knew.  Our uncles were lazy and did not work.  Instead, they would

sleep until 11 a.m. and then go out to "hang out" all day. Our uncles were constantly in trouble with the law. I remember that Uncle Martin was convicted of theft and burglary and that Uncle Lalo was convicted of theft, burglary, and murder while they were living there with us. Whenever the local authorities were investigating a crime in the Las Milpas area, they always came to our house first to find out whether any of them were involved. All of us, including Arturo would eat a lot of Mexican candies that had "chile" and tamarind. My grandmother would sell it so it was always available.

Arturo's lawyers never contacted me about testifying at his capital murder trial. If they had done so, I would have told them that I was willing to testify about his background and upbringing and to ask the jury to spare his life.

I declare under penalty of perjury that the foregoing is true and correct.


_____          ROSALINDA RODRIGUEZ

SIGNED under oath before me on the 10 day of June _____,

2004.



_____

NOTARY PUBLIC, State of Texas

YOLANDA R. VILLANUEVA
Notary Public, State of Texas
My Commission Expires
November 01, 2006

# Exhibit I

**AFFIDAVIT**

My name is Humberto Bocanegra.  I am a teacher and coach in the Pharr-San Juan-Alamo Independent School District.  Arturo Diaz was one of my students when I taught at Hidalgo I.S.D. and Arturo was in junior high school there.

I remember Arturo very well because he was starved for affection and was very eager to please – so much so that he could be easily influenced.  He yearned to belong with the athletic crowd but he did not have the self-esteem or confidence to try out for the sports teams or join the group. I believe he could have developed the athletic skills but he did not have the self confidence to try. Arturo did not have a father or any other positive role model, and he would seek me out for advice.  He often would tell me how he felt alone, and I attributed that to the fact that he lived with his grandmother and there was no adult male role model he could confide in. Even after Arturo dropped out of school, he would sporadically go by school sponsored functions and would wave and say hello to me.

I knew that he was not eating well because he always had a malnourished and tired look. He would often fall asleep in class. He started to hang around the crowd that was primarily boys from Mexico who spoke Spanish only. They were boys who came from working as street vendors in Mexico. He started to hand around this crowd because they would accept him as he was, no questions asked. Arturo then started to speak only Spanish and avoided speaking in English

I was genuinely shocked when I learned that Arturo had been charged with capital murder. When he was around me, Arturo was always calm, quiet, and helpful.  Nothing in his character indicated that he could be mean or violent.

I declare under penalty of perjury that the foregoing is true and correct.

HUMBERTO BOCANEGRA

SIGNED under oath before me on the _11_ day of June, 2004.

NOTARY PUBLIC, State of Texas

YOLANDA R. VILLANUEVA
Notary Public, State of Texas
My Commission Expires
November 01, 2006

2

# Exhibit J

**ED-OP REGISTRATION**                                                     HCA-13560 60C0

HCA RIO GRANDE REG. HOSP.
101 EAST RIDGE RD.
PO BOX 9300
McALLEN, TEXAS                  78503

| 1 MEDICAL RECORD NO | 2 BILLING NO | 3 A/R NO |
|---|---|---|
| 060200 | 000076210020 EE | 1 |

| 4 CLASS | 5 DATE | | 6 BAC | 7 | 8 BAD |
|---|---|---|---|---|---|
| ED | 12-11-94  22:10 | | 07 | E | |

DIAZ ARTURO ELEAZAR   M H 12-27-1975 018

| 27 PRIOR STAY | | | | | | |
|---|---|---|---|---|---|---|
| | | | | | S | 22 TELE |
| | | | | | | 210 |

636 RUSTY DRIVE       PHARR       ZIP=785770000   TX 781-2379

N

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                                       215   HIDALGO

