United States District Court
Southern District of Texas
FILED

**S** DEC 1 0 2004

Michael N. Milby, Clerk

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
McALLEN DIVISION

| | | |
|---|---|---|
| ARTURO DIAZ, | § | |
| | § | |
| Petitioner, | § | |
| | § | |
| v. | § | No. M-04-225 |
| | § | |
| DOUG DRETKE, Director, | § | |
| Texas Department of Criminal Justice, | § | |
| Correctional Institutions Division, | § | |
| | § | |
| Respondent. | § | |

## FIRST AMENDED PETITION FOR WRIT OF HABEAS CORPUS

Petitioner Arturo Diaz was convicted of capital murder, for murder committed during the commission of a robbery, and sentenced to death in state court. He is before this Court seeking habeas corpus relief under 28 U.S.C. § 2254. On June 16, 2004, Mr. Diaz filed his initial habeas corpus petition. By order of the Court entered September 24th, Mr. Diaz is to file an amended petition by December 12th. The instant amended petition is filed in compliance with that order. It includes all of the grounds raised in his original petition, incorporates the original exhibits attached thereto, and also raises additional claims.

The Director has filed a motion for summary judgment in response to Mr. Diaz's original petition. Once the Director files a responsive pleading to the instant amended petition, Mr. Diaz will file a response thereto.

Mr. Diaz's conviction and sentence are constitutionally infirm and must be reversed because the representation provided by his court-appointed trial counsel fell below the

minimum standards required by the Sixth Amendment. First, counsel failed to give any meaningful advice to Mr. Diaz regarding whether to accept the State's plea offer of life imprisonment in exchange for a guilty plea. Instead, they allowed him to make a uninformed plea of not guilty and contested the State's substantial case on guilt-innocence solely by challenging the robbery element of the offense – a wholly misguided approach that was doomed from the start, as discussed at length below. Counsel's almost total failure to consult with their client on what was literally a life-or-death decision denied Mr. Diaz his constitutional right to effective assistance of counsel at the guilt-innocence phase of trial.

Second, trial counsel failed to protect Mr. Diaz's right to a fair trial when they acquiesced in the State's unfounded challenge for cause to venire member Gerald Albrecht. Because Mr. Albrecht's responses to the trial court's questions did not reveal that his beliefs about capital punishment would substantially impair his deliberations on the death penalty, he was not properly subject to a challenge for cause. By joining in the State's motion to exclude Mr. Albrecht, Mr. Diaz's trial attorneys effectively waived a valid ground for reversal on appeal.

Most critically, Mr. Diaz's trial attorneys essentially did nothing on his behalf at the punishment phase, as they failed to conduct any meaningful investigation into potential mitigation witnesses. Even minimal effort on their part would have revealed numerous family members who were available to testify about the tragic circumstances of Mr. Diaz's impoverished, fatherless childhood and the criminal family members who were his male role

models throughout his formative years. Instead, trial counsel presented only one witness, an obviously ill-prepared psychologist whose testimony was extremely prejudicial to the defense. Finally, counsel's closing argument on punishment was devoted almost entirely to "residual doubt" – a rehash of the same arguments made at guilt-innocence that the jury already had rejected beyond a reasonable doubt. Trial counsel's complete abdication of their constitutional duty to investigate and present mitigating evidence denied Mr. Diaz a fair punishment phase hearing.

The fairness of the punishment proceedings was further undermined by the trial court's admission of constitutionally inadmissible evidence of Mr. Diaz's membership in a gang. This evidence was not offered in response to any evidence proffered by the defense and was not accompanied by any proof of the alleged gang's beliefs, practices, or propensity for violence. Because this evidence was irrelevant to the special issues submitted to the jury at punishment, its admission infringed on Mr. Diaz's First Amendment right of association and denied him a fair sentencing proceeding.

In addition, the prosecutor infringed on Mr. Diaz's right to remain silent at the punishment phase when he elicited testimony from Dr. Pinkerman that Mr. Diaz had refused to discuss the facts of the offense with him on the advice of his attorneys. This error, combined with trial counsel's ineffectiveness and the erroneous admission of gang membership evidence, also undermined the fundamental fairness of the sentencing proceedings.

3

Finally, appellate counsel rendered ineffective assistance. Even though trial counsel objected and preserved error with regard to the prosecutor's improper argument based on community expectations, appellate counsel failed to raise this as an issue on appeal.

## STATEMENT OF THE CASE

### I. State Court Proceedings

On February 11, 2000, a jury found Mr. Diaz guilty of capital murder in cause number CR-1464-99-G in the 370th District Court of Hidalgo County. On February 16, 2000, following a separate punishment hearing, the jury answered the statutory special issues submitted to it, following which the trial court sentenced Mr. Diaz to death. Mr. Diaz appealed, and on September 18, 2002, the Texas Court of Criminal Appeals affirmed. *Diaz v. State,* No. 73821. Exhibit A. On June 18, 2003, the Court of Criminal Appeals denied Mr. Diaz's state habeas corpus petition. *Ex parte Diaz,* No. 55,850-01.

### II. Federal Court Proceedings

On July 15, 2003, Mr. Diaz's state habeas counsel filed a motion for appointment of counsel in this Court. Therein, he represented that Mr. Diaz "now wishes to pursue his federal remedies and seek appointment of qualified counsel to pursue and represent him in federal court." State writ counsel advised the Court that he was "not available for appointment" because he was not licensed to appear in federal court and was "not competent to prepare and handle federal writs." Motion at 1. On December 12, 2003, the Court appointed the undersigned counsel to represent Mr. Diaz.

## III.  Statute of Limitations

Under the The Antiterrorism and Death Penalty Act ("AEDPA"), 28 U.S.C. § 2254,

(d)(1) A 1-year period of limitation shall apply to an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court. The limitation period shall run from the latest of--

> (A) the date on which the judgment became final by the conclusion of direct review or the expiration of the time for seeking such review;
>
> (B) the date on which the impediment to filing an application created by State action in violation of the Constitution or laws of the United States is removed, if the applicant was prevented from filing by such State action;
>
> (C) the date on which the constitutional right asserted was initially recognized by the Supreme Court, if the right has been newly recognized by the Supreme Court and made retroactively applicable to cases on collateral review; or
>
> (D) the date on which the factual predicate of the claim or claims presented could have been discovered through the exercise of due diligence.

(2) The time during which a properly filed application for State post-conviction or other collateral review with respect to the pertinent judgment or claim is pending shall not be counted toward any period of limitation under this subsection.

28 U.S.C. § 2244 (West Supp. 2003).

Here, Mr. Diaz's state habeas petition was filed on January 14, 2002, and his conviction was affirmed on September 18, 2002. Because the habeas petition was filed while his appeal was pending, the one-year limitations period did not begin to run until the Court of Criminal Appeals denied habeas relief on June 18, 2003. *See Brewer v. Johnson,* 139 F.3d

491, 492 (5th Cir. 1998) ("a properly filed application for state . . . collateral review . . . is not counted toward the limitations period"). Thus, Mr. Diaz's federal filing deadline is June 18, 2004.

Mr. Diaz's current counsel have not been afforded the full year-long statutory period to prepare his federal petition because almost six months had elapsed before they were appointed. Accordingly, the undersigned conferred with counsel for Respondent, who agreed that if Mr. Diaz timely filed his petition by June 18th, Respondent would not oppose the filing of this amended petition by December 12, 2004 – one year from the date that federal habeas counsel were appointed. *See* Exhibit B (letter confirming agreement).