SF DIAZ ARTURO ELEAZAR   12-27-1975   636 RUSTY DRIVE   PHARR   ZIP=785770000   210   TX 781-2379

N

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                                       215   HIDALGO

| P R I M A R Y |
|---|

| S E C O N D A R Y |
|---|

| T E R T I A R Y |
|---|

| 11 | 12-11-94 |
|---|---|

944.11, 948.00

| 84 PR | 85. NOTIFY IN EMERGENCY | 86 HOME TELE 210 | 87 WORK TELE | 88 MOW PATIENT ARRIVED |
|---|---|---|---|---|
| GM | DIAZ MARIA ELENA | 787-0249 | | PHARR PD |

**OUTPATIENT SURGERY INFORMATION**

| 91 PROC CD | 92 PROCEDURE | 93 LOC | 94. TIME | 95. ANES. |
|---|---|---|---|---|
| | | | 00:00 | |

**ACCIDENT** / **ONSET OF ILLNESS**

| 96. TYPE | 97 DATE | 98 TIME | 99 TYPE | 100 DATE | 101 | 102 | 103 |
|---|---|---|---|---|---|---|---|
| | 12-11-94 00:00 | | 11 | 12-11-94 | | | |

| 104 PHYSICIAN CALLED | 105 ATTENDING PHYSICIAN | 106 FAMILY PHYSICIAN |
|---|---|---|
| SHAH SAQIB MD | SHAH SAQIB MD | |

| SPECIAL CATAGORIES | | | DEMOGRAPHIC CD | | | 114 REV CAT | 115 BASE C/S | 116 OP INS | 117 EST CHGS | 118 VAL | 119 BY |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 108 | 109 | 110 | 111 00 | 112 00 | 113 00 99 | 052 | 000 | | 000000 | N | MEL |

MEDICAL RECORDS COPY

RIO GRANDE REG. HOSP.

~421 ~29                                    050989
DIAZ ARTURO CLEA...                          M
12/27/1975 018              12/11/94
...AM .A IF MD

# EMERGENCY DEPARTMENT NURSING ADDENDUM
## SURFACE TRAUMA

**NURSING DIAGNOSIS:**

[✓] Impaired skin integrity with potential for infection
[ ] Pain
[ ] Impaired skin integrity with potential for impaired circulation and tissue perfusion

Related to:
[✓] Mechanical trauma
[ ] Thermal trauma
[ ] Chemical trauma

**EXPECTED OUTCOME:**
[✓] Patient will verbalize decrease in discomfort
[✓] Patient/Significant Other will verbalize understanding of home care instructions and follow-up care
[✓] Patient/Significant Other will verbalize understanding and acceptance of Tx plan

**ASSESSMENT**

Body location ___Left forearm___

[ ] Abrasion _____

[ ] Amputation _____

[ ] Laceration _____
   [ ] Flap      [ ] Avulsion
   [ ] Size ____ cm

___Cigarette type burn___

[✓] Clean    [ ] Contaminated

**EDGES**        **BLEEDING**
[✓] Smooth      [✓] None
[ ] Gaping      [ ] Controlled by direct pressure
[ ] Jagged      [ ] Other _____

[✓] Burn
[ ] % _____
**DEPTH:**
[ ] Superficial
[ ] Partial thickness _____
[ ] Full thickness _____
**DISTAL CIRCULATION:**
[✓] Intact
[ ] Impaired _____
**SENSATION DISTAL TO INJURY:**
[ ] Intact
[ ] Impaired _____
**DISTAL RANGE OF MOTION:**
[ ] Full
[ ] Limited _____
[ ] Absent _____

ROM not assessed due to:
_____
_____
[ ] Other _____

| TIME | A. ASSESSMENTS | I. INTERVENTION(S) | E. EVALUATIONS |
|------|----------------|--------------------|----------------|
| 2255 | After forearm cleaned c H₂O, silvadene cream applied then 4x4 then Kerlix wrapped for each, with police officer at side he is in handcuffs an ankle chair. CBauley RN | | |

E. [✓] Patient/Significant Other verbalizes understanding of home care instructions and follow-up care.

[✓] Patient/Significant Other verbalizes understanding and acceptance of Tx plan.