## STATEMENT OF THE FACTS

Mr. Diaz was convicted of capital murder for having killed Michael Ryan Nichols in the course of committing or attempting to commit robbery of Mr. Nichols on April 3, 1999.[1] The facts are set out in the opinion of the Court of Criminal Appeals. *See* Exhibit A at 2-8. The evidence adduced by the State showed that Mr. Diaz and one Jose Luis Cordova were present at Mr. Nichols's apartment when he was killed. John Shepherd, Mr. Nichols's roommate, was stabbed but survived. He identified Mr. Diaz as the killer. A tennis-shoe print found in the apartment parking lot matched Mr. Diaz's shoe, and a beer bottle with Mr. Diaz's DNA on it was found in the apartment. Mr. Diaz and Mr. Cordova spent the night at the home of one Manuel Montes, and the next day a trash bag of clothing stained with Mr.

---

[1] In addition, in the same trial Mr. Diaz was convicted of attempted capital murder of John Shepherd and of aggravated robbery of Mr. Shepherd.

Cordova's and Mr. Nichols's blood was discovered there. In addition, Mr. Montes testified that he heard Mr. Diaz describing how he and Mr. Cordova had committed a murder. The defense did not present any evidence at the the guilt-innocence phase of trial.

### A. The plea offer

At a pretrial hearing held on Thursday, October 28, 1999, the State offered Mr. Diaz and Mr. Cordova a plea bargain of a life sentence for capital murder and a 40-year sentence for an unrelated murder in exchange for pleas of guilty. 6 RR 2-7. The prosecutor stated that "the offer exists only until Monday. Once they tell us no, there is no back-peddling [sic] after that, there is no nothing. We're going to proceed forward in seeking the death penalty." 6 RR 6. Defense counsel asked for time to discuss the offer with their client, and the court advised the defendants that they had until the following Monday, November 1st, to accept the offer. 6 RR 10-11. In response to an inquiry from Mr. Cordova's counsel, the court stated that it would allow the defendants and their attorneys to remain in the courtroom to discuss the offer. 6 RR 10.

On November 1, 1999, the parties again appeared in court, and defense counsel stated that Mr. Diaz had rejected the plea offer. 7 RR 1. The trial court then had Mr. Diaz sworn as a witness, and he responded affirmatively to the court's question "whether or not you are going to proceed with a jury and proceed with selecting the jury with the intention of the District Attorney's Office seeking the death penalty against you?" 7 RR 2. Mr. Cordova also rejected the offer. 7 RR 8-10. The State then withdrew the plea offer as "[t]o either of the

defendants." 7 RR 21.[2]

Subsequently, on January 26, 2000, a week before commencement of the guilt-innocence phase of trial, the trial court *sua sponte* called Mr. Diaz to the stand to question him regarding "any plea bargains that may have been offered." The trial judge stated that he was doing so "just simply to make sure that you understood everything that was going on." 25 RR 11. Mr. Diaz testified that the decision to go to trial was his and was made after discussing his options with his attorneys. 25 RR 12-13. The trial court did not ask, and Mr. Diaz did not testify, about the nature and extent of those discussions, nor did the court admonish Mr. Diaz or question him in any detail to ensure that his plea of not guilty was knowing and voluntary.

Had the court inquired further, it would have learned that trial counsel failed to discuss the plea offer in any depth with their client and failed to advise him of the likely consequences of the two options available to him. *See* Exhibit C (affidavit of Arturo Diaz). Mr. Diaz avers that his attorneys spent only about fifteen minutes discussing the offer with him in the courtroom immediately after the hearing at which the State extended the offer. Mr. Diaz's trial counsel

> told me that if I pled not guilty and went to trial, the State was sure to get a murder conviction, but that I might be acquitted of capital murder if we could show that the murder did not take place during a robbery. They did not tell me what sentence I would get if I were convicted of murder or when I would be eligible for parole. They made it sound like we had a 50-50 chance of winning

---

[2] Apparently, the State later re-extended the offer to Mr. Cordova, as he did not go to trial and instead pled guilty to capital murder in exchange for a life sentence.

on the capital murder charge if we went to trial. My attorneys did not advise me whether to accept the offer and told me that it was up to me."

Exhibit C at 1. In addition, "[m]y attorneys never told me that if I were convicted of murder, I could receive a life sentence and would not be eligible for parole for thirty years. If I had known that, I would have accepted the State's offer of a life sentence." Exhibit C at 2.

## B.    Voir dire of the jury panel

Mr. Diaz's trial counsel either agreed to, or did not contest, many of the State's challenges for cause to prospective jurors. Among the venire members successfully excluded by the State, with the defense's acquiescence, was Gerald Albrecht. Mr. Albrecht was not questioned by the prosecutor or defense counsel. In response to questions from the court, he testified that while his religious beliefs as a practicing Catholic would affect his deliberations on the death penalty, they would not preclude him from imposing it.

The trial court noted that Mr. Albrecht's responses to the juror questionnaire "indicated that you were uncertain how you felt about the death penalty." 20 RR 64. Mr. Albrecht testified that he had "a lot of uncertainty," although his religion led him to "generally disagree with the death penalty." 20 RR 65. He did not respond to the court's question as to whether he would follow his church's opposition to the death penalty "regardless of the evidence?" 20 RR 66. He "still really [didn't] know at this time" whether he could answer the special issues on punishment, knowing that a death sentence would result, because "I really don't know the depth of my religious beliefs on the issue." 20 RR 70. Mr. Albrecht agreed with the court that he really didn't know how he "would feel if I had

9

to actually do it." His "religious beliefs would cause [him] to lean against the death penalty," and he didn't think he could set them aside. 20 RR 71.

After questioning Mr. Albrecht, the trial court stated, "Out of an abundance of caution, I try to ask the question several ways. I think at the end, he pretty much put it on the table as far as his religious beliefs are concerned." The prosecutor, "joined by the defense," then moved to strike Mr. Albrecht, which the court did. 20 RR 72.

### C.    The defense's theory of the case

The defense's opening statement to the jury occupies less than two pages of the record. 27 RR 35-37. Their theory of the case consists of three sentences: "I want to make one thing clear to you, that the evidence is going to show that Arturo Diaz is not guilty of capital murder. And what evidence am I talking about? Conflicting testimony and no evidence of a robbery." 27 RR 36-37.

The defense called no witnesses at the guilt-innocence phase of trial, and defense counsel's closing argument was an incoherent mishmash that hinted at various defensive theories, many of them inconsistent, and none of which had any support in the evidence. 35 RR 59-76. The sum and substance of the "no robbery" defense was that there were inconsistencies among the State's exhibits depicting the crime scene (a sketch, a videotape, and photographs) as to whether the victim's wallet was on the table, and if so, whether a credit card was on top of it. These inconsistencies, Mr. Diaz's counsel argued, proved that the wallet had been moved during the investigation, and that the wallet had been moved

10

somehow proved that Mr. Nichols was not robbed. 35 RR 61-64.