_Raymond Crosley_ RN.

USE OF THIS ADDENDUM INDICATES ALL AREAS LISTED HAVE BEEN ASSESSED. UNCHECKED ITEMS INDICATE A NEGATIVE OR NOT APPLICABLE ASSESSMENT

EMERGENCY DEPARTMENT NURSING ADDENDUM
CGH 51-0063   Rev 10-91

CHART COPY

HCA RIC GRAND REG HOSPITAL
101 E RIDGE RD
P O BOX 9300
MCALLEN TX 78503

RIC GRANDE REG. HOSP.

DIAZ ARTURO CUTARO
12 27 71 CIS

## TRIAGE NURSING ASSESSMENT SHEET

| | | | |
|---|---|---|---|
| **Date** 12-16-94 | **Time** 2205 | ☐ Emergent ☐ Urgent ☑ Non-Urgent | |
| **Patient Name** Diaz Arturo | | **DOB** 4-27-75 | **Age** 18 |
| **Allergies** NKA | | ☐ NKA **LMP** N/A | |
| | | **Last Tetanus Toxoid** kenhown | |
| **Chief Complaint** cigarette burns to Ⓛ arm | | **Language** ES | |
| **Onset** last pm | | | |
| **Person Giving Information** pt | | | |
| **Private Physician** R. Trevino | | | |

**Mode of Arrival**  ☐ Carried   ☐ Wheelchair
☐ Stretcher   ☑ Walk   ☐ Rescue Squad   ☐ Ambulance

**Accompanied By**
☐ Self   ☐ Parent   ☐ Spouse   ☐ Friend   ☐ Police   ☐ Family

### HISTORY

| | |
|---|---|
| ☐ Heart ___ | **Current Meds**  ☐ YES  ☑ NO |
| ☐ Lung ___ | **List:** ___ |
| ☐ Diabetes ___ | |
| ☐ Nerves ___ | |
| ☐ Seizures ___ | |
| ☐ Asthma ___ | |
| ☐ Arthritis ___ | |
| ☐ COPD ___ | |
| ☐ Hypertension ___ | |
| ☐ Other ___ | |
| ☑ None | |

**TREATMENT PRIOR TO ARRIVAL**

### OBSERVATION

| **VITAL SIGNS:** | **TIME** | **TEMP** | **PULSE** | **RESP** | **B/P** |
|---|---|---|---|---|---|
| | 2207 | 98⁴ | 59 | 20 | 145/68 |

**SKIN:** ☑ Norm ☐ Pale ☐ Rash (Burns) ☐ Clammy ☐ Cyanotic ☐ Dry/Scaly ☐ Bruises ☐ Decubitus

**EMOTIONAL:** ☐ Anxious ☐ Hysterical ☑ Co-Operative ☐ Non Co-Operative ☐ Combative ☐ Threatening ☐ Hallucinating

**Location:** ___

**MENTAL STATUS:** ☑ Alert ☐ Disoriented ☐ Responds to   ☐ Unresponsive ☐ Shock   ☐ Voice ☐ Light Pain   ☐ Lethargic ☐ Deep Pain