The utter futility of the "no robbery" defense is apparent. On appeal, the Court of Criminal Appeals rejected Mr. Diaz's claim of evidentiary insufficiency, based on a lack of proof that Mr. Nichols was robbed, with the following reasoning:

> [Mr. Diaz] omits the wounded Nichols's statement, "Do what he says, get the money and they'll leave." This was strong evidence that [Mr. Diaz] was in the course of committing or attempting to commit robbery of Nichols.
> . . .
>
> There is other evidence of this element of the offense. A reasonable juror could infer that Nichols's $50 bill being missing was evidence that the robbery of him was completed.
>
> [Mr. Diaz's] action of robbing Shepherd (which could have been, but was not, alleged as the element that elevated the murder to capital murder) is a circumstance tending to show that [Mr. Diaz] was engaged in robbing the residents of the apartment. That he was not seen to steal anything from Nichols after he stole from Shepherd implies that he had robbed Nichols before he robbed Shepherd.
>
> The private meeting between the appellant and Arcy Reyes, which was followed by her telephone call and appearance at Nichols's apartment, suggests that a plan had been devised earlier in the evening.
>
> There was ample evidence to support the verdict that [Mr. Diaz] murdered Nichols in the course of robbing or attempting to rob him.

*Diaz v. State,* slip opinion at 9-10.

Moreover, Mr. Diaz's defensive theory was not presented to the jury in any coherent fashion, as it was intertwined with various other unfounded suggestions, including a challenge to the State's evidence placing Mr. Diaz at the crime scene, 35 RR 65-66, and the assertion that Mr. Shepherd had killed Mr. Nichols because they were involved in a

11

homosexual relationship and Mr. Shepherd was jealous of Mr. Nichols's other suitors. 35 RR 74.

The jury could not have been impressed. Defense counsel's argument that Mr. Diaz was not at the scene was both inconsistent with the "no robbery" theory and contradicted by a wealth of evidence, discussed *supra* at 5. Likewise, the suggestion of a homosexual passion attack had no evidentiary support whatsoever and was based solely on Detective Ramirez's initial suspicion, quickly abandoned, that Mr. Nichols might have been the victim of such an attack. 33 RR 187, 198-99, 210-11. The jury took less than four hours, including a lunch break, to find Mr. Diaz guilty of capital murder. 35 RR 96.

## D. The punishment phase of trial

At the commencement of the punishment phase of trial, a hearing was held outside the jury's presence regarding the State's intention to introduce evidence of extraneous offenses. 37 RR 1 *et seq.* The defense objected to the admission of any evidence that Mr. Diaz belonged to a gang. 36 RR 7. Defense counsel also advised the court that Mr. Diaz's grandmother was present in the courtroom and asked that she be excused from the Rule because she was not going to testify, a request that the court granted. 36 RR 26-27.

Thereafter, the State introduced evidence before the jury that Mr. Diaz belonged to a gang called the Pistoleros. Rolando Badillo, a shift supervisor at the Hidalgo County jail, testified that Mr. Diaz was housed in the Echo Two area of the jail and that there were seven or eight inmates in that area who were placed there "because of their charges, because of

their gang affiliation." 36 RR 144. Defense counsel objected to evidence of gang affiliation, but the court overruled the objection. 36 RR 144-45. Mr. Badillo then testified that the Echo Two area was used to house members of the Pistoleros gang, that they got along, and that "[w]e have had no problems." 36 RR 146. Two other witnesses, shift supervisor Robert Lopez and Lieutenant Danny Perez, also testified that members of the Pistoleros were housed in Echo Two. 36 RR 154, 165.

The State introduced evidence of several extraneous offenses – another murder committed ten days before the primary offense, and several offenses that occurred while Mr. Diaz was incarcerated in the Hidalgo County jail awaiting trial. These latter offenses included an escape attempt, two assaults, and participation in a prisoner uprising at the jail. 36 RR 151-66, 170-79, 197-202.

The defense presented only one witness, a psychologist, Dr. John Pinkerman. 37 RR 123 *et seq.* Prior to trial, the court had granted Mr. Diaz's request for appointment of a psychiatrist or psychologist and appointed Dr. Pinkerman "to examine and assist the Defendant . . . . " CR 218. The order provided that Dr. Pinkerman "deliver in a sealed envelope any and all reports generated from his evaluation and examination of [Mr. Diaz] only to his attorney, Daniel R. Reyes." CR 219.

From the outset of Dr. Pinkerman's testimony, defense counsel's unpreparedness was apparent. After the witness had testified that he was employed as "a private psychologist," 37 RR 124, the following ensued:

13

MR. REYES: Your Honor, at this time, we tender Doctor John Pinkerman as an expert in the field of psychiatry and psychology of psychiatry and psychology [sic].

MR. THOMPSON: I believe that the area was in psychology.

Q. BY MR. REYES: Have you testified in psychiatry?

A. No, sir.

37 RR 128.

Things went downhill from there. Dr. Pinkerman testified that he had conducted a two-part evaluation of Mr. Diaz that took approximately seven hours. 37 RR 129-30. In response to a question about whether Mr. Diaz had sustained trauma, Dr. Pinkerman testified that Mr. Diaz "had been knocked out a couple of times in fights, and also was in an automobile accident in which he suffered a head injury." 37 RR 131. Defense counsel then tried–and failed miserably–to establish that Mr. Diaz suffered lingering effects of that trauma:

> Q. Okay. And were you able to determine whether or not he suffered any bouts of unconsciousness or fainting because of that trauma to the head?
>
> A. *He denied having any episode of fainting or passing out.*
>
> Q. Okay. Did you prepare a report with respect to your evaluations of Mr. Diaz?
>
> A. I did.
>
> Q. Okay. If you are to refer to that report, would that assist you?
>
> A. Yes, it would.

14

Q. Okay. Can you look at Page 3 of your report, the first paragraph.

A. Okay.

Q. Were you able to determine when he had any bouts of unconsciousness or suffering from unconsciousness or fainting that he had had trauma?

A. *He denied to me that he had any difficulties with faintings or periods of unconsciousness.*

[Defense counsel approaches witness.]


Q. BY MR. REYES: Did you review Page 3 of your report, doctor, the first paragraph, the first couple of lines. If you can read that to yourself.

A. (Complies.)

Q. Based on your evaluation to [sic] Mr. Diaz, were you able to determine that because of the trauma to the head he suffered periods of unconsciousness and fainting; isn't that correct?

A. What I state is, he was assessed regarding his past history of head trauma, periods of unconsciousness or fainting. *He didn't ever spontaneously [sic] fainting or passing out.* He acknowledged that he had been knocked out a couple of times briefly as a result of fights.

Q. If an individual suffers from trauma to the head, would that be consistent with having periods of unconsciousness or fainting in your experience?

A. Would you repeat that question, please.

A. If a person suffers trauma to the head, whether it be from a prior accident or maybe --

[Objection overruled.]

Q. BY MR. REYES: – would that in your experience lead a person who

had periods of unconsciousness or fainting?

A.    *Not necessarily.*

37 RR 131-33 (emphasis added).

Dr. Pinkerman testified that Mr. Diaz's IQ was 89 and that sub-average cognitive abilities "can be associated with an increased risk for behavioral patterns . . . ." 37 RR 136. His tests revealed that Mr. Diaz suffered from cognitive disabilities in some areas, but not others. 37 RR 137. Dr. Pinkerman testified that Mr. Diaz may have suffered "cognitive impairment that could stem from prolonged alcohol or substance abuse . . . ." 37 RR 138. When counsel asked about the origins of antisocial behavior, Dr. Pinkerman responded that Mr. Diaz had "identified that he had begun an early history in childhood between the ages of 5 and 10 of behavior that we have come to learn has a high probability of turning toward delinquency and adult criminal behavior." 37 RR 139. Counsel concluded his direct examination by questioning Dr. Pinkerman regarding Mr. Diaz's drawing of a person as part of his evaluation. 37 RR 140-41.