**PUPILS:** ☐ PERL
R   L
☐ ☐ Pinpoint
☐ ☐ Mid Position
☐ ☐ Dilated
☐ ☐ Fixed
☐ ☐ Responding

**SEIZURES** ☐ Yes ☑ No

Pupil size scale: • • ● ● ⬤ ⬤ ⬤
1  2  3  4  5  6  7

**TRAUMA:** ☐ Single ☐ Mult ☐ F.B. ☐ Lac ☐ Poss Fx ☐ Abras ☑ Burn ☐ None

**PAIN:** ☐ Yes ☑ No ☐ Minimal ☐ Intermit ☐ Moderate ☐ Severe

**BLEEDING:** ☐ Yes ☑ No ☐ Ob-Gyn ☐ Other

**TYPE:** ☐ Minimal ☐ Moderate ☐ Severe

**Triage Nurse** J Tuncleaw

### PLANNING

**Goal** ___

| | | | |
|---|---|---|---|
| ☐ Observation | ☐ Control Bleeding | ☐ Position | ☐ Cardiac Monitor |
| **V/S** ☐ q 5 Min | ☐ Minimize Swelling | ☐ Elevate Limb | ☐ CPR |
| ☐ q 15 Min | ☐ Pain Relief | ☐ Semi Fowlers | ☐ Maintain Airway |
| ☐ q 30 Min | ☐ Isolate | ☐ Fowlers | ☐ Other ___ |
| | ☐ Patient & Family Informed: | ☐ Immobilize: ☐ Neck ☐ Limb | |

**RN** ___

KX316

00255 3

DIAZ ARTURO ELEAZAR
12/27/1975 018          12/11/9
SPAH SALIR MO

| DATE | TIME | NURSING ACTION-NURSES NOTES | SIGNATURE |
|---|---|---|---|
| 12-11-94 | 2235 | Ambulatory to ERLe | Jacuelen |
| | | See addendum | |

## EVALUATION

DISCHARGE:
- ☐ Improved
- ☐ Unchanged
- ☐ AMA
- ☐ Expired

ADMITTED:
- ☐ Improved
- ☐ Unchanged
- ☐ Stable
- ☐ Unstable

TRANSFERRED:
- ☐ Facility
- ☐ Improved
- ☐ Unchanged
- ☐ Stable

Room No. _____ O.R. _____ Time _____

## DISCHARGE SUMMARY

Discharge Date: 12/11/94
Discharge Time: 2255
Written Instructions Given?: ☐ YES  ☑ NO
Instructions Given To: ☑ Patient  ☐ Family  ☐ Friend  ☐ Nursing Home  ☐ Other

Ext Via:
- ☑ Walk
- ☐ Carried
- ☐ Ambulance
- ☐ Wheelchair
- ☐ Crutches
- ☐ Stretcher

Accompanied By:
- ☐ Self
- ☐ Spouse
- ☐ Family
- ☐ Parent
- ☐ Friend
- ☑ Police

Copies Of:
- ☐ Lab Work
- ☐ Chart
- ☐ Diet
- ☐ X-Rays
- ☐ EKG
- ☐ Work Slip
- ☐ Gym Slip

Prescriptions Given?: ☐ YES  ☑ NO
Medications Given: Silver line Chrom

Given to Take Home Prescriptions On Use?: ☐ YES  ☑ NO

Signature: Clay Barfor

# Exhibit K



Columbia University School of Public Health
154 Haven Avenue, New York, NY 10032

Contacts:  Larry Aber 212-304-7101
           Julian Palmer 212-304-7117

**NATIONAL CENTER FOR CHILDREN IN POVERTY**

# *Poverty and Brain Development in Early Childhood*

## OVERVIEW

Researchers have gathered new evidence on the importance of the first years of life for children's emotional and intellectual development.[1] Unfortunately, millions of American children are poor during these crucial years. Almost one in four (24 percent) of America's children under age three lived in poverty in 1995. These 2.8 million poor children face a greater risk of impaired brain development due to their exposure to a number of risk factors associated with poverty. Many poor young children are resilient and able to overcome tremendous obstacles but poverty poses serious threats to children's brain development. Recent advances in the study of brain development show a sensitive period when the brain is most able to respond to and grow from exposure to environmental stimulation. This window of optimal brain development is from the prenatal period to the first years of a child's life. While all children are potentially vulnerable to a number of risk factors which can impede brain development during this sensitive period, a disproportionate number of children in poverty are actually exposed to such risk factors. These risk factors can influence the brain through multiple pathways.