When the prosecutor attempted to use Dr. Pinkerman's report to cross-examine him, the defense objected because the report was not in evidence. 37 RR 143. Then, when the prosecutor sought to have Dr. Pinkerman's report admitted in evidence, the defense objected that it was not the best evidence. 37 RR 144-45. After a hearing outside the jury's presence, the trial court overruled the defense's objections and admitted the report. 37 RR 150.

Thereafter, the report in hand, the prosecutor quickly turned Dr. Pinkerman into the

State's star witness, eliciting testimony that Mr. Diaz "approached the assessment in somewhat of an exaggerated manner which may reflect an inability to cooperate with the testing or malingering in an attempt to present himself with the false claim of mental illness," 37 RR 152; that Mr. Diaz denied ever having been in an automobile accident in which he suffered a head injury, 37 RR 153; and that Mr. Diaz had refused to discuss the facts of the offense based on his attorneys's advice. 37 RR 155. The defense did not attempt a redirect examination of Dr. Pinkerman, and thus the last testimony the jury heard before retiring to deliberate on punishment was the conclusion of the prosecutor's cross-examination of the defendant's expert witness.

> Q.    You said that Mr. Diaz, the defendant's profile matches those of type C offenders; is that correct?
>
> A.    Yes, sir.
>
> Q.    And you describe those as the most difficult criminal offenders?
>
> A.    Yes, sir.
>
> Q.    Distrustful, cold, irresponsible, and unstable; is that right?
>
> A.    What I wrote was, they are viewed as distrustful, cold, irresponsible, and unstable.

37 RR 156.

Defense counsel's closing argument on punishment was every bit as inept as their presentation of Dr. Pinkerman's testimony. Incredibly, the vast majority of it was devoted to rehashing the unfounded–and, obviously, already rejected–arguments put forth at guilt-

17

innocence – that the State failed to prove a robbery, 38 RR 39-45; that Mr. Shepherd murdered Mr. Nichols out of homosexual jealousy, 38 RR 46-47; and that the presence of defensive wounds on Mr. Nichols's arms cast doubt on Mr. Shepherd's testimony that Mr. Nichols was tied up when he was killed. 38 RR 47-48. Defense counsel also attempted to discredit the probative value of the extraneous-offense evidence offered by the State, 38 RR 48-51, and argued that Mr. Diaz's prison record during a previous incarceration showed that he would not be a future danger if given a life sentence. 38 RR 51-52.

Finally, counsel argued briefly, almost in passing, that mitigating evidence existed that warranted sparing Mr. Diaz's life. The totality of defense counsel's argument on this point takes up two pages of the record. He citing as mitigating that Mr. Diaz (1) was married with a five-year-old daughter and that he grew up with his grandmother; (2) had learning disabilities, and (3) had strong feelings of guilt and depression and felt that he deserved to suffer. 38 RR 52-54. Trial counsel did not argue that the circumstances of Mr. Diaz's background and upbringing mitigated against a death sentence – nor could he have, as no evidence was introduced that might have supported such an argument. Illustrative of counsel's comments are the following:

> What you are going to know by reviewing those exhibits is that the doctor determined [sic] his evaluation of Arturo, that he had learning disabilities, impairments, and said whatever you want to. Okay. And you and I know that we don't get that ourselves. We don't get that way ourselves. It is – it comes from the parents. Our genes are determined from our parents. If I am a slow learner, it is not our [sic] fault. We told you that the problem that individuals have, start from their childhood.

\*     \*     \*     \*     \*

> MR. REYES: In answering Special Issue No. 3, the answer to that question has to be yes. That's the only possible answer you can come back with when you answer Special Issue No. 3. There is a sufficient mitigating circumstance. There are reasons why Arturo Diaz should get a life sentence and not the death penalty. There is [sic] plenty of them.

38 RR 52, 54.

Defense counsel's arguments about mitigating evidence were wholly unpersuasive as well as abbreviated. In the prosecutor's final argument, he reminded the jury that "[w]e have lots of people that are raised by grandmothers. There are people who aren't as lucky who have foster parents. But we don't call that an excuse for capital murder. We don't call that a mitigating circumstance." 38 RR 63. Further, defense counsel's assertion that Mr. Diaz's cognitive disabilities were of genetic origin was not supported by the record, as Dr. Pinkerman in fact testified that Mr. Diaz "may experience cognitive impairment that could stem from prolonged alcohol or substance abuse . . . ." 37 RR 138. Finally, as to Mr. Diaz's feelings of guilt, counsel cited to Dr. Pinkerman's report, 38 RR 52-53, which he previously had attempted to have excluded. 37 RR 144-45.

### E. The appeal

Prior to trial, the defense filed a motion in limine. It asked the trial court to order, *inter alia*, "[t]hat the prosecutor not argue that the people of the community want or expect a conviction, that there is community pressure or sentiment to convict, or that the jury verdict may or may not meet with public approval." CR 139. The court granted the motion. 26 RR

19

9-10.

At the punishment phase of trial, the prosecutor argued that the jurors "are here as a duty to the community. You are acting as public servants to this community." 38 RR 55. He continued in this vein, arguing that Mr. Diaz "is not like you. You have a duty to protect the people of this county." Defense counsel objected that the argument "violates our Motion in Limine." The trial court sustained the objection and instructed the jury to disregard the comment, but denied Mr. Diaz's motion for mistrial. 38 RR 65-67.

Mr. Diaz's appellate counsel raised sixteen points of error on appeal. In addition to arguing that the evidence was factually and legally insufficient and that trial counsel had been ineffective, he also complained of the admission of hearsay testimony, the admission of an exhibit whose prejudicial effect outweighed its probative value, and the admission of evidence of gang membership. No issue of improper prosecutorial argument was made.

### PETITIONER'S GROUNDS FOR RELIEF

Mr. Diaz raises the following claims for relief:

1. Trial counsel rendered ineffective assistance with regard to the guilt-innocence phase of trial by failing to adequately investigate the State's case and fully discuss it with Mr. Diaz to ensure that his plea of not guilty was knowing and voluntary.

2. Trial counsel rendered ineffective assistance during voir dire of the jury panel by failing to preserve error regarding the exclusion of venire member Gerald Albrecht.

3. Trial counsel rendered ineffective assistance at the punishment phase of trial by (1) failing to adequately investigate and present readily available mitigating evidence, (2) failing to prepare for the only witness

offered by the defense, a psychologist whose testimony was devastating to Mr. Diaz, and (3) devoting almost their entire closing argument to repeating the defensive theory that the jury had rejected beyond a reasonable doubt at the the guilt-innocence phase of trial.

4. The trial court denied Mr. Diaz a fair punishment hearing by admitting evidence that he was a member of a gang.

5. The prosecutor infringed on Mr. Diaz's right to remain silent by eliciting testimony from his expert witness that he had refused to discuss the facts of the offense.

6. Appellate counsel rendered ineffective by failing to raise an issue as to the prosecutor's improper argument at the punishment phase of trial regarding the community's expectations.

## ARGUMENT AND AUTHORITIES

### I. Standard of Review

Under the AEDPA, a state prisoner is entitled to relief with respect to any claim that was adjudicated on the merits in State court proceedings when the adjudication

(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

The Supreme Court has "made clear that the 'unreasonable application' prong of § 2254(d)(1) permits a federal habeas court to 'grant the writ if the state court identifies the correct governing legal principle from this Court's decisions but unreasonably applies that

principle to the facts' to the facts of petitioner's case.'" *Wiggins v. Smith,* 123 S. Ct. 2527,

2534-35 (2003) (quoting *Williams v. Taylor,* 529 U.S. 362, 413 (2000)). "In other words, a

federal court may grant relief when a state court has misapplied a 'governing legal principle'

to 'a set of facts different from those of the case in which the principle was announced.'"