## THE IMPACT OF POVERTY ON BRAIN DEVELOPMENT: MULTIPLE PATHWAYS



### Inadequate Nutrition

Children deprived of proper nutrition during the brain's most formative years score much lower on tests of vocabulary, reading comprehension, arithmetic, and general knowledge. The more severe the poverty a child faces, the lower his or her nutritional level is likely to be.[2] Malnutrition causes social withdrawal, delayed motor skills development, and delayed physical growth, leading to lower expectations from parents/teachers and less environmental probing.

### Substance Abuse

Doctors have known for years the harmful effects of nicotine, alcohol, and drugs both during and after pregnancy. Research has demonstrated that much of their impact on children stems from poor brain development, centered around stunted neurons in the brain and a lack of brain cells in crucial developmental stages, causing serious neurological disorders.[3]

### Maternal Depression

Many children whose mothers suffer from depression lack healthy brain development. It is vital for children to be stimulated by their environment during the first years of life. Mothers who are suffering from depression are less able to provide the positive responses needed by babies, less likely to interact with their babies, and often fail to respond to their infants' emotional needs. These deficits lead to babies who are more withdrawn, less active, and have shorter attention spans.[4]

### Exposure to Environmental Toxins

Exposure to neurotoxins such as lead causes brain damage and stunts the growth of the brain. One American child in six has toxic levels of lead in his or her blood; and 55 percent of African American children living in poverty have toxic levels of lead in their blood. Each year 400,000 newborns are delivered with toxic levels of lead in their blood that came from their environment.[5]

### Trauma/Abuse

Experiences of trauma or abuse during the first years of life result in extreme anxiety, depression, and/or the inability to form healthy attachments to others. While physical abuse is the most noticeable, emotional and mental trauma are also damaging. Another troubling effect of early trauma is that it leads to a significantly higher propensity for violence later in life. The stressors that face poor families cause much more trauma for their children.[6]

### Quality of Daily Care

Daily interaction plays an important role in a child's emotional and mental development. While the brain is forming and "learning" how to develop, consistent positive interaction is needed to ensure proper brain activity. Poor day care

hinders a child's brain activity and impedes development by discouraging interaction and limiting environmental stimulation. Compared to those who were not in day care, studies show that high quality day care can in fact enhance the intellectual development of poor children.[7]

## WHAT CAN BE DONE?

### Reduce the Poverty Rate

Given the importance of the first years of life to the development of the brain and to the ability of children to reach their full potential, it is particularly important to reduce children's exposure to critical risk factors during early childhood. There are many important programs and services which can improve the life chances of children in poverty. Also, it is critically important to attack child poverty directly. Poverty is a primary risk factor which increases the likelihood that young children will be exposed to multiple risk factors. These additional risk factors can have important negative effects on children's brain development. Any comprehensive strategy to promote early childhood brain development must therefore include strategies to reduce the poverty rate for young children.

Every other major Western industrialized nation has been more successful in preventing the incidence of child poverty and thereby decreasing the risks to healthy brain development. The United States can learn from these countries and develop new public- and private-sector strategies to reduce the child poverty rate that are consistent with its national values and economic means.[8]

## REFERENCES

1. Shore, R. (1997). *Rethinking the brain: New insights into early development*. New York, NY: Families and Work Institute.

2. Brown, L. & Pollitt, E. (1996). Malnutrition, poverty and intellectual development. *Scientific American*, 274(2), pp. 38–43.

3. Mayes, L. (1996). Early experience and the developing brain: The model of prenatal cocaine exposure. Paper presented at the invitational conference: "Brain Development in Young Children: New Frontiers for Research, Policy, and Practice, The University of Chicago, June 12–14.

4. Belle, D. (1990). Poverty and women's mental health. *American Psychologist*, 45(3), pp. 385–389.

5. The National Health/Education Consortium. (1991). Healthy brain development. *The National Health/Education Consortium Report*, January, pp. 4–5.