*Wiggins,* 123 S. Ct. at 2535 (quoting *Lockyer v. Andrade,* 123 S. Ct. 1166, 1175 (2003)).

## II.  Trial Counsel Failed To Adequately Advise Mr. Diaz Regarding the Plea Offer.

Under the familiar two-prong test of *Strickland v. Washington,* 466 U.S. 668 (1984),

a habeas corpus petitioner makes out a claim that trial counsel's representation was

constitutionally inadequate when he shows

> that counsel's performance was deficient. This requires showing that counsel
> was not functioning as the "counsel" guaranteed the defendant by the Sixth
> Amendment. Second, the defendant must show that the deficient performance
> prejudiced the defense. This requires showing that counsel's errors were so
> serious as to deprive the defendant of a fair trial, a trial whose result is reliable.

*Strickland* 466 U.S. at 687, *quoted in Williams v. Taylor,* 529 U.S. 362 at 390.

> To establish ineffectiveness, a "defendant must show that counsel's
> representation fell below an objective standard of reasonableness." To
> establish prejudice he "must show that there is a reasonable probability that,
> but for counsel's unprofessional errors, the result of the proceeding would
> have been different. A reasonable probability is a probability sufficient to
> undermine confidence in the outcome."

*Williams v. Taylor,* 529 U.S. at 390-91 (quoting *Strickland,* 466 U.S. at 688, 694).

"Prior to trial an accused is entitled to rely upon his counsel to make an independent

examination of the facts, circumstances, pleadings and laws involved and then to offer his

informed opinion as to what plea should be offered." *Van Moltke v. Gillies,* 302 U.S. 708,

721 (1948), *quoted in United States v. Day,* 969 F.2d 39, 43 (3rd Cir. 1992). Accordingly, the Supreme Court has held that a defendant who has pled guilty makes out a claim of ineffective assistance of counsel when he alleges that, but for counsel's unprofessional errors, he would have pled not guilty and insisted on going to trial. *Hill v. Lockhart,* 474 U.S. 52, 59 (1985). Conversely, ineffectiveness is demonstrated when counsel errs in advising his client to reject the government's plea offer and insist on a jury trial. *See, e.g., Turner v. Calderon,* 281 F.3d 851, 879 (9th Cir. 2002); *United States v. Faubion,* 19 F.3d 226, 228-29 (5th Cir. 1994). "[A] defendant has the right to make a reasonably informed decision whether to accept a plea offer." *United States v. Day,* 969 F.2d at 43 (citing *Hill v. Lockhart,* 474 U.S. at 56-57). The defendant's burden on such a claim is the mirror image of *Hill v. Lockhart.* He must show a reasonable probability that, had he been correctly advised, he would have accepted the plea agreement. *United States v. Faubion,* 19 F.3d at 230 n.20 (citing *United States v. Day, id.*).

Given these considerations, it cannot be gainsaid that trial counsel performs deficiently when he allows his client to plead not guilty before a jury in the face of overwhelming evidence of guilt. At a minimum, counsel should advise their client as to the strengths and weaknesses of the State's case, their proposed defensive theories, and a realistic appraisal of the jury's likely assessment of the evidence. In addition, the defendant must be told of the advantage that might be gained by pleading not guilty, whether it be a possible acquittal or, as in this case, conviction of a lesser included offense. Finally, the

defendant must be informed of the punishment to which he is exposed under the available options, as there can be no advantage in proceeding to trial without the possibility of receiving substantially lower punishment. Otherwise, the defendant–usually, as in Mr. Diaz's case, barely educated, and often mentally deficient–is deprived of the guiding hand of constitutionally effective counsel at perhaps the most critical stage of any criminal proceeding, when the choice literally is between life and death.

A decision to plead not guilty and proceed to trial is not subject to attack, obviously, when "the government offer[s] no deal" or "offers no concessions." *United States v. Faubion,* 19 F.3d at 229, 230. Likewise, such a claim will fail when the defendant "has identified nothing in the record which establishes that his guilt was so overwhelming that no reasonable attorney would have recommended against pleading 'not guilty.'" *United States v. Walder,* 2002 WL 1906205 *2 (N. D. Tex. 2002).

Neither circumstance is present here. That there was a plea offer made by the State is a matter of record. That the evidence of Mr. Diaz's guilt was overwhelming, there also can be little doubt. Trial counsel's file contains only a single page of notes that merely sets out the details of the plea offer, thus confirming Mr. Diaz's account of the abbreviated discussion that he and his attorneys had on this matter. *See* Exhibit D (affidavit of James M. Terry, Jr.). Had trial counsel taken more than fifteen minutes to discuss these matters with their client, and had they actually attempted to advise him, as was their constitutional duty, there is a reasonable probability that he would have accepted the offer. A full and frank discussion of

Mr. Diaz's alternatives would have revealed the following:

> In order to avoid a capital murder conviction, the defense had to convince the jury that Mr. Diaz did not rob Mr. Nichols.

> The defense planned to attack the robbery element of the offense by showing that Mr. Nichols's wallet was moved during the investigation of the crime scene.

> If convicted of murder, Mr. Diaz faced a range of punishment of imprisonment from five years to ninety-nine years or life. Tex. Penal Code Ann. §§ 19.02(c), 12.32(a).

> If given a sentence of life or sixty years or more, Mr. Diaz would not be parole-eligible for thirty years. Tex. Code Crim. Proc. Ann. art. 37.07 § 4(a).

Given these considerations, particularly in light of the utter insubstantiality of the proposed "no robbery" defense, the decision to plead not guilty is incomprehensible. The cautious trial judge obviously recognized as much, as he took the highly unusual step of *sua sponte* calling Mr. Diaz to the stand months after the offer had been rejected and asking him again about his decision "just simply to make sure that you understood everything that was going on." 25 RR 11. Although Mr. Diaz "concedes that he was notified of the terms of the plea bargain, he alleges that the advice that he received was so incorrect and so insufficient that it undermined his ability to make an intelligent decision . . . ." *United States v. Day,* 969 F.2d at 43. He thus "states a Sixth Amendment claim." *Id.*

In addition to deficient performance, the record also shows *Strickland* prejudice. The bottom line is that the defense rejected a deal for a life sentence and proceeded to trial hoping to convince the jury to convict of a lesser included offense that also was punishable by

25

imprisonment for life – the only benefit being a parole-eligibility date of thirty years rather than forty. Mr. Diaz has averred that if he had been fully advised, he would have accepted the State's offer instead of proceeding to trial. "My attorneys never told me that if I were convicted of murder, I could receive a life sentence and would not be eligible for parole for thirty years. If I had known that, I would have accepted the State's offer of a life sentence." Exhibit C at 2. Trial counsel's failure to fully discuss the plea offer with Mr. Diaz and advise him accordingly rendered their assistance constitutionally inadequate with regard to the guilt-innocence phase of trial.