6. Brooks-Gunn, J.; Klebanov, P.; Liaw, F.; & Duncan, G. (1995). Toward an understanding of the effects of poverty upon children. In Fitzgerald, H. E.; Lester, B. M.; & Zuckerman, B. (Eds.). *Children of poverty: Research, health, and policy issues*. New York, NY: Garland Publishing, Inc.

7. Burchinal, M.; Lee M.; & Ramey, C. (1989). Type of day care and preschool intellectual development in disadvantaged children. *Child Development*, 60(1), pp. 128–137.

   Cost, Quality, and Child Outcome Study Team; Helburn, S.; Culkin, M.; Morris, J.; Mocan, N.; Howes, C.; Phillipsen, L.; Bryant, D.; Clifford, R.; Cryer, D.; Peisner-Feinberg, E.; Burchinal, M.; Kagan, S.; & Rustici, J. (1995). *Cost, quality, and child outcomes in child care centers*. Denver, CO: University of Colorado at Denver, Department of Economics.

8. Danziger, S.; Smeeding, T.; & Rainwater, L. (1995). *The Western welfare state in the 1990s: Toward a new model of anti-poverty policy for families with children* (Luxembourg Income Study (LIS) Working Paper No. 128). Syracuse, NY: Syracuse University, Maxwell School of Citizenship and Public Affairs.

# Exhibit L

Case 7:04-cv-00225 Document 1 Filed in TXSD on 06/18/04 Page 123 of 126



CDC Home     Search     Health Topics A-Z

**Weekly**

**August 9, 2002 / 51(31);684-686**

# Childhood Lead Poisoning Associated with Tamarind Candy and Folk Remedies --- California, 1999--2000

Lead poisoning affects children adversely worldwide. In the United States, elevated blood lead levels (BLLs) ($\geq$10 $\mu$g/dL) result primarily from exposure to lead-based paint or from associated lead-contaminated dust and soil; however, other sources of lead exposure, including folk remedies, Mexican terra cotta pottery, and certain imported candies, also have been associated with elevated BLLs in children (1). This report describes five cases in California of lead poisoning from atypical sources. Health-care providers should be aware of the potential hazards of certain food products, and community members should be educated about potential sources of lead poisoning for children.

## Case Reports

Cases 1 and 2. In March 1999, two Hispanic children residing in Stanislaus County in the Central Valley, a boy aged 4 years and his sister aged 6 years, were identified during routine screening by California's Child Health and Disability Prevention (CHDP) Program. The boy had a BLL of 88.0 g/dL and the girl a BLL of 69.0 $\mu$g/dL. Both children underwent chelation therapy. Their parents had not traveled recently outside the United States but had used greta, a Mexican folk remedy (taken commonly for stomachache or intestinal illness) that usually contains high levels of lead. No pottery in the home tested positive for lead, and tests on paint and dust from their home did not indicate high lead levels. Greta powder collected from the family's home had 770,000 parts per million (ppm) of lead, and miniblinds on the windows of the home tested positive for lead by swab. Imported candies, including Dulmex-brand Bolirindo lollipops, which were identified later to be contaminated with lead, were found in the home.

Case 3. In May 2000, a Hispanic boy aged 4 years residing in Fresno County was identified during routine CHDP screening with a BLL of 26 $\mu$g/dL. His family had moved to California recently from Oaxaca, Mexico, where they had used a ceramic bean pot and water jug regularly. An environmental investigation did not reveal high lead levels in dust, paint, or soil, but tests on imported candies collected from the home revealed a candy wrapper with a lead level of 16,000 ppm. The child's BLL had decreased to 13.2 $\mu$g/dL by February 2002.