### III. Trial Counsel Failed To Preserve Error Regarding the Exclusion of Venire Member Gerald Albrecht.

"[T]he proper standard for determining when a prospective juror may be excluded for cause because of his or her own views on capital punishment . . . is whether the juror's views would prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath." *Wainwright v. Witt,* 469 U.S. 412, 424 (1985), *quoted in McFadden v. Johnson,* 166 F.3d 757, 760 (5th Cir. 1999). Venire members may not be excused for cause if they merely "stated that they would be 'affected' by the possibility of the death penalty . . . ." *Adams v. Texas,* 448 U.S. 38, 49 (1980). To the contrary, exclusion is proper only when it is clear that the prospective juror cannot follow the law, as when he states that he would "automatically" vote against the death penalty "[r]egardless of the facts and circumstances of the case," *McFadden,* 166 F.3d at 759-60; flatly states that he could not take an "oath" to base his punishment-phase answers solely on the evidence, *Mann v. Scott,*

26

41 F.3d 968, 980-81 & n.9 (5th Cir. 1994); or repeatedly states that he could not impose the death penalty "under any circumstances." *Bell v. Lynaugh,* 828 F.2d 1085, 1092 (5th Cir. 1987).

As shown above, venire member Gerald Albrecht's responses to the trial court's questions did not evince a steadfast unwillingness or inability to follow the law at the punishment phase of trial. Instead, he testified very candidly that he "still really [didn't] know at this time" whether he could answer the special issues on punishment, knowing that a death sentence would result, because "I really don't know the depth of my religious beliefs on the issue." 20 RR 70. At no point did he state that he could never impose the death penalty under any circumstances, only that his "religious beliefs would cause [him] to lean against the death penalty." 20 RR 71. Because the record does not support the conclusion that Mr. Albrecht's views on capital punishment would prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath, he was qualified to serve on Mr. Diaz's jury.

"*Voir dire* plays a critical function in assuring the criminal defendant that his Sixth Amendment right to an impartial jury will be honored." *Rosales-Lopez v. United States,* 451 U.S. 182, 188 (1981). Thus, defense counsel's participation in voir dire is critical to ensure the defendant's right to a fair trial. And while trial counsel's actions during voir dire enjoy a strong presumption of trial strategy, "it is insufficient for counsel to simply articulate a reason for an omission of act alleged to constitute ineffective assistance of counsel. The trial

strategy itself must be objectively reasonable." *Miller v. Webb,* 385 F.3d 666, 673 (6th Cir. 2004) (internal quotation marks omitted).

It is most telling that Mr. Diaz's trial attorneys were unable to offer any strategic basis for their joining in the State's motion to exclude Mr. Albrecht. Although trial counsel furnished affidavits on state habeas review that set out their purported reasons for acquiescing in the State's challenges to various venire members, they "did not provide affidavit testimony concerning the reasons why they had decided to join in the prosecution's challenge of prospective juror Gerald Albrechtg for cause . . . ." *Ex parte Diaz,* trial court's findings and conclusions at 280. This being so, the presumption of sound strategy simply does not apply.

The decision of Mr. Diaz's trial attorneys to join in the State's motion to strike Mr. Albrecht was objectively unreasonable and constituted deficient performance. There was no countervailing strategic reason for counsel's action, as none of Mr. Albrecht's responses showed any bias or antagonism whatsoever toward the defense. Rather, he was precisely the sort of thoughtful, conscientious juror whom the defense should have sought to have seated.

## IV.    Trial Counsel Failed To Investigate and Present Mitigating Evidence .

It is a basic principle of capital sentencing jurisprudence that "evidence about the defendant's background and character is relevant because of the belief, long held by this society, that defendants who commit criminal acts that are attributable to a disadvantaged background . . . may be less culpable than defendants who have no such excuse." *Penry v.*

*Lynaugh,* 492 U.S. 302, 319 (1989), *quoted in Roberts v. Dretke,* 356 F.3d 632, 641 (5th Cir. 2004). Thus, mitigating evidence of a defendant's character or background is of constitutional dimension at the punishment phase of a capital trial because of its significance in the jury's ultimate decision whether to impose the death penalty. *Moore v. Johnson,* 194 F.3d 586, 612 (5th Cir. 1999). *See also Wiggins,* 123 S. Ct. at 2543 ("life history is part of the process of inflicting the penalty of death") (quoting *Eddings v. Oklahoma,* 455 U.S. 104, 112 (1982)).

Given the undeniable importance of mitigating evidence in a capital sentencing proceeding, counsel has an "obligation to conduct a thorough investigation of defendant's background." *Williams v. Taylor,* 529 U.S. at 396. Indeed, it is "undisputable" that counsel's investigation into potential mitigating evidence must be "reasonably substantial" as well as "independent." *Lewis v. Dretke,* 355 F.3d 364, 367 (5th Cir. 2003) (quoting *Neal v. Puckett,* 286 F.3d 230, 236 (5th Cir. 2002)). Given the crucial importance of this duty of trial counsel, "investigations into mitigating evidence should comprise efforts to discover all reasonably available mitigating evidence . . . [including evidence of] family and social history." *Wiggins v. Smith,* 123 S. Ct. at 2535-37, *quoted in Roberts v. Dretke,* 356 F.3d at 638.

> In assessing counsel's performance, we look to such factors as what counsel did to prepare for sentencing, what mitigating evidence he had accumulated, what additional leads he had, and what results he might reasonably have expected from those leads. The focus of this inquiry is not whether counsel should have presented a mitigation case, but whether the investigation supporting counsel's decision not to introduce mitigating evidence . . . *was*

> *itself unreasonable.* A limited investigation into mitigating evidence may be reasonable only if counsel has a basis for believing that further investigation would be counterproductive or futile.

*Lewis,* 355 F.3d at 367 (citations and quotations marks omitted) (quoting *Neal v. Puckett,* 286 F.3d at 236, and *Wiggins v. Smith,* 123 S. Ct. at 2536, 2537) (original emphasis).

Counsel's performance is deficient when, as in Mr. Diaz' case, "counsel's decision to limit the scope of their investigation into potential mitigation evidence" was unreasonable. *Wiggins,* 123 S. Ct. at 2535. In such instances, counsel simply are "not in a position to make a reasonable strategic choice" about whether to present evidence in mitigation of punishment. *Id.* at 2543. *See, e.g., Hamblin v. Mitchell,* 354 F.3d 482, 493 (6th Cir. 2002) (counsel ineffective where he "did not present any meaningful mitigation evidence at the sentencing phase because he was not *prepared* due to his lack of knowledge and understanding of the sentencing phase of a capital case") (original emphasis).

With regard to the prejudice prong of *Strickland* at the punishment phase of a capital trial, relief is warranted when a defendant shows "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Bell v. Cone,* 535 U.S. 685, 695 (2002), *quoted in Guy v. Cockrell,* 343 F.3d 348, 352 (5th Cir. 2003). A reviewing court should "evaluate the totality of the available mitigation evidence–both that adduced at trial, and the evidence adduced in the habeas proceeding in reweighing it against the evidence in aggravation." *Williams v. Taylor,* 529 U.S. 397-98. *Strickland* prejudice is shown when, "[h]ad the jury been able to place the petitioner's

excruciating life history on the mitigating side of the scale, there is a reasonable probability that at least one juror would have struck a different balance." *Wiggins,* 123 S. Ct. at 2543. *See also Williams v. Taylor,* 529 U.S. at 398 (prejudice prong met where available mitigating evidence "might well have influenced the jury's appraisal" of the defendant's moral culpability), *quoted in Wiggins,* 123 S. Ct. at 2544.