Case 4. In June 2000, a Hispanic boy aged 2 years residing in Orange County was identified through routine screening as having a BLL of 26 $\mu$g/dL. The family's house was built in 1963 and had been renovated during early 2000. Tests on soil, paint, and dust in and around the child's home did not reveal high lead levels. The child had been given greta and azarcon (a folk remedy that usually

contains substantial amounts of lead) and had eaten various imported tamarind fruit candies purchased routinely by his family in Mexico. High lead levels were found in one of the three brands of imported candies the child had eaten. A Dulmex-brand Bolirindo lollipop had levels of 404 ppm and 21,000 ppm of lead in the stick and wrapper, respectively, and 0.2 ppm and 0.3 ppm in the candy and seed, respectively. Subsequent tests by the Food and Drug Administration (FDA) confirmed high lead levels in the wrapper of this product, and a public health warning was issued by FDA and the California Department of Health Services (CDHS).

Case 5. In August 2000, a Hispanic boy aged 4 years residing in Los Angeles County was identified through routine screening by California's Medicaid program with a BLL of 22 $\mu$g/dL. When the child was tested at age 1 year, he had an acceptable BLL of 5 $\mu$g/dL. Family members reported that he had been eating Mexican candies regularly for 3 years but denied use of folk remedies and imported pottery. An environmental investigation of their apartment, which was built in 1986, did not reveal high lead levels. The child was born in the United States and had not traveled to Mexico, and investigators identified no other potential sources of lead other than the Mexican candies. The family was advised not to allow the child to eat Mexican candies. As of December 2001, the boy's BLL had decreased to 11 $\mu$g/dL.

**Reported by:** *JG Courtney, PhD, S Ash, Childhood Lead Poisoning Prevention Br, California Dept of Health Svcs. N Kilpatrick, MPH, S Buchanan, PhD, P Meyer, PhD, Div of Environmental Hazards and Health Effects, National Center for Environmental Health; D Kim, MD, L Brown, MD, EIS officers, CDC.*

## Editorial Note:

The findings in this report underscore the importance of routine screening for lead and of conducting a thorough risk assessment of children with elevated BLLs including taking a complete history and environmental sampling. Although household paint and resulting contaminated dust and soil are the most common sources of exposure, all sources of lead poisoning should be identified and removed.

Of approximately 1,000 cases of elevated BLLs among California children that were reported to CDHS during May 2001--January 2002, candy produced in Mexico was identified as a possible exposure source in approximately 150 cases. When children eat lead-contaminated candies, exposure can exceed FDA's provisional tolerable daily intake level (PTIL) for lead of 6 $\mu$g in a typical 30-g food serving. FDA's PTIL corresponds to a lead intake capable of elevating the BLLs of a small child by 1 $\mu$g/dL. In the cases described in this report, the wrappers often contained amounts of lead that could greatly exceed FDA's PTIL if the lead were to leach into the candy. In addition, a substantial quantity of the lead could be released into saliva by a child licking the wrapper. When conducting investigations of lead exposures, clinicians and health educators are encouraged to consider inquiring about these products, together with folk remedies and the use of imported pottery, as potential sources of lead poisoning.

Lead poisoning associated with tamarind candy has been reported previously (*2--5*). Although the lead content of the particular candies that the five children described in this report ate could not be measured because the candy had been eaten, substantial concentrations of lead were found in the wrappers in four cases. Because the candies are sticky and can adhere to the wrapper, the children might have ingested lead from the wrapper; in addition, other sources of lead exposure (e.g., greta consumption) were found. In the cases described in this report, the frequency of eating Mexican candies and the brands eaten were not always ascertained. An investigation is ongoing to determine which specific candy products are contaminated with lead. CDHS has identified lead in several other

tamarind candies. In addition, FDA has embargoed food products containing tamarind fruit from entry into the United States because of filth from insects, rodents, and other pests.