## A.    The uncalled witnesses

That Mr. Diaz's trial counsel performed deficiently at the punishment hearing, there can be no doubt. The defense's only punishment-phase witness, Dr. Pinkerman, was able to provide the jury with very limited information about Mr. Diaz's background and instead focused on the results of his psychological evaluation. His testimony "revealed nothing . . . of [Mr. Diaz's] life history." *Wiggins v. Smith,* 123 S. Ct. at 2536. Uncalled were numerous family members who were available and willing to offer testimony favorable to the defense – evidence about Mr. Diaz's troubled upbringing that was constitutionally mitigating because it lessened his moral culpability.

Available and willing to give mitigation testimony on Mr. Diaz's behalf were his sister, grandmother, mother, cousin and a former teacher. *See* Petitioner's Exhibits E, F, G, H, I (affidavits of Veronica Veleta, Maria Elena Camacho, Angelica Ruiz, Rosalinda Rodriguez, and Humberto Bocanegra). If called, these witnesses would have testified about Mr. Diaz's "unstable and deprived childhood," how he "grew up in extreme poverty and neglect, surrounded by family violence and instability . . . ." *Hamblin v. Mitchell,* 354 F.3d

at 490.

None of Mr. Diaz's affiants was called to testify, however, because trial counsel never even interviewed them prior to trial. Had counsel done so, they would have learned that Mr. Diaz never knew his father and that the first five years of his life were spent with his mother, Angelica, a patently unstable individual who "was constantly bringing different boyfriends over to the house. Whenever one of her boyfriends was visiting, Arturo and [his sister Veronica] had to stay in the closet and be quiet, as if [they] didn't exist." Exhibit E at 1. Mr. Diaz's mother "never had enough food for them, and many times Arturo and Veronica would come to [his grandmother's] house afraid, hungry, and tired, and tell [her] that she was not at home. When they were living with Angelica, she was always having different men in the house. Many times, [the grandmother] would go to Angelica's house and find Arturo and Veronica locked in a closet so that they would not bother Angelica when she was with her male visitors." Exhibit F at 1. "When Arturo was very young, he witnessed [his mother] have epileptic attacks on many occasions and would run with Veronica to his grandmother's house for help. Arturo would be very upset when he would see [his mother] have an attack." Exhibit G at 3-4.

When Mr. Diaz was five years old, his mother "gave" her children to their grandmother because she "couldn't stand" them any more. Exhibit E at 1. Mr. Diaz lived with nine other people in a one-bedroom house with no hot water. Exhibit E at 2. He did not have a bed and slept on the floor. His male role models were his three uncles, who "were

constantly in trouble with the law. ... Uncle Martin was convicted of theft and burglary and ... Uncle Lalo was convicted of theft, burglary, and murder while they were living there with us. Whenever the local authorities were investigating a crime in the Las Milpas area, they always came to our house first to find out whether any of them were involved." Exhibit E at 3.

Mr. Diaz always was "tormented by the thought that there must be something wrong with [him], that [his] mother had left [him] because [he was] bad. Arturo also was very sad because he never knew his father." By the time he entered junior high, Mr. Diaz was desperately seeking a positive male role model and "was starved for affection and was very eager to please – so much so that he could be easily influenced." Exhibit I. He "started drinking to ease [his] pain. Arturo also would smoke marijuana and burn himself with cigarettes to help him forget the pain inside." Exhibit H at 1. When Mr. Diaz was admitted to the hospital at age of eighteen for cigarette burns on his arms. Exhibit J.

Had trial counsel thoroughly investigated Mr. Diaz's past, they also would have learned of the physical deprivation that he suffered and the likely lasting effects it had on him. When his mother was pregnant with him, she ate only one meal a day – usually "beans, soups, and cream of wheat." Exhibit G at 2. Mr. Diaz's diet as a child was no better, as "[m]any days, all [he][ had to eat was beans and soup." Exhibit E at 2. In addition, all of the houses in which he lived during the first five years of his life contained lead paint. Exhibit G at 2-3. As a child, he ate tamarind candy from Mexico that contained lead. Exhibit F at

2, Exhibit H at 2. Exposure to lead, including that included in such candy, "causes brain damage and stunts the brain." Exhibit K at 2. *See, e.g., Campbell v. Metropolitan Property and Casualty Insurance co.,* 239 F.3d 179, 182-83 (2nd Cir. 2001) (describing how children become afflicted with lead poisoning from lead-based paint).

On state habeas review, trial counsel submitted affidavits in which they averred that even though two of Mr. Diaz's family members were present at trial, they did not want to testify, Mr. Diaz did not want them to testify, and that "[s]aid decision was based on counsel's trial strategy and after conferring with Arturo Eleazar Diaz and he being in agreement." *Ex parte Diaz,* Trial Counsel's Affidavit, Issues Nos. 84-86. Regarding (1) whether other mitigating evidence was available, (2) if so, why it was not used, and (3) why they decided to present Dr. Pinkerman's testimony, trial counsel stated that "[w]hat was presented at trial was the evidence trial attorneys had available. Said decision was based on counsel's trial strategy and after conferring with Arturo Eleazar Diaz and he being in agreement." *Id.,* Issues Nos. 87-89.

Trial counsel's averments merely beg the question, as they do not adequately address *why* there was no other evidence available to offer at the punishment hearing. Contrary to trial counsel's affidavits, Mr. Diaz swears that he did not tell his attorneys to forego the presentation of mitigating evidence. Exhibit C at 2. The state habeas court never heard Mr. Diaz's side of the story, however, as his state habeas counsel did not present it – nor could he have, as he never had any communication with Mr. Diaz, not even responding to his

client's letter inquiries, and instead simply followed trial counsel's lead in failing to conduct any investigation whatsoever into potentially mitigating evidence.

Moreover, and of greater significance, even if Mr. Diaz did so instruct his trial attorneys, they nonetheless were obligated to investigate to the extent necessary to confirm the voluntariness of his instructions. This is because "if the defendant was not competent to make those instructions then he may pursue his *Strickland* claim." *Roberts v. Dretke,* 356 F.3d at 639 (citing *Autry v. Estelle,* 722 F.2d 358, 362 (5th Cir. 1984)). "Where . . . counsel is aware of the client's history of mental problems, the reasonableness of a decision made by counsel not to investigate that history is suspect." *Id.* at 639 (citing *Bouchillon v. Collins,* 907 F.2d 589, 597 (5th Cir. 1990)). Thus, a federal habeas court's principal concern in deciding whether trial counsel exercised reasonable professional judgment, "is not whether counsel should have presented a mitigation case. Rather, we focus on whether the investigation supporting counsel's decision not to introduce evidence of [the petitioner's] background *was itself unreasonable.*" *Wiggins,* 123 S. Ct. at 2536 (original emphasis).

Dr. Pinkerman's report stated that Mr. Diaz's "responses are often similar to individuals who see themselves as dependent, ineffective, and feeling excessive guilt." Report at 5. Moreover, "Mr. Diaz is very likely to submit to abuse and intimidation when those experiences fit into his view that he deserves to suffer." *Id.* Thus, trial counsel were put on notice that there were powerful reasons to question their client's purported decision to forego the presentation of testimony about his background and upbringing. "Because

35

counsel does not know what an investigation will reveal is no reason not to conduct the investigation." *Hamblin v. Mitchell*, 354 F.3d at 492. *Accord Blanco v. Singletary*, 943 F.2d 1477, 1501-03 (11th Cir. 1991) (counsel ineffective for "latching onto" client's assertions that he did not wish to call witnesses at penalty phase and failing to conduct an investigation sufficient to allow client to make an informed decision to waive mitigation); *United States v. Gray*, 878 F.2d 702, 711 (3rd Cir. 1989) ("counsel can hardly be said to have made a strategic choice against pursuing a certain line of investigation when s/he has not yet obtained the facts on which such a decision could be made"); *Knighton v. Maggio*, 740 F.2d 1344, 1350 (5th Cir. 1984) (habeas relief warranted if record shows that "counsel could not make a valid strategic choice because he had made no investigation").