These cases illustrate successful cooperation between FDA and state and local health departments to identify lead-contaminated products. Health-care providers should be aware of the potential hazards of food products, including candy, when evaluating a child with an elevated BLL. In addition, increasing education efforts are needed to inform persons in Hispanic communities that certain Mexican candies, pottery, and folk remedies can be potential sources of lead poisoning for children (*6*). Additional information about childhood lead poisoning is available from CDHS at http://www.dhs.ca.gov/ps/deodc/childlead and from CDC at http://www.cdc.gov/nceh/lead/lead.htm.

## References

1. CDC. Preventing lead poisoning in young children: a statement by the Centers for Disease Control. October 1991. Atlanta, Georgia: U.S. Department of Health and Human Services, Public Health Service, CDC, 1991.
2. CDC. Lead poisoning associated with imported candy and powdered food coloring--- California and Michigan. MMWR 1998;47:1041--3.
3. Fuortes L, Bauer E. Lead contamination of imported candy wrappers. Vet Hum Toxicol 2000;42:41--2.
4. Lynch RA, Boatright DT, Moss SK. Lead-contaminated imported tamarind candy and children's blood lead levels. Public Health Rep 2000;115:537--43.
5. Wu TN, Yang GY, Shen CY, Liou SH. Lead contamination of candy: an example of crisis management in public health. Lancet 1995;346:1437--8.
6. CDC. Guidelines for the management of elevated blood lead levels among young children. Atlanta, Georgia: U.S. Department of Health and Human Services, Public Health Service, CDC, 2002.

Use of trade names and commercial sources is for identification only and does not imply endorsement by the U.S. Department of Health and Human Services.

References to non-CDC sites on the Internet are provided as a service to *MMWR* readers and do not constitute or imply endorsement of these organizations or their programs by CDC or the U.S. Department of Health and Human Services. CDC is not responsible for the content of pages found at these sites. URL addresses listed in *MMWR* were current as of the date of publication.

**Disclaimer** All *MMWR* HTML versions of articles are electronic conversions from ASCII text into HTML. This conversion may have resulted in character translation or format errors in the HTML version. Users should not rely on this HTML document, but are referred to the electronic PDF version and/or the original *MMWR* paper copy for the official text, figures, and tables. An original paper copy of this issue can be obtained from the Superintendent of Documents, U.S. Government Printing Office (GPO), Washington, DC 20402-9371; telephone: (202) 512-1800. Contact GPO for current prices.

**\*\*Questions or messages regarding errors in formatting should be addressed to mmwrq@cdc.gov.

Page converted: 8/8/2002

United States District Court
Southern District of Texas
FILED

JUL 2 3 2004

Michael N. Milby, Clerk

United States District Court
Southern District of Texas
ENTERED

JUL 2 7 2004

Michael N. Milby, Clerk of Court

13

**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
McALLEN DIVISION**

| | |
|---|---|
| **ARTURO DIAZ,** § | |
| **Petitioner,** § | |
| § | |
| **vs.** § | **MISC ACTION NO.  M-03-MC-055** |
| § | |
| **DOUG DRETKE, DIRECTOR,** § | **M-04-225** |
| **TEXAS DEPARTMENT OF** § | |
| **CRIMINAL JUSTICE,** § | |
| **INSTITUTIONAL DIVISION,** § | |
| **Respondent.** § | |

## ORDER

Pending before the Court is Petitioner's action filed under 28 USC § 2254 and an Application to Proceed *in forma pauperis*. Having considered the application and the supporting documentation, the Court finds that Petitioner does not have the ability to pay the full cost of this action and should be permitted to proceed with his action without payment of fees or costs. Accordingly, it is hereby ordered that the Application to Proceed *in forma pauperis* be **GRANTED**.

The clerk shall forward a copy of this Order to counsel for Petitioner and counsel for Respondent via certified mail (return receipt).

DONE at McAllen, Texas this 23 day of July, 2004.

Tracy Klingler
UNITED STATES MAGISTRATE JUDGE