In addition, the state habeas record is silent as to just what, if anything, trial counsel discussed with Mr. Diaz before deciding not to investigate. "It is axiomatic–particularly since *Wiggins*–that such a decision cannot be credited as calculated tactics or strategy unless it is grounded in sufficient facts, resulting in turn from an investigation that is at least adequate for that purpose." *Lewis v. Dretke*, 355 F.3d at 368. Trial counsel's file contains little relating to mitigating evidence – nothing in the way of legal research or records of interviews with potential witnesses, and instead merely a few pages of handwritten notes. *See* Exhibit D. "There is no evidence in the record that counsel informed [Mr. Diaz] about the importance of mitigation to the penalty phase or the consequences of limiting the penalty phase to [Dr. Pinkerman's testimony]." *Hamblin v. Mitchell*, 354 F.3d at 492. Thus,

assuming *arguendo* that Mr. Diaz in fact instructed trial counsel that he did not wish family members to testify in his behalf, counsel's utter failure to ensure that this decision was informed and voluntary itself constitutes ineffective assistance of counsel. Counsel's claim of trial strategy is suspect, as "the 'strategic decision' . . . invoke[d] to justify counsel's limited pursuit of mitigating evidence resembles more a *post-hoc* rationalization of counsel's conduct than an accurate description of their deliberations prior to sentencing." *Wiggins,* 123 S. Ct. at 2538.

## B. Dr. Pinkerman

Inasmuch as the defense offered the jury virtually no information about Mr. Diaz that might have mitigated against the State's substantial punishment-phase evidence, there was little reason to believe that a death sentence would not be assessed. Any doubt on this score was removed when the only defense witness, Dr. Pinkerman, testified. To the extent that his vague testimony that Mr. Diaz suffered from learning disabilities was helpful, it was fully discredited on cross-examination. After suggesting that Mr. Diaz had attempted to feign mental illness and had refused to discuss the facts of the offense, Dr. Pinkerman concluded with his opinion that Mr. Diaz was among the most difficult class of criminal offenders – "distrustful, cold, irresponsible, and unstable." 37 RR 156. These were the last words of testimony that the jury heard before retiring to deliberate on punishment. One can only imagine what impact this testimony had, coming, as it did, from *the defense's expert witness*. Mr. Diaz would have been no worse off had his attorneys simply done nothing.

Trial counsel's ineptitude with regard to Dr. Pinkerman's testimony is clear. Under Rule 615 of the Texas Rules of Evidence,[3] the prosecution was entitled to examine and use Dr. Pinkerman's report in cross-examining him – which it did with devastating effect. It did not have to be that way. Had trial counsel prepared a bit more conscientiously, the prosecutor's cross-examination could have been avoided or, at the least, severely curtailed. The trial court's order appointing Dr. Pinkerman did not require him to prepare a report, and trial counsel could simply have instructed him not to. In that event, while the prosecutor might have made headway in his cross-examination of the defense's expert, he would not have had the witness's report to point the way.

Failing that, defense counsel certainly should have had pause about putting Dr. Pinkerman on the stand after having read his report. Dr. Pinkerman concluded his examination of Mr. Diaz on December 16, 1999, more than six weeks before trial. Reasonably competent trial counsel would have recognized the likely prejudice from his report and would at least have rethought the decision to use him as Mr. Diaz's only punishment-phase witness. Trial counsel had ample time to revise their punishment-phase strategy and consider utilizing other types of mitigating evidence. They could have called family members to testify or they could have sought the services of other expert witnesses.

---

[3] The rule provides, in pertinent part, as follows: "After a witness other than the defendant has testified on direct examination, the court, on motion of a party who did not call the witness, shall order the attorney for the state or the defendant and the defendant's attorney, as the case may be, to produce, for the examination and use of the moving party, any statement of the witness that is in their possession and that relates to the subject matter concerning which the witness has testified." Rule 615(a), Tex. R. Ev.

They did not, and the ensuing demolition of Dr. Pinkerman on cross-examination was the inevitable result.

## C.    The defense's closing argument

Defense counsel's final error was in devoting almost the entirety of their final punishment-phase argument to the same theory they had aired at the guilt-innocence phase – that Mr. Diaz may have committed murder, but not robbery. "When examining counsel's closing argument to determine whether it was ineffective, this Court considers the closing argument in its entirety." *Riley v. Dretke,* 339 F.3d 308, 317 (5th Cir. 2003). The Fifth Circuit has noted "that, in an appropriate capital case, counsel's decision to rely upon the jury's residual doubt about the defendant's guilt may be not only reasonable, but highly beneficial, to a capital defendant." *Moore v. Johnson,* 184 F.3d at 618 (citing *Andrews v. Collins,* 21 F.3d 612, 623 n. 21 (5th Cir. 1994)).[4] As shown above, however, "[t]his is not a residual doubt case." *Id.* There was no real issue regarding identity, and the defensive theory that Mr. Diaz did not commit robbery was ill conceived and clumsily presented. It did not carry the day at guilt-innocence, and their was scant reason to believe that it would succeed at punishment. *See Johnson v. Cockrell,* 301 F.3d 234, 240 (5th Cir. 2002) (given overwhelming evidence against defendant at the guilt-innocence phase of trial, jury was unlikely to have retained any residual doubt concerning his guilt). In sum, Mr. Diaz's case

---

[4] *Cf. United States v. Davis,* 285 F.3d 378, 384 n. 7 (5th Cir. 2002) ("we express no view regarding the correctness of the district court's ruling regarding residual doubt qualifying as a legitimate mitigating factor for the jury to consider in assessing punishment").

vividly illustrates the proposition that "because the jury must find guilt at the culpability phase beyond a reasonable doubt, a 'residual doubt' theory makes no sense." *Hamblin v. Mitchell,* 354 F.3d at 489.

Defense counsel's dilemma was that they had nothing else to argue because they had not presented any other mitigating evidence – the inevitable result of their failure to conduct the sort of investigation that is constitutionally mandated in a capital trial. They did not consult with Mr. Diaz fully enough to make an informed decision on the scope of their punishment-phase investigation, and their failure to conduct a full investigation left them with nothing else to argue, save, of course, for what was provided by Dr. Pinkerman.

The prosecutor had no such dilemma, as he had ample evidence to support his argument – much of it provided by the defense. He first defused the residual doubt argument: "Don't let defense counsel try to get you to change your verdict regarding his guilt of capital murder. That's past. You gave him a fair chance. He had his trial on that issue. The defense argues that to try to deflect you from the issues that you are here to decide, the special issues." 38 RR 56. The prosecutor relied heavily on Dr. Pinkerman's testimony as an indicator of future dangerousness, noting his conclusions that Mr. Diaz "is malingering and faking mental illness," 38 RR 59; that Mr. Diaz "never suffered any head trauma" and "was not sexually abused as a child," 38 RR 62; and asserted that Mr. Diaz "went so far as to fake mental illness because he doesn't have any problems, because he doesn't have any excuses, because there are no mitigating circumstances." 38 RR 63.